COMMONWEALTH OF MASSACHUSETTS
UNITED STATES DISTRICT COURT

C.A. NO. 04-11173 RWZ

RALPH JOSEPH d/b/a NEW BEDFORD
MARINE RESCUE,

      Plaintiff

v.

J.P. YACHTS, LLC,

      Defendant

DEFENDANT J.P. YACHTS, LLC'S
POST-TRIAL BRIEF

## I.    INTRODUCTION

Now comes the defendant J.P. Yachts, LLC ("J.P. Yachts", "defendant" or "LADY MAZIE") and hereby respectfully submits to the court its Post-Trial Brief. This brief, in company with J.P. Yachts' Requested Findings of Facts and Rulings of Law accompanying this brief, constitute J.P. Yacht's post-trial submissions. For the reasons more fully set forth in these two submissions, the defendant J.P. Yachts, LLC respectfully requests that this honorable court finds that an enforceable salvage contract was entered into, and compensates the plaintiff Ralph Joseph d/b/a New Bedford Marine Rescue ("New Bedford Marine" or "BoatUS") either under the agreed to amount of $125/hour per boat, or on a quantum meruit basis, as more fully set forth below.

## II.    BRIEF SUMMARY

In the early morning hours of September 2, 2003, the 85-foot motor yacht LADY MAZIE dragged her anchor and grounded on a beach outside the harbor of Cuttyhunk Harbor, Massachusetts. The yachts owner and captain, Joseph Prescott, called New Bedford Marine

Rescue and asked for a boat to assist.  The two agreed that the boat would be charged at the rate of $125/hour.  When the boat arrived, either its services or its operator was found to be unsatisfactory and Prescott called and asked for another boat.  The conditions under which that second boat was engaged are disputed.  The defendant says that New Bedford Marine Rescue agreed to provide the second boat under the same terms as the first.  New Bedford Marine Rescue denies this.  The defendant says that compensation for the plaintiff should therefore be calculated on the basis of contract salvage at the rate $125/hour per boat.  The plaintiff says that he is entitled to a pure salvage award under the <u>Blackwall</u> factors.

In this brief, the defendant will argue that the plaintiff has not established a legal entitlement to a pure salvage award under maritime law.  First, the plaintiff has not proven the actual existence of a marine peril, sufficient to trigger the <u>Blackwall</u> analysis.  Secondly, even if a marine peril has been established, under governing principles of admiralty law, a party is not entitled to enter into one form of salvage agreement, and later convert to the other form merely because the latter is then determined to be more lucrative.  In addition, the absence of any "no cure, no pay" arrangement between the parties precludes the findings of an entitlement to a recovery under pure salvage principles.  Finally, even if the <u>Blackwall</u> factors are employed and an analysis under them is undertaken, the facts of this case are such that only a very low order salvage could be found, with a correspondingly minimal salvage reward granted.

The defendant contends, and in this brief will argue, that the proper approach for the court to take would be to calculate the amount of recovery based on the oral contract for the first boat.  That contract could be applied to calculate the compensation due for the use of the second boat, either by extending the terms of the oral contract to the second boat, or alternatively by applying principles of *quantum meruit,* as will be more fully shown herein.

2

III.    ARGUMENT

(A)    An Enforceable Salvage Contract Was Made

(1)    An Enforceable Salvage Contract Was Offered and Accepted

It is undisputed that, at the inception of the events giving rise to this suit, New Bedford Marine offered to provide contract salvage services at the rate of $125/hour per boat and operator, T1, 83 (Prescott)[1]; T2, 66 (Joseph); and the offer was accepted by Jerry Prescott, T1, 83 (Prescott). Offer and acceptance are undisputed, and therefore a valid oral contract for marine salvage was created[2]. Flagship Marine Services Inc. d/b/a Sea Tow Services v. Belcher Towing Company et al., 1992 AMC 2901 (11th Cir., 1992) (finding enforceable salvage contract based on oral offer and acceptance).

(2)    The Towing Services Agreement Does Not Govern

The terms of the BoatUS on-the-water Towing Service Agreement (Plaintiff Exhibit 9) do not govern the parties in this case, and its obligations are not binding upon the defendant J.P. Yachts, LLC or Jerry Prescott. Although Mr. Prescott testified that he was a BoatUS member, no contract bearing his signature was proven to the court. The court is therefore left with no evidence of the express contractual obligations under which Mr. Prescott agreed to be bound, if any. When expressly asked on the witness stand whether Exhibit 9 was the effective contract covering his call to New Bedford Marine, Mr. Prescott denied it, saying

---

[1] References to the trial transcript employed in this brief, as well as the defendant's Requested Findings of Facts and Rulings of Law, will be as follows: the trial transcript for Day 1 will be referred to as "T1"; the transcript for Day 2 will be referred to as "T2". The page of the transcript will follow that citation, followed by the name of the witness testifying in parentheses, e.g. "T1, 22 (Prescott)".

[2] The amount of consideration originally agreed to was $125/hour for boat and operator, and that, too, was not in dispute. T1, 83 (Prescott); T2, 65 (Joseph). It is also undisputed that, at the conclusion of the operation, Jerry

3

that he was not calling to get the pre-paid tow, but rather because he wanted to find a reputable towing service whom he could engage by the hour to accomplish what he needed.  The burden of proving the existence of a contract and its terms is upon the one claiming rights under that contract.  The COMMANCHE, 75 U.S. 448 (1869); Kimes v. United States, 207 F. 2d 60 (2d Cir., 1953), 1953 AMC 1335; The SUSAN, 23 F. Cas. 40 (D. Mass. 1859) (No. 13, 630); Connolly v. S.S. KARINA II, 302 F. Supp. 675, 1969 AMC 1105 (E.D. N.Y. 1969).  Because the plaintiff failed to produce a copy of the Towing Services Agreement executed by, and therefore binding upon Jerry Prescott, the plaintiff failed to prove the terms of any such agreement, and therefore is not entitled to claim any benefits therefrom.

Moreover, the actual terms of the BoatUS on-the-water Towing Services Agreement (Plf. Exhibit 9) appeared to preclude application of the contract for salvage purposes in any event. The fourth paragraph in that Agreement states: "this service does not apply to…salvage, including but not limited to hard groundings, or any assistance requiring more than vessel, pumps, divers, etc…"  T2, 67 (Joseph); Plf. Exhibit 9.  This provision appears seems to exempt any salvage arrangement arrived at between the parties from the terms of the contract, and to leave the parties free to make their own private arrangements, which is in effect exactly what was done.


(B)    Plaintiff is Not Entitled to Void the Salvage Contract

The salvage contract need not be in writing, but the proof of it must be clear and explicit. Parks and Cattell, THE LAW OF TUG TOW AND PILOTAGE 1103 (3d ed., 1994 Ed.).  The burden of proving the existence of the contract and its terms is upon the one claiming the right

---

Prescott asked for his bill, but the defendant's representative, Joseph Moniz, did not give it to him. T1, 22, 79 (Joseph).

under the contract.  The COMMANCHE, 75 U.S. 448 (1869); Kimes v. United States, 207 F. 2d

60 (2d Cir., 1953), 1953 AMC 1335; The SUSAN, 23 F. Cas. 40 (D. Mass. 1859) (No. 13, 630);

Connolly v. S.S. KARINA II, 302 F. Supp. 675, 1969 AMC 1105 (E.D. N.Y. 1969).  Once the

agreement has been proved, the burden of disputing its validity is upon the disputing party.  The

THORNLEY, 98 F. 735 (5th Cir. 1899).

        The existence and the terms of the original oral contract for salvage are not in dispute.

Both parties agree that the initial offer of $125/hour for a boat and operator was made by the

plaintiff and accepted by the defendant. T1, 83 (Prescott); T2, 88 (Joseph).


        (1)     When A Party To A Salvage Operation Begins Under One Form Of Salvage, That
                Party May Not Convert The Arrangement To Another Form If It Later Appears
                More Advantageous To Do So

        It is an axiom of admiralty law that when a party to a salvage operation begins

under one form of salvage, that party may not convert the arrangement to another form if it later

appears more advantageous to do so.  BENEDICT ON ADMIRALTY v. 8, sec. 13.06 (2003

supra.); The ELFRIDA 172 U.S. 186 (1898); 2002 AMC 2982; Flagship Marine, supra, 1992

AMC 2901 (11th Cir., 1992).

