# BENEDICT ON ADMIRALTY

**VOLUME 8**

**DESK REFERENCE**

*Filed Through:*
**RELEASE NO. 92, December 2003**



LexisNexis™
Matthew Bender®

13-29                                   **SALVAGE**                                   § 13.06

the interlopers will be denied any reward, even if their conduct was otherwise meritorious.[71]

The last issue of distribution of a salvage award arises as between the owner of a salving vessel and its crew. Maritime courts very much sense their role in this exercise is to regard mariners as wards of the admiralty. Otherwise, the owners and masters of rescuing vessels will tend to appropriate salvage awards for themselves, while giving only a paltry bonus to the hearty and intrepid mariners who make such daring rescues even possible.[72] There is even statutory protection for seamen in this regard.[73] Nevertheless, when courts have been obliged to make an apportionment between the vessel owner and its crew, the current tendency has been to favor vessel interests, unless the nature of the personal efforts of the crew are extraordinary.[74] On occasion, courts will make special rewards to particular members of the crew (or master), and will otherwise leave the distribution among the crew to pro rata shares (based on monthly wages) or equal shares.[75]

## § 13.06  Contract Salvage

In contrast to "pure," "equitable," or "voluntary" salvage — the subject so far considered in this Chapter — contract salvage arises when a potential rescuer and the owner or master of distressed property make a written or oral contract for salvage services. When such a salvage contract is proven to be an enforceable instrument, the admiralty court is obliged to follow the terms of the contract in establishing the compensation and this precludes the court from fixing a discretionary salvage award.[1] Additionally, some salvage contract cases involve determination of whether the putative salvor breached the agreement, or otherwise failed to perform satisfactorily.[2] In the most common type of salvage contract — the "No Cure, No Pay" terms of the Lloyd's Open Form[3] — the question may arise whether there really was success within the meaning of the contract (and not under the general maritime law of equitable salvage).[4] Obviously, the admiralty court will have jurisdiction of the subject matter in a salvage dispute whether the action is one of pure salvage or contract salvage.[5]

---

[71] *See* The Blendon Hall, 1 Dods. 414, 165 Eng. Rep. 1361 (Adm. 1814) (Eng.).

[72] *See* Sonderburg v. Ocean Tow Boat Co., 22 F. Cas. 795 (C.C.D. La. 1878) (No. 13,175); Compania Galaeana, S.A. v. M/V Caribbean Mara, 565 F.2d 358, 1978 AMC 684 (5th Cir. 1978).

[73] *See* 46 U.S.C. § 10317; The Steamer Adirondack, 5 F. 213 (S.D.N.Y. 1880); Falgout Bros. Inc. v. The Pangaea, 966 F. Supp. 1143, 1146 (S.D. Ala. 1997).

[74] *See* 3A BENEDICT § 281-83.

[75] *See id.* § 284.

[1] *See* The Elfrida, 172 U.S. 186 (1898).

[2] *See* 3A BENEDICT § 179.

[3] *See id.* App. A-10 for one of the latest versions of this form agreement.

[4] *See* Bonifay v. The Paraporti, 145 F. Supp. 879 (E.D. Va. 1956).

[5] *See* The Emulous, 8 F. Cas. 704 (C.C.D. Mass. 1832) (No. 4480). *See supra* Ch. II.

§ 13.06 BENEDICT ON ADMIRALTY 13–30

The decisive issue in most contract salvage cases is a factual one of contract formation: whether a binding and enforceable instrument was concluded between the parties. Perhaps this is not surprising since the conditions giving rise to salvage contracts are rife with potential for vagueness and confusion, overreaching and unconscionability. A high level of specificity is required for a salvage contract; loose talk will not suffice, nor will anything less than "a contract to pay a given sum for the services to be rendered, or a binding arrangement to pay at all events. . . ."[6] A salvage contract must be clear, definite and explicit as to the amount of compensation and there must be a mutual understanding that the services involved are in the nature of salvage.[7] As for the authority to enter into a salvage contract, ship masters are almost always assumed to have such agency.[8] A salvage contract is often pled as an affirmative defense to a libel for voluntary salvage,[9] in which case (typically) the shipowner bears the burden of proof of demonstrating the existence of a binding contract.[10]