        The original agreement reached between the plaintiff and defendant was one for

contract salvage.  See infra at Section III(A)(1).  Not only was the agreement properly reached

between the parties, but the plaintiff tendered contract salvage services, and the defendant

accepted such services in the form of the arrival of the first salvage boat on scene. T1, 72

(Prescott) (first salvage boat arrived at 6:53 a.m.); T2, 74 (Joseph) (Joseph sent Clinton E. Allen

in the first boat to provide contract salvage services).

        In The ELFRIDA, the plaintiff, a Galveston, Texas salvor sought to recover the

amount of $22,000 from the owners of the British steamship ELFRIDA salved by the plaintiff

following a 1894 grounding in Texas.  At first there seemed little hope of salvaging the vessel

without extensive damage and expensive.  The master therefore refused an offer of pure salvage

services, and insisted on a contract.  The salvor and master then agreed upon a fixed amount of

$22,000.  The salvor was imminently successful in freeing the vessel in a short amount of time,

with little or no damage to the vessel.  Realizing that a pure salvage agreement would therefore

been much less expensive to it, the shipowner then sought to set aside the salvage contract and to

enforce an award based upon time and effort, which would have been to its advantage.

In affirming the enforceability of the salvage contract, the Supreme Court noted

that salvage contracts are subject to many variable contingencies, such as storms, strikes, or

changes in the cost of labor.  These contingencies may make a contract unexpectedly profitable

to one party or the other, but such conditions alone are not sufficient to overturn a presumptively

valid contract. 17 US 195-6; 2002 AMC 1982, 1990-1.  The ELFRIDA is the foundation for the

salvage principle, still recognized by admiralty courts today, that a party should be bound by a

contract properly and prudently entered into regardless of the disproportion of compensation, as

viewed from hindsight. Id. at 206; 202 AMC at 2997.  In our case, the plaintiff's effort to

disavow the viable and enforceable oral salvage contract agreement, and to replace it with a pure

salvage award, is exactly the type of conduct proscribed by the Supreme Court in The

ELFRIDA.

    (2)    The Absence of A "No Cure No Pay" Term Precludes The Enforcement Of A
Pure Salvage Arrangement

The existence, or non-existence, of a "no cure, no pay" provision is one of the key

tools courts employ in determining what manner of salvage arrangement to enforce upon

disputing parties.  Flagship Marine Services Inc. d/b/a Sea Tow Services v. Belcher Towing

Company et al., 1992 AMC 2901 (11th Cir., 1992).  There was never any discussion between the parties to this suit of a "no cure, no pay" arrangement, and examination of the entire trial transcript finds no reference anywhere to any such understanding between the parties.  The absence of such an arrangement means that the enforceable arrangement between the parties must be one of contract, rather than pure salvage.

In Flagship Marine, the defendant was the owner of the tug E.N. BELCHER Jr. In July, 1989, the tug was intentionally beached along the Florida coast after its crew discovered that it was taking on water rapidly.  The plaintiff, a commercial salvage operation similar to BoatUS, the plaintiff in this case, (in Flagship Marine it was a Sea Tow franchise) was notified and arrived after the grounding.  The tug captain asked the Sea Tow representative how much Sea Tow's services would cost, and the representative said: "We'll worry about that later".  The tug captain then told Sea Town to "do whatever was necessary to save the tug."  Sea Tow had previously charged the tug owner for salvage services on a flat running rate basis.  Flagship Marine Services Inc. d/b/a Sea Tow Services, 1992 AMC at 2903.

Following a successful salvage of the tug, Sea Tow asserted a pure salvage claim; the tug owners disputed that claim saying that compensation should be determined under contract salvage principles.  The 11th Circuit agreed with the defendant tug owner because the oral exchange between the tug captain and the Sea Tow representative "created a binding agreement in which (the defendant) undertook to pay Sea Tow for its services, whether or not those services were successful" (emphasis added).  The fact that the agreement bound Belcher, the tug owner, to pay for services "whether successful or not" was cited by the court as the critical factor in denying Sea Tow's pure salvage claim, because in entering into such an

agreement, Sea Tow was no longer assuming a "no cure, no pay" risk associated with pure

voluntary salvage. <u>Id</u>. at 2906-7.

   Similarly, in our case, the plaintiff was not, by the terms of the oral agreement,

asked to incur a "no cure, no pay" "risk", typically associated with pure voluntary salvage.  The

absence of a "no cure, no pay" understanding precludes the finding of pure salvage.  <u>See</u>

<u>Flagship Marine</u>, <u>supra</u>.


   (3) <u>The Salvage Contract is Not Voidable On the Basis of Mistake</u>

   Admiralty law of salvage, as in the case with general contract law, requires that in

order to void a salvage contract, mistakes of fact must be mutual and material.  See <u>The</u>

<u>KENNEBEC</u>, 231 F. 423 (5th Cir. 1916); <u>Flores</u> v. <u>American Seafoods Co</u>. 335 F. 3d. 904, 914

(9th Cir. 2003) (admiralty court declined to void contract where mistake was unilateral, and/or

where mistake rendered results unconscionable, citing Restatement (2d.) of Contracts, Sec.153

(1981)).  Moreover, some authorities add the additional requirement that in order for a contract

to be avoided where the mistake was unilateral, the risk of unilateral mistake must not have been

assumed by the parties seeking to avoid the contract.  <u>See</u>, <u>e.g</u>. <u>Covich</u> v. <u>Chambers</u>, 37 N.E. 2d.

115, 8 Mass. App. Ct. 740 (1979) (court declined to void land purchase agreement, where

complaining parties assumed the risk of mistake).


   (a) <u>The Plaintiff's Mistake As to the Fact of LADY MAZIE's Grounding Was</u>
     <u>Unilateral</u>

   The plaintiff may not claim mutual mistake in seeking to avoid the salvage

contract.  The trial testimony of Ralph Joseph made it clear that the focal fact in determining, for

Mr. Joseph at least, the nature of his contractual relationship with the defendants was a

determination at the inception of whether LADY MAZIE was aground.  Here is Mr. Joseph's

trial testimony:

> "Q:  (By Mr. Sutherland) What are the circumstances that
> would cause you to conclude that the original contract that
> you made Mr. Prescott changed?
> A:  The situation was not as it was represented.  Either the
> situation deteriorated very rapidly…
> Q:  You mean after he called you?
> A:  From the time he called me to the time my first boat arrived
> on scene, or he drastically understated the seriousness of
> the situation.  I am not sure what the case was.
> Q:  Had he told you that his ship was hard aground, what
> would you have told him in response to his request for
> services?
> A:  <u>I would have told him that it sounds as though they were in
> a salvage situation, and we would be happy to come out
> and make an assessment and see if there was something we
> could do for him.</u>"  (T2, 84 (Joseph)).

By this testimony, the plaintiff Ralph Joseph clearly admits that his

mistake as to LADY MAZIE's grounding status at the inception was the critical fact that made a

difference between his earlier $125/hour offer of boat and operator, and the pure salvage

arrangement which he later attempted to force on the defendant.  It is undisputed that this

mistake is unilateral.  Jerry Prescott certainly knew he was aground. (T1, 48 (Prescott) (LADY

MAZIE was aground)). And he so advised Mr. Joseph in his original conversation (T1, 42

(Prescott) (Mr. Prescott told Joseph that he was aground on the beach and he wanted a vessel to

come and put a stern line to his vessel and idle until the tide comes in.)