On the other hand, vessel owners periodically wish to divest themselves of apparent obligations under salvage contracts they have concluded. In such circumstances, they have argued that the contracts were legally unenforceable for a variety of reasons. Among the reasons that admiralty courts have rejected is that the shipowner later discovers that he has made a bad bargain and the salvor has earned a windfall profit from his deal. In the key case of *The Elfrida* those were precisely the facts: the master of the imperilled vessel, with great deliberation, entered into a salvage contract and later sought to set it aside when it became clear that the salvage services were successfully accomplished with greater ease and in less time than was originally thought possible. The Supreme Court upheld the contract.[11] The essential rule of *The Elfrida* is that a salvage contract will be upheld *unless* it was entered into collusively, by compulsion, fraudulent misrepresentations, mutual mistake of important facts, or is plainly inequitable. Collusion can occur between the master of a distressed vessel and the salvor,[12] and such would be a form of salvor misconduct that would render the services ineligible for an award.[13] As in general contract law, mistakes of fact must be *mutual* and *material* in order to void a salvage contract.[14] Salvage contracts

---

[6] The Camanche, 75 U.S. (8 Wall.) 448 (1869); Flagship Marine Servs., Inc. v. Belcher Towing Co., 966 F.2d 602 (11th Cir. 1992). *See also* The Excelsior, 123 U.S. 40 (1887).

[7] *See* Ft. Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d 137, 1969 AMC 186 (5th Cir. 1968).

[8] *See* Andrews v. Wall, 44 U.S. (3 How.) 568 (1844).

[9] *See* The Camanche, 75 U.S. (8 Wall.) 448 (1869).

[10] *See* Kimes v. United States, 207 F.2d 60, 1953 AMC 1335 (2d Cir. 1953).

[11] 172 U.S. 186 (1898).

[12] *See* Houseman v. The Schooner North Carolina, 40 U.S. (15 Pet.) 40 (1841).

[13] *See supra* § 13.04.

[14] *See* The Kennebec, 231 F. 423 (5th Cir. 1916).

procured under inequitable or compulsive circumstances, although rare,[15] have been voided.

Even where a salving vessel has concluded a salvage contract with the owners of a ship in distress, that does not preclude the salving crew from recovering as equitable salvors. If the rule were otherwise, salvage contracts would consistently oust the rights of individual seamen, a clear violation of the public policy behind salvage.[16] Crew-members may conclude their own contracts with the distressed vessel. Somewhat curiously, the crew of professional salvors are not considered protected under this rule, on the theory that they are compensated through their employer.[17] While this seems at variance with court holdings that professional salvors act "voluntarily" within the meaning of that phrase for purposes of general qualifications for an equitable salvage award,[18] the sense may be that the rights of individual professional salvors are not as likely to be disparaged by shipowners as are other mariners who serve as occasional salvors.

Lastly, it is important to recognize that contract salvors are not to be preferred over equitable salvors. All who salve property lost at sea are to be considered for a salvage award.[19] The admiralty court has an obligation to weigh the relative value of the salvage services offered by contract and equitable salvors, and to then distribute an award accordingly. To categorically prefer contract salvors over pure salvors — and consequently to deny salvage awards to pure salvors in these circumstances — would seriously undermine the carefully-wrought system of incentives that salvage law has developed. Admiralty courts have expressed concern that, where there is a definitive owner of property lost at sea, that owner may seek to favor a contract salvor and improperly seek to deny an award to a pure salvor for meritorious services rendered.[20] Pure salvors have a right to expect that their services will be seriously considered by admiralty courts, even where owners would prefer to reward contract salvors of their own choosing.[21]

## § 13.07 Historic Salvage

Within the last twenty years, "historic salvage" — sometimes more disparagingly known as "treasure salvage" — has emerged as an distinct sub-specialty among admiralty practitioners. Historic salvage refers to the identification,

---

[15] See Osal Marine Servs., Inc. v. M/V Panasea, 1993 AMC 1930 (W.D. Wash. 1992); Magnolia Petroleum Co. v. National Oil Transp. Co., 286 F. 40 (5th Cir. 1923); The Jessomene, 47 F. 903 (N.D. Cal. 1891).