At this point, two important points must be made in derogation of Ralph

Joseph's claim that he did not know LADY MAZIE was aground at the inception.  The first

point is that Joseph's attempt to blame Jerry Prescott (<u>See</u>, T2, 84 (Joseph) <u>supra</u>.) is clumsy,

ineffective, and unpersuasive.  That is because under cross-examination Joseph admitted that on

September 2, when he first received the call from Jerry Prescott, he then had with Mr. Prescott a

"detailed conversation" in which he was able "to ask him a lot of questions and gather a lot of information about what he was telling you." T2, 101 (Joseph). This was, in fact, a conversation which Joseph had earlier characterized in his deposition as a "twenty-question session". T2, 101 (Joseph). Moreover, Joseph admitted: that in that "20-question session" Joseph was the one asking the questions (T2, 101 (Joseph)); that Joseph was the one gathering the information (T2, 102 (Joseph)); that Joseph had the opportunity to ask Mr. Prescott questions (T2, 102 (Joseph)); that Jerry Prescott answered the questions he was asked (T2, 102 (Joseph)); that it was Joseph himself who needed the information (T2, 102 (Joseph)); and that if Joseph had a needed additional information, there was nothing from preventing him from calling Jerry Prescott back that morning and getting it (T2, 103 (Joseph). Joseph was, in short, the one who needed information, knew what information he needed, asked the questions to secure the information he needed, asked as many questions as he needed, had time to ask the questions, and had time to call back to get additional information. Incredibly, after conceding all of that, Joseph finally admitted that his failure to understand that LADY MAZIE was aground could not be blamed on Jerry Prescott because he himself never asked Mr. Prescott whether LADY MAZIE was aground.

> Q: (By Mr. Hewig) There is one problem with blaming Mr.
>     Prescott for not giving you accurate information; isn't
>     there, sir? Just one little problem; isn't there?
> A:  Is there?
> Q:  Do you know what it is, sir?
> A:  Are you going to say that I did not ask him the right
>     questions?
> Q:  Did you? You did not ask Mr. Prescott if his boat was
>     aground; did you, sir?
> A:  No, I did not.
> …
> Q:  (By Mr. Hewig, continuing) That is not fair; is it sir?  To
>     blame Mr. Prescott when you did not even ask him the
>     question; is it, sir? Not fair?

10

A:  (No response)  (T2, 104-5 (Joseph)

Clearly, to the extent that Mr. Joseph was at all mistaken about the status of LADY MAZIE's grounding, the fault was entirely his own.  He needed the information; he conducted the interview; he asked all the questions he wanted; he could have called back to ask additional questions and to obtain more information; and yet, he did not ask whether LADY MAZIE was aground.  That oversight can not with a straight face be laid at the doorstep of Mr. Prescott.  The fault for that mistake, if indeed it is a mistake at all, is that of Ralph Joseph, and of Ralph Joseph alone.

The second important point that must be made in this connection is that Ralph Joseph's trial testimony, to the effect that he did not initially know that LADY MAZIE was aground, is not credible.  That is because, on September 11, 2003, a mere nine days after the events leading to this suit, Joseph himself admitted to sending a letter to Nancy Zachariades, of the Atlantic Mutual Insurance Company, defendant's underwriters, in which he made the following statement:

> "As a result of its (sic) normal, full-time salvage/assistance patrol and salvage watch-standing activities, company resources were immediately available to respond when contacted by BoatUS dispatch, reporting the vessel LADY MAZIE had dragged anchor and run aground, and the master requested our assistance.  <u>The reporting party said that the vessel had dragged her anchor and become aground on the rocky beach north of Cutty Hunk Island jetty</u>. (Emphasis added)."  Defendant Exhibit D.

Obviously realizing that this factually-detailed and far more proximate version of events would create problems for his credibility, Joseph tied himself in knots at trial attempting to explain this letter away: (1) It was a summation of the facts (T2, 68 (Joseph); (2) The letter was a "bad letter" (T2, 68 (Joseph)); (3) the letter was "a –form letter" (T2, 68

(Joseph));  (4) the letter was "one of several templates that are in my word processor.  You pick the one that suits the situation, highlight the name of the boat and change it." (T2, 68 (Joseph); (5) "the facts were correct, but not necessarily in order" (T2, 68 (Joseph)); (6) "the letter was intended as a settlement letter to introduce the company and to open the claim" (T2, 68 (Joseph)).  None of these flimsy excuses were persuasive.  On cross-examination, Joseph admitted, as he had to, that: (1) the letter clearly contradicts his trial testimony that he was not told that LADY MAZIE had run aground (T2, 90 (Joseph)); (2) the signature on the letter is his and he did sign the letter (T2, 90 (Joseph)); and, most incredibly of all, (3) that it had been his custom at the time to send settlement demand letters to insurance companies in which he had not accurately verified the facts (to put it somewhat mildly and politely) (T2, 92 (Joseph)).  In all probability, Joseph's September 11, 2003 letter (Defendant Exhibit B) is completely true.  It was written but nine days after the events; it was written prior to the instigation of litigation and prior to Joseph's acquaintance with the defendant's primary defense of contract salvage; and, unlike his later trial testimony, the fact as of that date had no self-serving purpose, whereas denying that fact at the time of trial did have the self-serving benefit, extremely important to Joseph in hindsight, of establishing his challenge and defense to the defendant's contract salvage argument. See, T2, 84 (Joseph) (where Joseph admitted under examination from his own attorney that, had he been told that LADY MAZIE was aground he:

> "would have told him (Jerry Prescott) that it sounds as though they were in a salvage situation, and we would be happy to come out and make an assessment and see if there was something we could do for him."

The truth is that Jerry Prescott told Ralph Joseph, in his initial conversation, that LADY MAZIE was aground. Jerry Prescott testified to that with complete credibility, and with no ulterior or self-serving motivation for doing so. T1, 42 (Prescott) (Mr.

Prescott told Mr. Joseph in the first conversation that he was aground on the beach, and he wanted to a vessel to come put a stern line to LADY MAZIE and idle until the tide came in.) Ralph Joseph admitted as much in his letter of September 11, 2003. (Def. Exhibit D).

Any mistake of fact as to LADY MAZIE's grounding was a unilateral mistake made solely by Ralph Joseph. His attempts to blame that mistake on Jerry Prescott are completely ineffective, and in fact his assertion that he was not told of LADY MAZIE's grounding at the outset is completely without credibility[3], and must not be credited by this court. To be a mutual mistake, the mistake must have been made by both parties at the time of inception as to a basis assumption, which has a material effect on the agreed performance. Covich v. Chambers, 37 N.E. 2d. 115, 8 Mass. App. Ct. 740, 749 (1979).

(b)    The Plaintiff Assumed the Risk of Unilateral Mistake

As discussed in greater detail above, it was Ralph Joseph who conducted and controlled the initial telephone interview with Jerry Prescott on September 2, 2003. Joseph admitted at trial that he had a detailed conversation with Jerry Prescott, that he had earlier referred to the conversation as a "twenty-question session", that it was Joseph himself who was asking the questions and gathering the information, that he had an opportunity to ask his questions and that Jerry Prescott answered the questions that were asked, that it was Joseph who knew what information he needed to get from Prescott, and that had he needed to get additional

---

[3] Joseph's trial testimony also snared him in the web of another attempted deception. He earlier testified that Mr. Prescott was "vague about the name of his insurer." That testimony was quickly discredited when Mr. Joseph was presented with Defendant's Exhibit B, the letter which he himself had signed and sent to the defendant's underwriter, by name, a mere nine days after the incident itself. Confronted with that letter, Joseph had to admit that, vague or not, it did not take him much time to find out the name of Mr. Prescott's insurance company, and sent them his $350,000 "invoice". T2, 100-1 (Joseph).

information there was nothing preventing him from calling back and getting it.  See, generally, T2, 101-3 (Joseph).

In Covich v. Chambers, the purchaser of land for a real estate development later sought to cancel a note and mortgage given to finance the purchase on the ground of mutual mistake or fraud based on error in calculating land areas conveyed by the deed, and also based on flawed assumptions about water table and gravel removal permits which would have been necessary to develop the property.  The court considered the status of the parties and determined that, as a real estate developer, the plaintiff, the party seeking to void the contract, was a professional development expert; that it was he who had approached the defendant for the purchase, and had pursued the sale; that he more than the defendant knew of the importance of water table tests and gravel removal; and that as a professional, he could have written into the Purchase and Sale Agreements pre-conditions keyed to water table and gravel removal pre-requisites. Id. at 750-1.  Based on those facts, the court found that it was the plaintiff who assumed the risk of factual mistake. "A party bears the risk of mistake when…he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates, but treats his limited knowledge as sufficient." Id. at 749 (citing R. 2d, Contracts, Section 296).