[16] See Bergher v. General Petroleum Co., 242 F. 967 (N.D. Cal. 1917).

[17] See The Ocklawaha, 1964 AMC 2695 (S.D.N.Y. 1963).

[18] See supra § 13.03[B].

[19] See The Blackwall, 77 U.S. (10 Wall.) 1, 12 (1869); The Kanawha, 254 F. 762 (2d Cir. 1918); The Elmbank, 69 F. 104 (9th Cir. 1895).

[20] See Mason v. The Blaireau, 6 U.S. (2 Cranch) 240, 266–67 (1804); The Clarita and The Clara, 90 U.S. 1 (1874).

[21] See The Missouri, 17 F. Cas. 484, 488 (D. Mass. 1854) (No. 9654); The Henry Ewbank, 11 F.Cas. 1166, 1170 (C.C.D. Mass. 1833).

# THE LAW OF TUG, TOW, AND PILOTAGE

## BY ALEX L. PARKS

Late Member of the Oregon State Bar and the Bars of the United States District Court, District of Oregon; Court of Appeals, Ninth Circuit; Court of Appeals, District of Columbia; United States Supreme Court; Late Member of the Maritime Law Association of the United States; Late Associate Member of the Association of Average Adjusters of the United States; Late Adjunct Professor (Admiralty), Willamette University College of Law

*and*

## EDWARD V. CATTELL, JR.

Member of the Bars of New Jersey and Pennsylvania; United States District Courts, District of New Jersey and Eastern District of Pennsylvania; United States Courts of Appeals, Third and Fourth Circuits; and the United States Supreme Court; Member of the Maritime Law Association of the United States; Adjunct Professor (Admiralty), Widener University School of Law

### THIRD EDITION

*Associate Authors*

TOSH HAYASHI
Metcalf & Hayashi
Halifax, Nova Scotia, Canada

JONATHAN LUX
WILLIAM MARSH
Ince & Co.
London, England

DEREK R. HENTZE
Group Secretary, Caltex Australia, Limited
Sydney, Australia



CORNELL MARITIME PRESS
*Centreville, Maryland*
Case 1:04-cv-11173-MBB   Document 18-2   Filed 09/26/2005   Page 5 of 9

which apparently left little hope of saving the vessel without very serious damage. A salvor offered to attempt to free the vessel for whatever the court would award him. The offer was refused. Bids were invited and the salvor who first tendered his services was the low bidder. The contract agreed upon called for the vessel to be refloated and placed in a safe anchorage and the job to be completed in twenty-one days. The sum agreed upon was $22,000—the amount bid—which was about one-fourth its value. The salvor was eminently successful, freeing the vessel in two or three days. The amount was not paid and the salvor libelled the vessel *in rem*. The owners in defense alleged mutual mistake of fact, with the salvor taking advantage of the master's mistake as to the nature of the services required; that the parties were not on equal footing; and that the salvor had made an unreasonable bargain. The district court awarded the full sum; the court of appeal reduced it by one-half; the Supreme Court reinstated the full amount. Justice Brown set forth the following principles which rather succinctly state the law of contract salvage:

(1) Where the agreed upon compensation is dependent upon success, and particularly success within a limited time, the award may be very much larger than a mere *quantum meruit*;

(2) Such contracts will not be set aside unless corruptly entered into, or made under fraudulent representations, a clear mistake, or suppression of important facts, in immediate danger to the ship, or under other circumstances amounting to compulsion, or when their enforcement would be contrary to equity and good conscience;

(3) It is not within the discretion of the courts to set aside salvage contracts in all cases where, after the service is performed, the stipulated compensation appears to be unreasonable;

(4) A salvage contract is not objectionable when prudently entered into, upon the ground that it may result more or less favorably to the parties interested than was anticipated when the contract was made;

(5) Where no such circumstances exist as amount to a moral compulsion, such a contract will not be set aside simply because the price agreed to be paid turned out to be much greater than the services were actually worth; the presumptions are in favor of the validity of the contract;

(6) When, at the time the contract was made, the price agreed upon appeared to be just and reasonable in view of the value of the property at stake, the danger from which it was to be rescued, the risk to the salvors and the salving property, the time and labor probably necessary to effect the salvage, and the contingency of losing all in case of failure, the sum ought not to be reduced by an

unexpected success in accomplishing the work, unless the compensation for the work actually done is grossly exorbitant.[4]