In our case, Ralph Joseph, the professional salvor, is in the same situation as was the professional developer in Covich.  As in Covich, Joseph was the professional who was aware at the time of the initial phone conversation that "he had only limited knowledge with respect to the facts with which the mistake relate, but treated his limited knowledge as sufficient.".  Joseph could and should have asked whether, in the circumstances related, LADY MAZIE was aground.  In failing to do so, he treated the limited knowledge he had gathered as

sufficient.  In failing to ask whether LADY MAZIE was aground, Joseph assumed the risk of

unilateral mistake. <u>Id.</u>  Because Joseph assumed the risk of unilateral mistake, he is in no

position to ask this court to void the original contract he made with Jerry Prescott. <u>Id.</u>  Because

the mistake for which he assumed the risk was mutual and material, admiralty law will not

recognize his attempt to void the salvage contract.  <u>The KENNEBEC</u>, 231 F. 423 (5th Cir. 1916).


(c)    <u>Enforcing the Original Salvage Contract Would Not Be Unconscionable</u>

Enforcing the original salvage contract agreement, reached between the

parties at the time of the first telephone conversation, would be a completely fair and just result

for all parties.  The quoted price of $125/hour, for boat and operator, was a price determined

entirely by Ralph Joseph.  As such, it is a price which is both presumptively fair, and sufficient

to cover his costs for the services offered.

The services requested and the service ultimately provided were

essentially the same – towing service only.  Mr. Prescott testified that in his first call to Ralph

Joseph he asked for a vessel to come and put a stern line to his vessel and idle until the tide came

in. T1, 42 (Prescott).  Prescott told Joseph that the wind was gusting up to 20 knots and

Northeast to East. T1, 42 (Prescott).  He also told Joseph that LADY MAZIE had anchored 300

yards from the shore.  All of those facts were essentially admitted by the plaintiff at trial.  Ralph

Joseph admitted that Prescott had advised that his anchor had dragged, and that he needed a boat

to keep his stern from going on the beach. T2, 65 (Joseph).  The wind condition, too, was

essentially admitted by the defendant.  Clinton E Allen, the operator of the first boat on scene,

admitted that he did not know what the wind speed was.  T1, 131 (Allen).  Joseph Moniz, the

operator of the second boat on the scene, admitted that winds were blowing 15-20 knots from the

northeast. T2, 10 (Moniz).  When the first boat arrived, after some preliminary difficulties, it

eventually succeeded in doing what Mr. Prescott had asked, and what Ralph Joseph had agreed

to do.  It put a line on LADY MAZIE's stern, and held it until the tide came in. T1, 140 (Allen)

(Allen kept a strain on his line to keep LADY MAZIE from going further on the beach.)

Presumably, if only one boat had been used, this service, which was exactly the service asked for

and provided, would have been worth $125/hour, the price set by the plaintiff.  The second boat

arrived on the scene, and provided exactly the same service.  A line was secured to LADY

MAZIE's stern, and the boat maneuvered to keep a strain on the line until the tide came in. T2,

15; 18-9 (Moniz) (when he arrived, Joseph Moniz set his line into LADY MAZIE's tender, took

a position at about the same distance as Allen and held the line trying to keep LADY MAZIE in

position.)  Since the services provided by the second boat were identical to that provided by the

first boat, and since the services provided were identical to that requested by Jerry Prescott, and

offered (with respect to the first boat at least) by Ralph Joseph, presumably the $125/hour figure,

set by Ralph Joseph, would also be fair compensation for the second boat as well.[4]

       The fact that both boats were used for exactly the service requested

compels the conclusion that the rates set by Ralph Joseph, for the services requested, was a fair,

and not an unconscionable rate.  In fact, there was little or no salvage component to any service

provided by New Bedford Marine on September 2, 2003.  That fact was admitted by every

plaintiff witness who testified at trial.  Clinton E. Allen, the operator of the first boat that arrived

on scene, admitted on cross-examination that the only materials used were two boats and two

hawsers or ropes.  Allen further admitted that none of the special salvage equipment (gas

---

[4] Jerry Prescott testified at trial that Joseph offered him the second boat at the same rate of $125/hour.  T1, 85 (Prescott).  At trial, Joseph denied this.  T2, 79, 84 (Joseph) (Jerry Prescott asked for an invoice based on the $125/hour figure, but Joseph would not agree to that arrangement.)

dewatering pumps, electric dewatering pumps, plugs, mats, patching materials, first aid kits, or pollution control or abatement materials) carried aboard his boat needed to be used on September 2, 2003. T1, 166-7 (Allen).  Joseph Moniz, the operator of the second boat that arrived on scene, admitted the same thing under cross-examination. T2, 44-5 (Moniz). And, in his turn, Ralph Joseph also had to admit to the same thing on his cross-examination: two boats, two hawsers and two operators were all that were used; there was no occasion to use pumps, patching materials, collision materials, or pollution materials. T2, 86 (Joseph).  The sum and substance of all the services provided by the plaintiff were, in fact, nothing more than what had been expressly and concisely requested by Jerry Prescott, and agreed to be provided by Ralph Joseph, multiplied by two. What would have been fair compensation by one boat providing those services would be equally fair for the second boat.

On cross-examination, Joseph testified that the first boat was engaged from 6:00 a.m. to 6:00 p.m. for approximately 12 hours, and that the second boat was engaged from 7:00 a.m. until 6:00 p.m., at approximately 11 hours, for a total of 23 hours.  Fair compensation for the use of those two boats, at the rate set by Ralph Joseph himself, and for precisely the services requested by Jerry Prescott and offered by Joseph, would therefore have been $125 x 23 hours = $1625.00. Compensation at the rate set by Joseph himself, and based on the express services requested and provided, can therefore hardly be said to be unconscionable. [5]  Flores v. American Seafoods Co. 335 F. 3d. 904, 914 (9th Cir. 2003) (admiralty court declined to void contract where mistake was unilateral, and/or where mistake did not render the results unconscionable, citing R.2d. Contracts, Sec. 153 (1981)).

---

[5] On September 11, 2003, nine days after he had rendered the towing services which he had initially offered at $125/hour, Joseph submitted a letter to the defendant's underwriters demanding $350,000 for the services. T2, 99 (Joseph); Defendant's Exhibit D.  That sum, for $1625 worth of boat and operator time, and 23 hours worth of towing services, would have been unconscionable.

(4)    <u>There Is No Forced Salvage</u>

Pure salvage, although sometimes called non-contractual, is in fact established by contract principles in the vast majority of circumstances.  The general rule is that there is no "forced salvage" except in certain limited circumstances.  Maritime law recognizes the right of the owner, or of the owner through his servant, the ship's master, to refuse salvage services except under certain limited circumstances: (1) when to do so would imperil participants in the common venture, including both cargo interests (<u>The ODENWALD</u>, 71 F. Supp. 314, 1947 AMC 666 (D. P. R. 1947), <u>Aff'd</u> 168 F. 2d. 47, 1948 888 AMC (1st Cir. 1948), or passengers (<u>The VEENDAM</u>, 46 F. 489 (S.D.N.Y. 1891)); (2) when the vessel is abandoned by its owner and crew (<u>The GERBEVILLER</u>, 34 F. 2d 825 (D. Mass. 1929)); or, (3) until the moment that the peril begins to destroy the vessel and threaten human lives. <u>See</u>, <u>generally</u>, Healy and Sweeney, THE LAW OF MARINE COLLISION (Cornell, 1998), 403-4.  As there is no evidence or cargo or passengers aboard the vessel whose interests are distinct from the owner Jerry Prescott, and as it is undisputed that LADY MAZIE was at no time abandoned, the only material inquiry here is therefore whether Mr. Prescott assented to a pure salvage arrangement, or alternatively, whether such an arrangement could have been forced upon him by a peril beginning to destroy his vessel and threaten the lives of those aboard.