The English and Commonwealth cases are in full accord. See *Akerblom v. Price*, (1881) 7 Q.B.D. 129 (C.A.); the *Mark Lane*, (1890) 15 P.D. 135; the *Port Caledonia and the Anna*, [1903] P. 184; the *Henry*, (1851) 15 Jur. 183; the *Cruz V.*, (1862) Lush. 583; the *Kingalock*, (1854) 1 Spinks E. & A. 263; the *Amerique*, (1874) L.R. 6 P.C. 468; the *Generous*, (1868) L.R. 2 A. & E. 57; the *Strathgarry*, *Crusader*, [1907] P. 15; the *Phantom*, (1866) L.R. 1 A. & E. 58; the *Strathgarry*, [1895] P. 264; the *Inna*, [1938] P. 148; the *True Blue*, (1843) 2 W.Rob. 176; the *Silver Bullion*, (1854) 2 Spinks E. & A. 70; the *MacGregor Laird*, [1867] W.N. 308; *Connolly v. the Dracona*, (1896) 5 Ex. C.R. 146, *aff'd*, 5 Ex. C.R. 207 (Can.); *Pearce v. Letherby*, (1905) 6 O.W.R. 77, *aff'd*, 6 O.W.R. 606 (Can.) In *North Star Marine Salvage Ltd. v. the B.C. Adventure*, [1973] F.C. 50, 36 D.L.R. (3d) 136 (F.C.T.D.), a salvage agreement which required payment whether salvage was successful or not was upheld.

Although the contract need not be in writing, nonetheless proof of it must be clear and explicit. The *Graces*, (1844) 2 W.Rob. 294. The burden of proving the existence of the contract and its terms is upon the one claiming a right under the contract . . . usually the salvor. The *Comanche*, 75 U.S. 448, (1869); *Kimes v. United States*, 1953 AMC 1335, 207 F.2d 60 (2d Cir. 1953); *Lago Oil & Transport Co., Ltd. v. United States*; *Sears v. American Producer*, 1972 AMC 1647 (N.D. Cal. 1972); the *Susan*, 23 F. Cas. 440 (D. Mass. 1859) (No. 13,630); the *Olockson*, 281 F. 690 (5th Cir. 1922); *Conolly v. S.S. Karina II*, 1969 AMC 1105, 302 F. Supp. 675 (E.D.N.Y. 1969); *Staples v. Ace Builders*, 1959 AMC 1359, 262 F.2d 295 (2d Cir. 1959); the *Viscount*, [1966] 1 L.l.L.Rep. 328. Once the agreement has been proved, the burden of disputing its validity is upon the one so alleging. The *Helen and George*, (1858) Swab. 368; *Akerblom v. Price*; the *Elfrida*; the *Thornley*, 98 F. 735 (5th Cir. 1899).

See *Leader Marine Co., S.A., Lim. Procs., M/V Nevera*, 1982 AMC 2068 (N.D. Cal. 1981), where the owner of a vessel which answered a sinking ship's SOS call and rescued its crew was held entitled to recover $1,500 in diversion expenses from the sinking vessel's owner. It will be observed that this is an instance of life salvage where no property was salved, as was the case in *Peninsula & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.*, 1977 AMC 283, 553 F.2d 830 (2d Cir. 1977).

---

4. See also the *Emulous*, 8 F. Cas. 704 (C.C.D. Mass. 1832) (No. 4,480); the *North Carolina*, 40 U.S. 15 (1841) (settlement fraudulently made); the *Clandeboye*, 70 F. 631 (4th Cir. 1895) (fraud); *Crary v. the El Dorado*, 6 F. Cas. 765 (S.D.N.Y. 1856); the *Clotilde*, 5 F. Cas. 1075 (D. Me. 1872) (No. 2,903) (mutual mistake); the *Sirius*, 57 F. 851 (9th Cir. 1893) (compulsion); the *Magnolia Petroleum v. National Oil Transport Co.*, 1923 AMC 248, 286 F. 40 (5th Cir. 1923) (compulsion); the *Jessomene*, 47 F. 903 (N.D. Cal. 1891) (compulsion).