(a)    <u>There Was No Mutual Assent to a Pure Salvage Arrangement</u>

At no time did Jerry Prescott assent to a pure salvage arrangement with New Bedford Marine.  He expressly denied that any such arrangement had been entered into, and refused to sign a salvage agreement when tendered to him at the conclusion of the operations on

September 2, 2003. T1, 92 (Prescott); T2, 79 (Joseph) (Joseph admitted being called by Jerry Prescott to say that he was not going to sign the salvage contract); T2, 29 (Moniz) (Prescott told Joseph that pure salvage was not what he had agreed to and that he would not sign the salvage contract.)  In fact, Jerry Prescott went on to testify that not only had he never assented to a pure salvage agreement, he was never told that a pure salvage situation existed, was never told that the $125/hour agreement per boat was terminated, and never assented to such termination as claimed by Ralph Joseph. T1, 92 (Prescott).  Continuing, and to the extent that Joseph's claim of a pure salvage situation was  to depend upon certain provisions of the plaintiff's 2003 annual License Service agreement, Plaintiff's Exhibit 13, Jerry Prescott also denied the following: (1) that Joseph asked him whether he was in "immediate peril"; (2) that Joseph asked him whether he needed special salvage equipment; (3) that Joseph told him that if he asked for a second boat, a salvage situation is immediately invoked; (4) that Joseph told him that under New Bedford Marine's License Service Agreement with BoatUS, if a vessel needs special salvage equipment, or if a vessel needs multiple boats, a salvage situation is immediately invoked; (5) that Joseph told him if he requested and received the services of the second boat, he would have to sign a salvage contract later; (6) that Joseph told him that the boat operator on scene had reported back to Joseph that Prescott was "in immediate peril"; and (7) that Joseph told him that if he did not want to accept a second boat under pure salvage arrangements, his choice was to find someone else to assist. T1, 94-5 (Prescott).

From all of the above, and particularly considering the fact that the limited scope of services requested by Jerry Prescott were, in fact, ultimately exactly what was provided, and also considering the fact that Prescott consistently refused to enter into any sort of salvage arrangement, including the afternoon in question when presented with a salvage contract on the

deck of his own vessel, there is no basis on which to find any form of mutual assent to a pure salvage arrangement. Attempting to impose such an arrangement after the fact would constitute forced salvage, a principle which, as noted before, is not recognized by admiralty law. See, generally, Healy and Sweeney, supra. at 404.

(b)    LADY MAZIE Was Not Being Destroyed By the Elements

The only other legally recognizable basis for forcing a pure salvage situation upon the defendants would be a finding by the court that at the moment of the tendering of the services, the peril was beginning to destroy LADY MAZIE and threaten human lives. It is undisputed that that was not the case. Jerry Prescott testified not only that LADY MAZIE was not destroyed by the elements, or ever in peril of being destroyed by the elements, but that she was in the end not even damaged by her grounding. LADY MAZIE was towed into deep water following her release, and found to have no water in her bilges, indicating no hull damage. T1, 70 (Prescott). After being towed to deeper water LADY MAZIE successfully tested her "running gear" (her propellers and rudders), with no damage. T1, 70 (Prescott). Neither Jerry Prescott, nor his captain Michael Bain, believed that LADY MAZIE was even resting on hard bottom. Michael Bain testified that when he set the second anchor after the vessel had run aground, he dragged it over approximately 75 feet of bottom, and it was slippery, but not bumpy, indicating grass but not a rocky bottom. T2, 123-4 (Bain). Jerry Prescott testified that in October, 2003, one month after the grounding, he physically examined the bottom of LADY MAZIE and saw no abrasions to the fiberglass hull, and no scrapes to the paint, both of which in his experience he would have expected to see had LADY MAZIE been sitting on rocks or a hard surface as claimed by the plaintiff. T1, 88-9 (Prescott).

20

Based on the above trial evidence, it is undisputed that LADY MAZIE was not in any immediate peril of being destroyed by the elements, or having human lives threatened. Accordingly, there is no basis under this theory to force an unconsented to pure salvage arrangement upon the defendants. See, generally, Healy and Sweeney, supra. at 403-4.

(C)     The Plaintiff Is Not Entitled To Recovery Under A Pure Salvage Theory

The defendant's opposition to the plaintiff's pure salvage claim rests on two premises. First, the defendant contends that an enforceable salvage contract was legally entered into, and that compensation should be based on the agreed upon amount. Alternatively, the defendant states that the plaintiff is not entitled to recovery under principles of pure salvage because the plaintiff has not met his burden of proving the existence of a marine peril. Finally, as will also be discussed in this section, the defendant states that even to the extent that the court may determine that the application of pure salvage principles are for some reason in order, examination of the six Blackwall factors will clearly show that this was an extremely low order salvage effort meriting only the most minimal reward.

The plaintiff has the burden of proving the three elements necessary in order to establish a valid pure salvage claim: (1) marine peril; (2) service voluntarily rendered when not required as an existing duty; and (3) success in whole or in part, or that the service rendered or contributed to such success. New Bedford Marine Rescue Inc. v. Cape Jewelers Inc., 2003 AMC at 497. The defendant does not contest issues (2) and (3). The service of New Bedford Marine was voluntary rendered and not required as an existing duty. The plaintiff did not contact New Bedford Marine pursuant to the terms of any special contractual arrangement, but only to "find a reputable towing service that (he) could engage by the hour to accomplish what (he) wanted."

T1, 61 (Prescott).  The defendant does, however, dispute that the plaintiff has met his burden of proving a marine peril.

     (1)    <u>The Plaintiff Has Failed To Prove His Burden of Establishing a Marine Peril</u>

     Admiralty courts have recognized that in determining the existence of a marine peril, the threat to a vessel does not need to be imminent, but in must be <u>probable</u> that the vessel will be damaged or destroyed without intervention.  <u>New Bedford Marine Rescue Inc</u>., <u>supra</u> at 497.  There is no evidence in our case from which the court can conclude that it was "probable" that LADY MAZIE would have been damaged or destroyed without intervention.

     Jerry Prescott testified that the weather at the time that he was awakened at 3:00 a.m. September 2, 2003 to find LADY MAZIE aground was winds northeast 15-20 knots and seas 1-2 feet.  T1, 37 (Prescott).  LADY MAZIE's position aground was around 1000 yards from Pease Ledge.  T1, 46 (Prescott).  LADY MAZIE had one anchor out from the night before. T1, 54 (Prescott).  Captain/Mate Michael Bain set a second anchor out off the starboard quarter between 200-300 feet, bearing into the direction of the winds and seas.  He set the anchor in that position for the express purpose of setting LADY MAZIE against the winds and seas and preventing it from going in closer to shore. T2, 18-23 (Bain).  When it was aground, the wind and seas were not pushing LADY MAZIE toward the rock jetty.  T1, 102 (Prescott).  At the time it was aground, the winds and seas also were not pushing LADY MAZIE toward Pease Ledge.  T1, 102 (Prescott).  Similarly, at the time it was aground, the winds and seas were not pushing LADY MAZIE towards the area marked on a chart – Plaintiff's Exhibit 21 – as "RKY", meaning rocky bottom. T1, 103 (Prescott); Plf. Exhibit 21.

     Jerry Prescott did not believe that M/Y LADY MAZIE was resting on hard, or rocky, bottom.  He believed that M/Y LADY MAZIE rested on soft bottom throughout because

when a fiberglass hull rests on rocks, gravel or ledge, you can hear a grinding sound inside the boat, and he heard none. T1, 88-9 (Prescott). Captain/Mate Michael Bain also did not believe that M/Y LADY MAZIE was aground on hard bottom. That was because when he was setting the second anchor into the winds and seas, he pulled the anchor line in by hand approximately 75 feet, until the anchor flukes "set" into the bottom, and he testified that the anchor slid along a slick or slippery bottom, rather than bumped over a rocky bottom. T2, 118-22 (Bain). While LADY MAZIE was aground, Jerry Prescott did not believe that the propellers were touching bottom, although the rudders might have been. T1, 57 (Prescott). This proved to be correct because after LADY MAZIE was towed into deep water, Jerry Prescott was able to successfully test the vessel's "running gear", meaning rudders and propellers. T1, 70 (Prescott). Similarly, after LADY MAZIE had been towed into deep water, Captain Michael Bain went below deck and found no evidence of water or leaks to the hull. T1, 70 (Prescott).