# THE LAW OF MARINE COLLISION

by Nicholas J. Healy
Adjunct Professor of Law, New York University

and

Joseph C. Sweeney
John D. Calamari Distinguished Professor of Law, Fordham University

(1998)



CORNELL MARITIME PRESS
Centreville, Maryland

The *Stockholm* in dry dock after her collision with the *Andrea Doria*, July 25, 1956.

4. Success: the salvor's efforts—whether singly or jointly with others[24] must save all or part of the venture, i.e., the vessel, cargo, and freight (if at risk.)[25]

### Section B. Property Rights of the Salved Vessel Owner; Consequences of Abandonment

Salvage law enforces the property rights of owners of salved vessels, while at the same time ensuring a fair reward to the successful salvor. Thus, one purpose of the tradition that the master should be the last person to abandon a foundering vessel is to protect the owners' right to refuse salvage offers in order to seek more favorable towage or contract salvage terms.[26] But the owner's right to risk the vessel by refusing salvage must give way before the rights of other participants in the common venture, including the cargo interests.[27]

---

2. Marine peril: there must be some kind of danger[20] to the vessel,[21] or her cargo,[22] or both, from the natural or artificial actions of the seas, winds, waves, or nearness of the shore.

3. Voluntariness: the salvor or salvors must owe no legal duty[23] to perform the service.

---

20. See *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel (La Nuestra Señora de Atocha)*, 569 F.2d 330, 1978 AMC 1404 (5th Cir. 1978), in which the government contested plaintiff's salvage claim on the ground that no marine peril then existed respecting the wreck of a Spanish treasure ship sunk in a hurricane off the Marquesas Keys of Florida in 1622. The court rejected this argument, holding that the wreck was still in peril of being lost through the actions of the elements, noting, "Marine peril includes more than the threat of storm, fire or piracy to a vessel in navigation." Cf. *Klein v. Unidentified Vessel*, 758 F.2d 1511, 1985 AMC 2970 (11th Cir. 1985). See also *Platoro Limited, Inc. v. Unidentified Remains of a Vessel*, 695 F.2d 893, 1984 AMC 2288 (5th Cir. 1983), involving another Spanish treasure ship sunk in a hurricane off the Texas coast in 1555; *Martkakis v. The Volendam*, 486 F. Supp. 1103, 1980 AMC 915 (SDNY 1980), where the master and crew of the *Monarch Sun* were allowed salvage claims against the *Monarch Star*, of the same ownership, when the latter vessel lost power and drifted; *Fort Myers Shell and Dredging Co. v. The Barge NBC 512*, 404 F.2d 137, 1969 AMC 186 (5th Cir. 1968), where the court took into consideration the possibility of stranding after a towing hawser had parted. In *The Benison*, 36 F. 793 (SDNY 1888), following a collision, the bow and stem of the *Benison* were carried away to the collision bulkhead, which was in danger of giving way; thus, although the sea was calm, the towage by the salving steamship was perilous.

21. *Wiggins v. 1,100 Tons, More or Less, of Italian Marble*, 186 F. Supp. 452, 1960 AMC 1774 (ED Va. 1960); *St. Paul Marine Transport Co. v. Cerro Sales Corp.*, 312 F. Supp. 338 (D Hawaii 1970).

22. *The Gerbeviller*, 34 F.2d 825 (D Mass. 1929); *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333 (2d Cir. 1983); *Flagship Marine Services, Inc. v. Belcher Towing Co.*, 761 F. Supp. 793, 1992 AMC 181 (SD Fla. 1991), rev'd on other grounds, 966 F.2d 602, 1992 AMC 2901 (11th Cir. 1992); *Taylor v. 42 Foot Egg Harbor Hull*, supra note 19.

23. *The Clarita and The Clara*, supra note 16. See generally, *The Fisher's Hill*, 218 F.2d 631, 1955 AMC 697 (2d Cir. 1955); *Clifford v. The Islander*, 751 F.2d 1, 1985 AMC 1855 (1st Cir. 1984); *Nunley v. The Dauntless Colocotronis*, 863 F.2d 1190, 1993 AMC 1676 (5th Cir. 1989), on defendant's burden of proof.