        Examination of several of the exhibits, most of them submitted by the plaintiff, further illustrates why, given LADY MAZIE's position and the existing weather, it was not "probable" that it would be damaged or destroyed. A chart showing the general vicinity of Cuttyhunk outer harbor was entered as Plaintiff's Exhibit 20. That exhibit was marked by Captain/Mate Michael Bain at his deposition showing the position of LADY MAZIE aground ("G") and the second anchor which he had set toward the northeast, in the direction of the winds and seas, marked with an "A". T2, 126 (Bain). This exhibit is the same as Defendant Exhibit E. Compare this with Defendant's Exhibit B, showing the direction of the wind and waves, and the respective anchor and grounding positions of LADY MAZIE. This exhibit was a photostat of a chart which Jerry Prescott marked up based on his personal observations of the events in question. T1, 108 (Prescott). By examining these two exhibits and comparing the respective

positions of the vessel and the wind, it is easy to see why Jerry Prescott's testimony to the effect

that the winds and seas were not pushing LADY MAZIE towards the jetty, towards Pease Ledge,

or towards the area marked "RKY" was completely correct.  Those areas, arguably, might have

posed a probability  of damage or destruction to LADY MAZIE; there is no evidence, however,

from any source, that LADY MAZIE was ever in danger of striking any of those three areas.

There is no material disagreement as to the weather conditions prevailing on

September 2, 2003.  Clinton E. Allen, the operator of the first assist boat, testified that the waves

were 2-3 feet in height, but that he did not know wind speed. T1, 131 (Allen).  The repeated

references throughout his testimony to wind speeds of 25 or 28 knots or higher (e.g. T1, 166

(Allen)) are therefore not probative of the actual wind speeds.  The wave height difference

between Allen's observations (2-3 feet) (T1, 131 (Allen)) and that of Jerry Prescott (1-2 feet)

(T1, 37 (Prescott)) are insignificant.  There is no evidence from any source that a 3 foot wave

was capable of making "probable" damage or destruction to LADY MAZIE.  The other New

Bedford Marine Rescue boat operator, Joseph Moniz, testified that seas were slightly higher (2-4

feet), but again this would hardly seem to present any probability of damage or destruction to

LADY MAZIE, a boat which was 85-feet long, 22-feet wide, and had 6 feet of freeboard, and

which had two anchors out, one of them tending into the wind. T2, 12 (Moniz).  With respect to

wind speed, Moniz consistently agreed that the winds were much lower than those claimed by

both Allen and Joseph.  Moniz fairly consistently testified that wind speeds were in the range of

15-20 knots. T2, 10-12; 38-9 (maybe even less than 15-20) (Moniz).  The testimonies of both

Ralph Joseph and Clinton E. Allen with respect to wind speed are not probative because they

simply related a claim that Jerry Prescott had earlier told them winds were blowing at 28 knots.

T2, 72 (Joseph); T1, 133 (Allen).

The actual recorded weather can be determined by examining closely Defendant's Exhibit A, the NOAA Local Climatological Data of Hourly Observations Reported from Martha Vineyard's Airport. Jerry Prescott testified that he secured these observations several days after the event. In his own hand, he indicated the times when LADY MAZIE dragged anchor, when the first assist boat arrived, the second boat arrived, and when he floated free. He read into the transcripts the times and wind speeds reflected by this weather report. T1, 99-101 (Prescott). As can be seen from examining both Exhibit A and Mr. Prescott's trial testimony, the wind speeds tended to be in the vicinity of 14-16 from about 5:00 a.m. until 10:00 when LADY MAZIE floated free. There was one observation where it reached 17 knots, at 8:53 a.m. This report is compelling and persuasive testimony that the 28 knot wind speeds claimed by Joseph and Allen simply did not occur, regardless of whether they claimed to have gotten the information from Mr. Prescott or not.

That the wind and sea conditions were also not particularly threatening on the day in question can be easily determined by examining the several "action" photographs apparently taken by Clinton E. Allen. T1, 64 (Allen); Plf. Exhibits 18 and 19. Jerry Prescott examined these photographs during the trial. He testified that the distance between LADY MAZIE's main deck and the water line is approximately 6 feet. T1, 90-1 (Prescott). In examining Exhibit 18, he testified that this photograph showed seas in the 1-2 foot range, consistent with his recollection of the weather throughout September 2, 2003. T1, 89-90 (Prescott). He also testified that he had had 30 years experience at sea, and was able to tell from the condition of the sea what the wind speeds would likely be. Again, examining Exhibit 18, he stated that it was "impossible" that winds could have been blowing 28 knots at sustained speeds, with gusts to 35 as claimed by Allen and Joseph, based on the condition of the sea portrayed in Exhibit 18. T1, 91 (Prescott).

Clearly, the photographs submitted by the plaintiff prove that the plaintiff has failed to show that weather conditions were such that they threatened LADY MAZIE with "probable" damage or destruction on September 2, 2003.

It is curious that the plaintiff, who never set foot aboard LADY MAZIE and therefore had no knowledge about the sound penetrating LADY MAZIE's hull, or about the bottom over which LADY MAZIE's anchor dragged, nonetheless insists that LADY MAZIE was aground on "cantaloupe" or "cobblestone" size rocks. T1, 136-7 (Allen). The plaintiff even introduced photographs of the shoreline (but incapable of being interpreted as to size) proportedly taken by Allen sometime after September 2, 2003. T1, 137 (Allen); Plf. Exhibit 24-5. If, as the plaintiff contends, LADY MAZIE really was aground on "cantaloupe" size rocks, then that fact would only seem to prove that the defendant's contention that LADY MAZIE was not, at any time on September 2, 2003, in any probable peril of damage or destruction. That is the case because it is indisputed that following the grounding, LADY MAZIE was hauled in October and inspected by Jerry Prescott. Mr. Prescott not only found no abrasions to the hull, he additionally found no scrapes to the paint. There was absolutely no damage to LADY MAZIE whatsoever resulting from her September 2, 2003 grounding experience. Indeed, then, had that grounding occurred on "cantaloupe-sized rocks" as the plaintiff contends, being pushed farther ashore by winds and seas coming from the northeast – in other words being pushed onto more "cantaloupe-sized rocks", cannot be seen by any exercise of logic or deduction to represent a probable threat of damage or destruction. At this point, defendant also notes that it was the testimony of New Bedford Marine's witness, Joseph Moniz, that LADY MAZIE was so close to the shore at the time he arrived on scene that he could not even maneuver his 21-foot Kencraft shallow draft boat between LADY MAZIE and the shore. T2, 13 (Moniz). This, notwithstanding

the fact that Moniz stated that he had taken the 21-foot boat specifically because it had a shallow draft. T1, 9 (Moniz). If LADY MAZIE were that far up on the shore, it is hard to understand how any additional 2-3 foot waves, or 15-20 knot winds could have pushed her any farther ashore. And even had that occurred, if, as plaintiff contends, LADY MAZIE was already resting on "cantaloupe-sized rocks", it is equally hard to understand how being pushed onto additional cantaloupe-sized rocks would have presented her with any more probable damage or destruction than it had already incurred, which as it turned out, was nothing.

        For all the reasons discussed above, the plaintiff has failed to prove a maritime peril sufficient to merit the application of pure salvage analysis. New Bedford Marine Rescue Inc., supra at 497 (plaintiff has the burden of proving a marine peril). One additional point must be made here. Jerry Prescott testified, and it was undisputed at trial, that there were other marine assistance services available to him on September 2, 2003. He had talked to other services, and had he decided not to employ New Bedford Marine, he could have called such other services for assistance. T1, 96 (Prescott).

        (2)    <u>Application of *Blackwall* Factors Proves This Was A Very Low Order Salvage</u>

        Admiralty courts have recognized that in determining a fair salvage award, it is difficult to rely on precedent because salvage cases are seldom alike. Courts have also acknowledged that it is widely recognized that admiralty courts should not calculate salvage awards by using fixed percentages in determining such awards, because there is no precise formula generally utilized by courts to determine such awards. Instead, salvage awards must be calculated on a fact-specific basis. <u>New Beford Marine Rescue Inc</u>., <u>supra</u>, at 501-2.