Nonvoluntariness is clearest where municipal firemen of the jurisdiction where the ship is located perform the services. See, e.g., *Firemen's Charitable Association v. Ross*, 60 F. 456 (5th Cir. 1893). But when volunteer firemen put out a fire originating outside their jurisdiction, salvage may be awarded. *Bowers v. The European*, 44 F. 484 (SD Fla. 1890).

The voluntariness issue respecting crew members of the salved vessel turns on the permanent duty relationship owed to the vessel. Theoretically, when the order "abandon ship" is given, the relationship terminates. See *The Georgiana*, 245 F. 321 (1st Cir. 1917); *Baretich v. United States*, 97 F. Supp. 600, 1951 AMC 1812 (SDNY 1951). However, case law does not fully support such a facile distinction. In *Bertel v. Panama Transport Co.*, 202 F.2d 247, 1953 AMC 471 (2d Cir. 1953), during a fire on board an oil tanker, the master ordered "abandon ship" but plaintiffs, who were in the engine room, did not hear the order, remained at their posts, and then extinguished the fire. Their salvage claims were denied, as their duty to the ship had not ended with the master's order, which was construed as one for a mere temporary abandonment to save lives, rather than a permanent abandonment which would terminate the relationship. See also *The Matt W. Ransom*, 58 F. Supp. 1008, 1945 AMC 254 (D Md. 1945); and *Lavall v. United States*, 92 F. Supp. 532, 1950 AMC 1016 (SDNY 1950).

No similar duty to the ship rests on passengers, but the duty of self-preservation will result in the denial of salvage claims where the acts do not amount to extraordinary services to save the ship. *The Connemara*, 108 U.S. 352 (1883). For an example of extraordinary services, see *Toule v. The Great Eastern*, 24 F. Cas. 25 (No. 14, 110) (SDNY 1864).

There is a policy against recovery of salvage by U.S. Coast Guard personnel, even though search and rescue is not mandatory. No such policy inhibits recovery by U.S. Navy or U.S. Air Force personnel. See *United States v. Amoco Co. (The Amoco Virginia)*, 417 F.2d 164, 1969 AMC 1761 (5th Cir. 1969). See also *In re Sun Oil Co.*, 342 F. Supp. 976, 1972 AMC 2258 (SDNY 1972), aff'd, 474 F.2d 1048, 1973 AMC 572 (2d Cir. 1973). As a result of collision, the bow of the *Maumee Sun* became embedded in the hull of the *American Pilot*, whose master ordered the two ships to be lashed together until removal of the oil cargo of the *Maumee Sun*. The *American Pilot*'s officers and crew filed salvage claims against the *Maumee Sun*, which were rejected, as the services were found not voluntary, in partial reliance on the Stand-By Act, 33 U.S.C. former §§ 367-68 (now repealed and replaced), but also relying on the idea that the alleged salvors were guaranteeing their own safety as well as the safety of the *Maumee Sun* by the lashings ordered by her master.

24. *The Blackwall*, supra note 16; *The Sabine*, supra note 11; *B.V. Bureau Wijsmuller v. United States*, supra note 22; *Reynolds v. The Tug Patrice McAllister*, 572 F. Supp. 1131, 1984 AMC 1303 (SDNY 1983); *Flagship Marine Services, Inc. v. Belcher Towing Co.*, supra note 22. Unsuccessful efforts are not penalized unless damage is caused by gross negligence or willful misconduct generally, *In re Amoco Cadiz*, 1984 AMC 2123 (ND Ill. 1984); and *Allseas Maritime S.A. v. The Mimosa*, supra note 16.

25. *In re Sincere Navigation Corp.*, 327 F. Supp. 1024, 1971 AMC 2270 (ED La. 1971); *In re Ta Chi Navigation (Panama) Corp. S.A.*, supra note 12; *Faneuil Advisors, Inc. v. The Sea Hawk*, 50 F.3d 88, 1995 AMC 1504 (1st Cir. 1995), where salvage lien priority over a preferred ship mortgage was denied on an abandoned vessel in state custody, secured to a pier but not in danger of sinking.