The six factors employed by admiralty courts in calculating a pure salvage award were set forth in THE BLACKWALL, 77 U.S. at 13-4, 202 AMC at 1814-15. Those six factors are as follows: (1) the degree of danger from which the ship was rescued; (2) post-casualty value of the property saved; (3) the risk incurred in saving the property from impending peril; (4) the promptitude, skill, and energy displayed in rendering the salvage services; (5) the value of the property employed by the salvors and the dangers to which it was exposed; and (6) the cost in terms of labor and materials expended by the salvors in rendering the services. New Bedford Marine, supra, at 502. Applying those factors to the facts of this case will illustrate more clearly and persuasively than any other argument why a pure salvage analysis should not, and indeed cannot, be applied, but to whatever extent it is, this was a low order salvage and merits only the most minimal of rewards.

(a)     The Degree of Danger From Which The Ship Was Rescued

Defendant has already analyzed what it believes to be the complete absence of any marine peril in (C)(1) supra. The defendant incorporates its discussion of that section here as evidence that the degree of danger from which LADY MAZIE was rescued was minimal, or non-existent.

(b)     Post-Casualty Value of The Property Saved

The plaintiff has the burden of proof in asserting a pure salvage claim. New Bedford Marine, supra, 2003 AMC at 497. The plaintiff entered no evidence onto the record at the time of trial of the post-casualty value of LADY MAZIE.

The only reference at all to the value of LADY MAZIE occurred at the opening testimony of Jerry Prescott, where he stated that in 2000 he purchased LADY MAZIE for "2.9". The full meaning of this number was never qualified. T1, 23 (Prescott). It is customary in salvage cases to proffer expert testimony as to post-salvage value of the vessel saved. See, e.g. Int'l Towing and Salvage Inc. v. F/V LINDSEY JEANETTE, 1999 AMC 2465, 2470 (U.S.D.C. M.D. Fla. 1998) (discussing expert opinion testimony as to post-salvage fair market value of salvaged vessel.) No such evidence was proffered at our trial.

(c)    The Risk Incurred In Saving The Property From Impending Peril

Defendants contend that the only danger presented to the two New Bedford Marine Rescue assistant boat operators was presented through their own poor handling of their boat. T1, 80 (Prescott). The risk of danger presented to the two assist boat operators is a combination of two factors: the degree of marine peril, or the danger to which the vessel was exposed, presented by the prevailing weather conditions (discussed in greater detail and incorporated herein in (C)(1) above. The second component of the risk analysis is the promptitude, skill and energy displayed by the assist boat operators; in other words, the professionalism with which they carried out their assigned tasks. For purposes of economy, defendant will incorporate its discussions of both marine peril and professionalism here to illustrate that the risk presented to the New Bedford Marine personnel was minimal, but for their own lack of experience and lack of professionalism.

(d)    The Promptitude, Skill, And Energy Displayed In Rendering The Salvage
Services

Any discussion of the professionalism of the services provided by New

Bedford Marine Rescue to LADY MAZIE on September 2, 2003 must begin with the

observation that the entire operation seemed to have been plagued by unprofessionalism, if not

outright incompetence, from beginning to end.  It is indeed fortunate, as Mr. Moniz observed

during his trial testimony, that nobody was more seriously injured.  But New Bedford Marine

Rescue cannot claim the benefit of any risk, which is the consequence of the unprofessionalism

or incompetence of its own employees.

The circus began when assistant boat operator Clinton E. Allen arrived on

scene with the simple instructions of taking a line from LADY MAZIE, heading into the winds

and seas and keeping a strain on the line, and could not carry it out. T1, 83-5 (Prescott).  It was

because Allen was having difficulty handling his boat, and continued to slack the line off that

Jerry Prescott decided to call Ralph Joseph and ask for a second boat operator.  T1, 84-5

(Prescott).  At trial, Allen even admitted his own difficulty, and then testified that eventually he

just changed course, headed into the wind and altered his engine RPMs and, that accomplished,

was able to "stay on point." T1, 142 (Allen).  One can only wonder why it took so long for a

professional salvor to discover how easy it was to keep his vessel pointed into the seas and

winds.

There were many other details which emerged at trial which strongly suggest that

both the operators and the operations were greatly lacking in professionalism and competence.

Allen did not know how to evaluate wind speeds, and proceeded into the salvage operation

without knowing what the wind speeds were. T1, 131 (Allen).  Allen admitted that he did not

know the status of the tide, a surprising admission considering the critical role the tide had in

eventually releasing LADY MAZIE. T1, 145 (Allen).  It is no wonder that Allen testified that

when he arrived on scene at about 7:00 a.m., he expected that he would have to stay there for

"the next six hours".  T1, 146 (Allen).  Had Allen bothered to consult a simple tide table, such as

the pocket size tide table his employer submitted as Plaintiff's Exhibit 5 at trial, he would

perhaps have had a more accurate idea of what lay ahead of him.

Then there is the matter of the so-called "salvage plan".  Ralph Joseph's letter of

September 11, 2003 to Atlantic Mutual Insurance Company, Defendant's Exhibit D (the truth

and credibility of which has long-since been impeached), claims that Allen, on arrival, developed

a "salvage plan".  Allen's "salvage plan" was, apparently, doing nothing more than what Jerry

Prescott had requested at the inception – taking a line from LADY MAZIE's stern and keeping a

strain on the line to keep LADY MAZIE from going farther onto the beach. T1, 140; 142-4

(Allen).  In any event, salvage plan or not, nobody from New Bedford Marine ever discussed a

"salvage plan" with Jerry Prescott who, as the owner and occupant of the vessel in its grounded

condition, would seem to have been a rather important party to any such discussion. T1, 97

(Prescott).

Similarly, there is the issue of who was in command of the "salvage" operation.

Once again, Jerry Prescott was never informed of who was in command. T1, 97 (Prescott).  That

may have been because there seems to be have been some confusion about who was in

command, as between Allen and Moniz themselves.  As far as Moniz was concerned, when he

arrived, Allen was in command of the operation. T2, 19 (Moniz).  He confirmed his

understanding of the convention that in any assist operation, the first boat on scene takes

command, and the first boat on scene was that of Allen. T2, 36 (Moniz).  But Allen never did

verbally relinquish command, and Moniz was left having to "assume" that he took command himself when Allen told LADY MAZIE to speak directly to him. T2, 38 (Moniz).  That is where the confusion began. At that point, for reasons known only to himself, Allen decided to have his own line removed from LADY MAZIE, and to leave Moniz secured with a line.  T2, 40 (Moniz). That was done, notwithstanding the fact that Allen's boat was larger and had two 130 HP engines, whereas Moniz's boat only had one 130 HP engine. T2, 40 (Moniz).  Moniz, then, had been left with the smaller boat and smaller engine to prevent LADY MAZIE  from drifting back onto the shore.  This, despite the fact that Moniz admitted that he did not even know the size of LADY MAZIE's engines. T2, 41 (Moniz). The wisdom of Allen's actions at this point are highly questionable, but even more so in light of Moniz's own admission that he had never had any prior experience dealing with groundings as a salvor for New Bedford Marine. T2, 112 (Moniz); and also, even more incredibly, that he had never before even operated the 21-foot Kencraft boat, with which he was now entrusted to stop LADY MAZIE from drifting onto the beach. T2, 412 (Moniz).

        Allen, the more experienced assist boat operator, and the one with the bigger boat and twice the horsepower and also the one who was initially in command and had never relinquished it, was now pre-occupied with bringing the line aboard his boat. T2, 40 (Moniz), while he abandoned the inexperienced Moniz.  That inexperience soon began to show.  Moniz claims that he told Prescott to "bump" LADY MAZIE in gear, to take it out, to "bump" it into reverse and then take it out. T2, 22-3 (Moniz).  Although both Moniz and Allen denied they had ever told Jerry Prescott to put LADY MAZIE's engines "in gear", it is undisputed that that, in fact, was what Prescott was told to do.  Allen said as much in his trial testimony where he said he

instructed Jerry Prescott to release his own hawser, then "go forward, neutral, reverse, neutral" before releasing the hawser to Moniz's boat. T1, 148 (Allen).