26. See *The J.C. Pfluger*, 109 F. 93 (ND Cal. 1901); *Squires v. The Ionian Leader*, supra note 16; *In re Ta Chi Navigation (Panama) Corp., S.A.*, supra note 12, a Greek flag steamship began to tow a burning Liberian vessel which had been abandoned by her crew, against the wishes of the owner, who had already retained a professional salvor's services. The owner obtained a court order for the surrender of the vessel to the professional salvor, and the steamship owner's salvage claim was denied. See also *Grauwiller v. King*, 131 F. Supp. 630, 1955 AMC 1236 (EDNY 1955), aff'd, 229 F.2d 153, 1956 AMC 319 (2d Cir. 1956).

27. *The Odenwald*, 71 F. Supp. 314, 1947 AMC 666 (D P.R. 1947), aff'd, 168 F.2d 47, 1948 AMC 888 (1st Cir. 1948). A U.S. Navy crew was awarded salvage for salving a German commerce raider scuttled by her crew, despite the general policy of the U.S. Navy not to press salvage claims. While the German government might have approved the deliberate action of the crew during the "neutrality patrol" period before the United States entered the Second World War, the court could not ignore the rights of cargo owners and the Swiss mortgagee in the vessel, which carried commercial cargo. (Since the United States was not yet in the war, the U.S. Navy could not take the vessel as a prize. However, the salvage libel had the effect of immobilizing the ship for the duration of the war.)

crew,[28] and passengers.[29] As long as the shipowner is in actual or constructive possession of the vessel through the master, officers, and crew, he can control any salvage problems that may arise.[30] Thus, there can be no forced salvage of the vessel until the moment the peril begins to destroy her and threaten human lives. The law has never required acceptance of salvage service by the shipowner under all circumstances. But when the vessel is abandoned in fact, any salvor may attempt to rescue her from peril.[31] This effective abandonment is considered as occurring at the time when no reasonably prudent person would refuse salvage.[32]

Abandonment, however, is of two types: (1) a temporary abandonment ordered by the master or other person in charge of the vessel for the safety of life, as in a fire at sea which appears to be out of control[33], and (2) a permanent abandonment, as when the shipowner expressly or implicitly relinquishes title to the vessel.[34] After a physical abandonment of the vessel by master, officers, and crew, the owner may seek contract salvage (or towage).

If the cost of salvage and repairs would exceed the vessel's value when repaired, under the usual hull policy forms the owner may tender abandonment of title to the vessel to the hull underwriters as a constructive total loss.[35] It should be noted, however, that the permanent abandonment of a vessel in the navigable waters of the United States will not terminate the owner's obligations under the Wreck Act,[36] which are to mark the wreck with a buoy or

---

beacon during the day and a lantern at night[37] until removal by the owner[38] or by the U.S. government at the expense of the owner.[39]

Abandonment of title by the shipowner, or by the hull underwriters if title has been properly abandoned to them, will have the consequence that one who locates and takes possession of the vessel will be awarded title in accordance with the law of finds.[40] Under American law, the first finder of abandoned property on the high seas to reduce it to effective possession acquires title to the property.[41] More than discovery is necessary for title, although the reduction to possession may be by mechanical means.[42] Under English law, cargo abandoned to the sea was Crown property outside the law of salvage.[43]

### Section C. Special Defenses to Salvage Claims

Admiralty courts have traditionally refused to reward salvors' faults by applying equitable principles, such as the "clean hands" doctrine, to reduce deny an award or disqualify a particular salvor[44] guilty of fraud, deceit, other willful, unlawful conduct relating to the matter in dispute.[45] Condi

---

28. See *Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.*, 553 F.2d 830, 1977 AMC 283 (2d Cir. 1977). A remedy in *quantum meruit* for actual expenses was provided where there was no basis for a claim for life salvage, since there was no property saved from a marine peril. A passenger ship with medical personnel changed course to come to the aid of a crew member who had suffered a heart attack on a merchant vessel without medical personnel.

29. *The Veendam*, 46 F. 489 (SDNY 1891).