Very likely the most accurate and persuasive account of what happened is that of Jerry Prescott. He heard the instructions of the second boat to put his engines in gear with the hawser still attached, and objected to it. He considered it to be risky, but testified that the assist boat insisted that the line stay aboard as a safeguard to prevent LADY MAZIE from drifting back to the beach. Accordingly, Jerry Prescott carefully instructed the assist boat to be careful to keep the line slack, to keep it away from LADY MAZIE's screws, and that he would put the starboard engine into gear and turn slowly to port. T1, 104-5 (Prescott). Prescott then proceeded to put the starboard engine into gear at idle speed (the slowest possible speed), and began a slow turn to port, away from the shore. T1, 105-6 (Prescott).

Moniz testified that he was attempting, at the time, to back his boat down, to get the line slack, and somehow to turn himself "parallel" with LADY MAZIE. T2, 23 (Moniz). Nonetheless, and curiously, Moniz indirectly acknowledged the warning he received from Jerry Prescott. At trial, he said that he heard Prescott said "something about putting it in gear. I don't know remember what was said, but I said okay…" The next thing Moniz knew, his boat was being dragged backwards and the port side was going under the water. T2, 23 (Moniz). That was no way for the person in "command" of the salvage to conduct the operation. In fairness to Moniz, however, it must be noted that he was completely inexperienced as either a salvor, or as an operator of the boat he chose to take. Allen, the person truly in "command" of the salvage operation was, of course, taking in his line when all of this happened. It is impossible to examine the unfortunate capsizing of the small assist boat without concluding that the entire affair was riddled with unprofessionalism, inexperience and incompetence.

33

Even more compelling, the entire affair was totally unnecessary, and that fact was later admitted by New Bedford Marine Rescue employees at trial. Clinton E. Allen, the salvor in "command" of the operation, testified that the stated reason for keeping one hawser aboard LADY MAZIE while it was testing its engines was to prevent LADY MAZIE from drifting back onto the rocks again in the event that either of the engines or rudders did not work. T1, 149 (Allen). He further justified this excuse by adding "we had sustained winds of 28 knots…" That was a curious comment considering the fact that Allen had earlier admitted that he did not know what the wind conditions were, as well as the fact that Jerry Prescott and Joseph Moniz seemed to have been in agreement that winds were more like 15-20 knots, a fact confirmed by inspection of the nautical climatological data observation table (Def. Exhibit A).

Jerry Prescott correctly expressed his objections to the procedure by stating at trial that all that needed to be done was to take all lines off LADY MAZIE, stand by while it tested its engines and rudders, and if the tests did not prove satisfactory, simply get another line aboard before it drifted into difficulty. T1, 104 (Prescott). When pressed with this question on cross-examination, Allen himself had to admit that if LADY MAZIE had been taken out far enough so that it would not blow back on the beach, all lines could have been released, the assist boats could have stood by, the engines tested, and if the test was unsatisfactory, lines could have been put back aboard LADY MAZIE. T1, 169 (Allen). On cross-examination, Moniz admitted the same thing. T2, 44-5 (Moniz). Moniz also acknowledged the danger of a procedure which leaves too much room for human error. T2, 42 (Moniz). Finally, Moniz admitted that after the entire operation was over and he was back in the boat with Allen, the two of them had a conversation about no longer leaving lines on a salved boat while engines are being tested.

According to Moniz, the two of them came to the conclusion that that is a good idea because the procedure they had been following was too dangerous. T2, 42 (Moniz).

Clearly, the procedure in which a line was left aboard LADY MAZIE while engines were being tested was poorly thought out, poorly organized, dangerously executed, fraught with peril, completely unprofessional, and saddest of all, totally unnecessary. Truly professional and competent salvors could and should have known better. On the undisputed facts in this case, New Bedford Marine Rescue cannot win high marks for skill or energy displayed in rendering the salvage services.

(e)    The Value of The Property Employed By The Salvors And The Dangers To Which It Was Exposed

Defendant has already noted its contention that the dangers posed to the second assist boat, which was overturned in the ill-starred effort to prevent LADY MAZIE from drifting back onto the beach, is a danger which was presented by the unprofessionalism and incompetence of the assist boat operators themselves. As to the value of the property employed, here again the plaintiff has failed to meet his burden of proof. At trial, Ralph Josesph identified two boats employed in the assist operations of September 2, 2003. The first was an aluminum hard-bodied boat with an inflatable collar with two outboard 130 HP engines, equipped with approximately $12,000 worth of electronics. Joseph estimated that the boat had a value of "over $100,000". T2, 55-7 (Joseph). The second boat was identified as a fiberglass modified Kencraft, the value of which he estimated at between $40,000-$45,000. T2, 58 (Joseph). That boat, of course, was lost and the loss was adjusted by payment of $18,300 to New Bedford Marine by underwriters. T2, 58 (Joseph). At the trial, Joseph placed no value on any of the other

equipment which he said was used: communications, antennas and towers, radios, computer equipment, electronics, software, pumps, salvage gear, survival suits, etc. T2, 53 (Joseph).

      (f)    <u>The Cost In Terms Of Labor And Materials Expended By The Salvors In Rendering The Services</u>

Here again, the plaintiff offered no evidence as to this factor. The only evidence before the court was that the first assist boat was offered at a rate of $125/hour (T2, 88 (Joseph)), a price which, because it was set by Joseph himself, is presumably sufficient to cover the costs of the labor and materials.

In conclusion, the plaintiff has failed to meet his burden of proving entitlement to a pure salvage award. This because the plaintiff failed to prove, at the inception, the existence of a marine peril. In addition, based on the undisputed facts and factors discussed above, the danger from which LADY MAZIE was rescued was low; the risk incurred in saving the property was also low, but for the unprofessionalism and incompetence of the salvors themselves; the professionalism and skill displayed by the salvors was highly questionable; and there was very little showing made by the plaintiff of the actual value of the property employed, and no showing made of the post-casualty value of the property saved. Based on all of the foregoing, to whatever extent the plaintiff is entitled to a pure salvage award, such an award should reflect the low order salvage effort, and the poor performance by the salvors during the course of the operation.

(D)    The Court Should Calculate the Plaintiff's Compensation on Principles of Quantum Meruit

Because the plaintiff is not entitled to compensation under a pure salvage arrangement and/or because the plaintiff has failed to meet his burden of proving such entitlement under the Blackwall factors, the compensation due to the plaintiff should be calculated, either on the basis of the oral salvage contract negotiated ($125/hour), or alternatively, on the basis of the oral salvage contract for the first boat ($125/hour) and on a *quantum meruit* basis for the second boat. Sea Tow Services of Carterett County Inc. v. S/V NAUTILUS et al., 2000 AMC 799, 802-3 (N.Y. Arb. 1999) (upon failure to prove entitlement to pure salvage award, compensation on *quantum meruit* basis is appropriate.)

It was the undisputed testimony at trial that the services of both boats totaled approximately 23 hours.  At the rate of $125/hour therefore, the total award due the plaintiff is $1625.  That would apply whether compensation for the second boat is calculated pursuant to the oral contract, or whether the terms of the oral contract are applied to calculate the compensation for the second boat under principles of *quantum meruit*.  Whichever way is employed, that figure is a fair rate for compensation for services based upon the rate established by the plaintiff himself.  The rate is therefore presumptively fair and adequate to compensate the plaintiff for the costs of labor and materials.  It must be remembered that the use of two boats, their operators and their hawsers, were the only services requested by the defendant, and were essentially the only services provided by the plaintiff.

IV.    <u>CONCLUSION</u>

For all the reasons stated herein, the defendant respectfully requests that this honorable court award the plaintiff compensation for services based on the oral contract for both boats, or alternatively, the oral contract for the first boat, and *quantum meruit* for the second boat. Alternatively, if the <u>Blackwall</u> factors are analyzed for a pure salvage award, all the facts suggest that this was a low order salvage meriting only the most minimal award.

Defendant,

J.P. YACHTS, LLC

By its attorney,

/s/ William Hewig, III
William Hewig, III (BBO# 541910)
Kopelman and Paige, P.C.
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

Date:   September 23, 2005

254094/60314/0004