30. *Bonifay v. The Paraporttee*, 145 F. Supp. 879, 1956 AMC 1898 (ED Va. 1956). See also the 1910 Convention, supra note 2, art. 3: "Persons who have taken part in salvage operations, notwithstanding the express and reasonable prohibition on the part of the vessel . . . have no right to any remuneration." But see *The Snow Maiden*, 159 F. Supp. 30, 1958 AMC 272 (D Mass. 1958). The first "salvor" or finder on the scene was granted equitable restraining orders on competing American salvors in *Columbus-America Deep Search, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 1988 AMC 2957 (ED Va. 1988), reversed on other grounds, 974 F.2d 450, 1992 AMC 2705 (4th Cir. 1992). See also *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel*, 924 F. Supp. 714, 1996 AMC 2481 (ED Va. 1996).

31. *The Gerbeviller*, supra note 22. In *Brady v. The African Queen*, 179 F. Supp. 321, 1960 AMC 69 (ED Va. 1960), the vessel went aground with little expectation of being refloated. Owners abandoned the vessel to hull underwriters, who engaged contract salvors. They failed to refloat the vessel, and the underwriters announced that the vessel was permanently abandoned. Several months later plaintiff refloated and separated the stern section. In an *in rem* proceeding, plaintiff was awarded the entire proceeds of a sale.

32. See *Bunge Corp. v. Agri-Trans Corp.*, 542 F. Supp. 961, 1983 AMC 1931 (ND Miss. 1982), aff'd in part, vacated in part, 721 F.2d 1005 (5th Cir. 1983).

33. *Bertel v. Panama Transport Co.*, supra note 23; *Drevas v. United States*, 58 F. Supp. 1008, 1945 AMC 254 (D Md. 1945).

34. *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059, 1988 AMC 1109 (1st Cir. 1987).

35. See American Hull Syndicate form of hull policy in appendix 9.

36. 33 U.S.C. §§ 409, 411–16, 418, 502.

37. See *Inland Tugs Co. v. Ohio River Co.*, 709 F.2d 1065, 1984 AMC 1943 (6th Cir. 1983); *Allied Chemical Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1982 AMC 1271 (5th 1981) (good faith but unsuccessful search for a wreck).

38. *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 1967 AMC 2553 (1967). Wreck removal costs are not subject to limitation of liability. See *In re Chinese Maritime Trust, Ltd.*, F.2d 1357, 1973 AMC 1110 (2d Cir. 1973); *In re Sincere Navigation Corp.*, supra note 25; *In re Insoll Marine, Inc.*, 1992 AMC 765 (ED La. 1991). Cf. *In re Compania Nacional de Navegacion*, 463 F. Supp. 330, 1979 AMC 730 (D C.Z. 1978).

39. *Wyandotte Transportation Co. v. United States*, supra note 38.

40. See *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified Wrecked and Abandoned Steam Vessel*, supra note 34; *Hener v. United States*, 527 F. Supp. 350, 1982 AMC 847 (SDNY 1981).

41. *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel (La Nuestra Señora de Atocha)*, supra note 20.

42. *Columbus-America Discovery Group, Inc. v. The Unidentified Wrecked and Abandoned Vessel (The Central America)*, 1989 AMC 1955 (ED Va. 1989), reversed on other grounds, 974 F.2d 450, 1992 AMC 2705 (4th Cir. 1992). See also *Brady v. The African Queen*, supra note 31.

43. Under English law, flotsam, jetsam, and lagan were "Droits of the Admiralty." 2 A. Browne, *A Compendious View of the Civil Law and of the Law of The Admiralty*, 46–54 (London, 1802).

44. See *The Boston*, 3 F. Cas. 932, (No. 1673) (C.C. D Mass. 1833), in which Justice Story applied the equitable maxims of clean hands and utmost good faith. See also *Aetna Insurance Co. v. Hattersley*, 1984 AMC 2837 (D Or. 1983).

45. *The Clarita and The Clara*, supra note 16. Later recognition of the equity "clean hands" doctrine may be found in *Johnson v. Yellow Cab Transit Co*, 321 U.S. 383 (1944), where defendants, Oklahoma state officers, had seized plaintiff carrier's shipment of liquor to the officers' club at a federal reservation, Fort Sill. Defendant argued lack of clean hands, but the Supreme Court answered:

> We may assume that because of the clean hands doctrine a federal court should not, in an ordinary case, lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law. But this does not mean that courts must always permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law in the