COMMONWEALTH OF MASSACHUSETTS
UNITED STATES DISTRICT COURT

C.A. NO. 04-11173 RWZ

RALPH JOSEPH d/b/a NEW BEDFORD
MARINE RESCUE,

       Plaintiff

v.

J.P. YACHTS, LLC,

       Defendant

DEFENDANT J.P. YACHTS, LLC'S
REQUESTED FINDINGS OF FACT
AND RULINGS OF LAW

## I.      INTRODUCTION

Now comes the defendant J. P. Yachts, LLC ("J.P. Yachts", "defendant" or "M/Y LADY MAZIE") and respectfully submits to this honorable court adopt its Requested Findings of Fact and Rulings of Law for the above-captioned case.

## II.      REQUESTED FINDINGS OF FACT

### A.      GENERAL BACKGROUND

1.      J.P. Yachts, LLC was at all material times to this case a Delaware corporation and was the owner of the Motor Yacht ("M/Y") M/Y LADY MAZIE.  T1, 22 (Prescott)[1].  Jerry Prescott and Mary Lou Prescott are the owners of J.P. Yachts LLC (Id.)

2.      M/Y LADY MAZIE was at all material times hereto a motor yacht 85-feet long by 22-feet wide, built in the year 2000 in Argentina and purchased new by her current owners, who took delivery in Charleston, South Carolina.  T1, 22-3 (Prescott).  M/Y LADY MAZIE had

---

[1] References to the trial transcript employed in these requests, as well as the defendant's Post-Trial Brief, will be as follows: the trial transcript for Day 1 will be referred to as "T1"; the transcript for Day 2 will be referred to as "T2".

twin diesel engines rated at 1400 HP each, and a bow thruster.  The bow thruster was a propeller

in a shaft used to push the boat to the left or to the right. T1, 53 (Prescott).

    3.    New Bedford Marine and Rescue was a small marine-assistance corporation

begun in 1995 by the plaintiff Ralph Joseph. T2, 49 (Joseph).

    4.    J.P. Yacht's owner, Jerry Prescott had boated for over 30 years, and at one time

held Coast Guard licenses, successively for 50 tons and later 100 tons. T1, 26-7 (Prescott).

    5.    When he was aboard M/Y LADY MAZIE, Jerry Prescott considered himself to be

captain. T1, 27 (Prescott).

    6.    Michael Bain had been employed by Jerry Prescott as Mate/Captain of M/Y

LADY MAZIE since either 2000 or 2001.  Bain had been involved in boating since he was 18

years old, or for approximately 34 years.  During those years, he had extensive experience sailing

and delivering pleasure boats up and down the East Coast of the United States, in the Caribbean,

through the Panama Canal to the West Coast, and up the interstate waterway into the Great

Lakes and St. Lawrence seaway. T2, 109-12 (Bain).


B.    <u>GROUNDING OF SEPTEMBER 2, 2003</u>

    7.    On September 1, 2003, M/Y LADY MAZIE departed the Pope's Island Marina,

New Bedford, Massachusetts bound for Cuttyhunk Island, arriving there in early afternoon.

Upon arrival, M/Y LADY MAZIE anchored just outside the Cuttyhunk Harbor jetty.  Aboard

were Jerry Prescott, his wife, and mate Michael Bain. T1, 28 (Prescott); T2, 113 (Bain).

    Plaintiff's Exhibit 22 was a chart printed from M/Y LADY MAZIE's computer

showing a computer-generated box in the approximate position where M/Y LADY MAZIE had

anchored. T1, 30-2 (Prescott).

---

The page of the transcript will follow that citation, followed by the name of the witness testifying in parentheses,

8.      Later the afternoon of September 1, 2003, M/Y LADY MAZIE's owners, Jerry

Prescott and Mary Lou Prescott, took M/Y LADY MAZIE's small 15-foot tender ("a small

boat") into Cuttyhunk, tied it up, walked around town, and then returned in the evening.  The

weather at that time was gray and overcast with light and variable winds out of the south and

southeast. T1, 32, 34-5 (Prescott).

9.      Upon returning to M/Y LADY MAZIE the evening of September 1, 2003, and

before turning in, Jerry Prescott determined that the anchorage then occupied by M/Y LADY

MAZIE was a safe anchorage. T1, 35 (Prescott).

10.     At approximately 3:00 a.m. the morning of September 2, 2003, Jerry Prescott was

woken by a "bump".  He went to the pilot house where he encountered Michael Bain.  They

found M/Y LADY MAZIE aground, and parallel to the shore, approximately 150-200 feet off

the beach, with the vessel's port side facing the shore, starboard side facing the sea, and its bow

facing the west. T1, 35-7 (Prescott).  At approximately the same time, Michael Bain also felt a

"thump".  He got up and ran to the pilot house knowing that the vessel was aground. T2, 115-6

(Bain).

11.     The weather at the time that Jerry Prescott and Michael Bain were awakened was:

winds north-northeast 15-20 knots, mists, seas 1-2 feet in height.  T1, 37 (Prescott); T2, 117

(Bain).

12.     Cuttyhunk Harbor is exposed totally from the north, but from the northeast there

is some protection from Nashawena Island.  T1, 40 (Prescott).  Jerry Prescott believed that the

cause of the grounding was probably that the wind had swung around from the south to the north,

probably shortly before 3:00 a.m., and caused M/Y LADY MAZIE to drag its anchor.  T1, 40

(Prescott).

_e.g._ :  T1, 22 (Prescott).

13.     Together, Jerry Prescott and Michael Bain set about putting out another anchor to secure M/Y LADY MAZIE.  Prescott pulled the anchor and line out of the lazerette, a compartment on M/Y LADY MAZIE's bow.  Bain put M/Y LADY MAZIE's 15-foot tender into the water, took it around to the bow, and was handed the anchor and line by Jerry Prescott. T2, 117 (Bain).  The extra anchor was a 35 pound Danforth equipped with approximately 10-15 feet of chain, and 300 feet of line. T2, 118 (Bain).  Because M/Y LADY MAZIE's starboard side was pointing seaward and was therefore exposed to the wind and sea, Bain, with the anchor and line, maneuvered the tender off of M/Y LADY MAZIE's starboard quarter (that is, off the direction of the starboard stern or rear) about 250 feet.  The purpose of taking the line in that direction was to secure the anchor in such a position that it would keep M/Y LADY MAZIE's bow from swinging closer in to shore.  T2, 118-20 (Bain).

14.     Michael Bain dropped the anchor in a position approximately 250 feet off the starboard quarter of M/Y LADY MAZIE.  He then maneuvered the tender back to the boat, handed the anchor line to Jerry Prescott on deck , came back aboard MY LADY MAZIE, and pulled the anchor line in himself.  The purpose of pulling the anchor line back in was to cause the anchor to "set".  Setting the anchor meant getting the flukes, or blades, to dig into the bottom and hold.  That way, even though the wind was blowing against M/Y LADY MAZIE's side, the anchor would not drag, and would hold the vessel, and prevent it from moving further. T2, 120-22 (Bain).

15.     From the deck of M/Y LADY MAZIE, Michael Bain pulled the anchor line in about 75 feet until the anchor set or held.  As he was pulling the anchor over the bottom, he could tell that he was pulling it over a grassy rather than rocky bottom.  He could tell that

because the anchor slid easily along the bottom.  Had he been pulling it over a rocky bottom, he

would have been able to feel the anchor bumping along and over the rocks.  T2, 123-4 (Bain).

16.    Defendant's Exhibit E is a reproduction of a chart.  Michael Bain marked the

position of the vessel's grounding and anchor with the letter "G", and the place where he placed

the second anchor out to secure LADY MAZIE with the letter "A".  T2, 125-6 (Bain); Def.

Exhibit E.

17.    M/Y LADY MAZIE's position aground was around 1000 yards from Pease

Ledge.  T1, 46 (Prescott).

18.    M/Y LADY MAZIE had originally anchored approximately 300 yards from the

shore, in about 9 feet of water. T1, 47 (Prescott).  It was the opinion of both Jerry Prescott and

Michael Bain that M/Y LADY MAZIE was aground on a "soft" bottom. T1, 48 (Prescott); T2,

122-4 (Bain); Def. Exhibit E.

19.    From contemporaneous notes he had kept, Jerry Prescott testified that the time of

dragging of anchor was approximately 3:04 a.m., September 2, 2003. T1, 99-101 (Prescott); Def.

Exhibit A.

20.    Consulting his charts, Jerry Prescott anticipated low tide at Cuttyhunk Harbor

between 6:00 and 7:00 a.m. that morning, and high tide around 1:00 p.m. T1, 52 (Prescott).


C.    CALL TO NEW BEDFORD MARINE AND RESPONSE

21.    Jerry Prescott was a member of BoatUS as of September 1, 2003.  He testified

that BoatUS was a marine member service consisting of franchises providing marine assistance

services to boaters, including towing.  T1, 41 (Prescott).

22.    Although BoatUS provided pre-paid towing services to members, Jerry Prescott

did not call BoatUS to avail himself of that service.  He did not call BoatUS because he was a

member; instead, he called simply to "find a reputable towing service that (he) could engage by the hour to accomplish what he wanted." Mr. Prescott was not trying to engage BoatUS services pursuant to the terms of any written contract. T1, 60-1 (Prescott).

23.    Jerry Prescott testified that the towing service agreement (Pl. Exhibit 9) was not the effective agreement governing his call, because he was not calling to get pre-paid towing service offered by the agreement. T1, 60 (Prescott).

24.    Jerry Prescott called BoatUS's 800 number and was referred to the nearest franchise member in New Bedford. He then called that number and spoke with the person he later learned to be Ralph Joseph. T1, 41-2 (Prescott).

25.    Jerry Prescott told Ralph Joseph that he was aground on the beach. T1, 42 (Prescott).

26.    Jerry Prescott told Ralph Joseph that he had dragged his anchor and wanted an assist vessel to come and put a line to M/Y LADY MAZIE's stern and hold the vessel in place until the tide changed. T1, 42 (Prescott); T2, 65 (Joseph); T1, 83 (Prescott).

27.    Jerry Prescott told Ralph Joseph that the wind had been gusting up to 20 knots from the northeast and swinging to the east. T1, 42-3 (Prescott).

28.    New Bedford Marine, through its principle Ralph Joseph ("Joseph"), offered to send a boat and operator at the rate of $125/hour in response to Jerry Prescott's request for assistance. T1, 83 (Prescott); T2, 65 (Joseph).

29.    Jerry Prescott believed that his first call to New Bedford Marine was made at about 5:00 a.m. T1, 83-4 (Prescott).

30.    The New Bedford Marine Rescue assist boat arrived at the scene of M/Y LADY MAZIE's grounding at about 6:53 a.m. T1, 99-101 (Prescott).

D.    ACTIONS OF FIRST ASSIST BOAT ON SCENE

31.    On the arrival of the first New Bedford Marine assist boat, winds were 10-15 mph, gusts to 20. T1, 52-3 (Prescott).

32.    When the first New Bedford Marine assist boat arrived, Jerry Prescott sent out his tender to retrieve a line from the assist boat and return it to M/Y LADY MAZIE.  The line was secured to M/Y LADY MAZIE's starboard quarter (stern) cleat. T1, 55 (Prescott).

33.    At this point, M/Y LADY MAZIE was aground on soft bottom, listing about 5°. ITs propellers were not touching the bottom, but its rudders might have been. T1, 55, 57 (Prescott).

34.    Jerry Prescott talked to the assist boat operator over VHF radio.  He asked him not to make any attempt to pull M/Y LADY MAZIE off the shore. T1, 57-8 (Prescott).

35.    In the same conversation, Jerry Prescott also asked the assist boat operator to keep a constant tension on the line.  The assist boat operator was having difficulty handling his boat and kept slacking the line off.  Prescott tried to raise him again on VHF radio and got nowhere. Prescott did not consider that the assist boat operator was carrying out his duties in a professional way. T1, 79 (Prescott).

36.    New Bedford Marine Rescue employee Clinton E. Allen ("Allen") was the operator of the first assist boat. He was called at about 5:00 a.m., and left New Bedford at about 5:30.  T1, 129-31 (Allen).

37.    Boat operator Allen did not know the wind speed or direction upon his arrival on scene.  He thought the waves were between 2-3 feet.  T1, 131 (Allen).

38.    Upon his arrival, M/Y LADY MAZIE's Captain/Mate Michael Bain met Allen in M/Y LADY MAZIE's tender. T1, 133 (Allen).

39.    Assist boat operator Allen admitted that on arrival he had difficulty holding his boat's position.  Eventually, he changed his course and headed more into the wind, and adjusted his boats RPMs.  When he did that, he found that it helped him to stay in position. T1, 142 (Allen).

E.    JERRY PRESCOTT'S SECOND CALL TO NEW BEDFORD MARINE

40.    Jerry Prescott made a second call to New Bedford Marine.  He called because he had asked the first assist boat operator to keep a constant tension on the line, and the operator seemed to be having difficulty keeping slack out of the line.  Prescott had made further attempts to reach him on VHF radio, without success. T1, 84-5 (Prescott).

41.    Because of his difficulties with the first assist boat operator, Jerry Prescott called New Bedford Marine again and spoke again to Joseph.  He asked whether there was another boat available. T1, 84-5 (Prescott)

42.    Jerry Prescott testified that they had discussed price, and that Joseph had agreed to send the second boat for $125/hour, the same price as was offered for the first. T1, 85 (Prescott).

43.    Jerry Prescott also reminded Joseph that the purpose of the boats was simply to secure lines to the stern and hold it steady, not to attempt to pull M/Y LADY MAZIE off the beach. T1, 85 (Prescott).

44.    Joseph called a some-time employee of his named Joseph Moniz ("Moniz"), prior to 8:00 a.m.  He told Moniz that Allen was on a grounding assignment and needed assistance. T2, 9 (Moniz).

45.    Moniz traveled to the New Bedford Marine facilities and took a 21-foot KenCraft, with a single 130 HP outboard motor, and proceeded to the scene. T2, 9 (Moniz).

46.     Jerry Prescott's second discussion with New Bedford Marine in which he requested the second boat occurred around 7:00 a.m. T1, 87 (Prescott).

47.     The second New Bedford Marine assist boat arrived on scene around 8:53 a.m., or shortly before 9:00 a.m. T1,87, 99-101 (Prescott).

48.     On arrival of the second boat, Jerry Prescott instructed it to send its hawser (rope or line) in with his tender, as had been done with the first assist boat, and then to coordinate its efforts with the first assist boat, getting the two boats to take a strain on their lines and form a "V" to keep tension on the stern. T1, 87 (Prescott).

49.     When Moniz arrived on scene Allen, already there in the first assist boat, instructed him to have M/Y LADY MAZIE's tender take his hawser and to put it on the same cleat as the line from the first assist boat.  Moniz was then to help Allen pull equally to keep a strain on M/Y LADY MAZIE's stern until the tide came in and lifted it off the bottom. T2, 12 (Moniz).

50.     Moniz testified that when he arrived on scene the winds were 15-20 knots, and the waves were 2-4 feet. T2, 12 (Moniz).

51.     Working together the two assist boats finally succeeded in forming a "V" to keep a strain on the lines leading to M/Y LADY MAZIE's stern. T1, 87 (Prescott); T2, 12 (Moniz).

52.     Between 9:00 and 10:20, the tide came in and began to lift M/Y LADY MAZIE off the bottom. M/Y LADY MAZIE floated free at about 10:13 a.m. by one account, or about 10:20 by another. T1, 87, 99-101 (Prescott); T2, 18, 22 (Moniz).

F.     EVENTS FOLLOWING M/Y LADY MAZIE'S REFLOATING

53.     When M/Y LADY MAZIE refloated, both assist boats were attached.  They then towed M/Y LADY MAZIE, stern first, away from the area of the grounding and out to deep

9

water.  The two boats towed M/Y LADY MAZIE approximately ¼ mile away from the jetty, and beyond Bell Buoy No. 6 depicted on Exhibit 4.  T1, 147 (Allen).

54.    It was agreed by the two assist boat operators that the convention that they followed was that in an assist operation, the first boat on scene takes command. T2, 36 (Moniz).

55.    That meant, as far as Moniz was concerned at least, that Allen was in command of the operation. T2, 19 (Moniz).

56.    Accordingly, it was appropriate for Allen to direct the conclusion of the operation. Apparently recognizing that, Allen began talking to Jerry Prescott.  He told Prescott that he wanted his own hawser released from M/Y LADY MAZIE's stern.  T1, 147-8 (Allen).

57.    Following the release of the his hawser, Allen directed Jerry Prescott to test his engines and rudders.  He directed Prescott do this by putting the engine first in forward, then in neutral, then in reverse, then in neutral again.  Providing that the engines and rudders were running properly, Allen then advised that he would have Moniz release his hawser. T1, 148 (Allen).

58.    Allen testified that the reason he kept one hawser aboard M/Y LADY MAZIE while asking M/Y LADY MAZIE to put her engines into forward, neutral and then reverse was because he did not want M/Y LADY MAZIE to go back onto the rocks again, in the event that the engines or rudders did not operate properly.  T1, 149 (Allen).

59.    The rule, as Moniz understood it, was that the person in command retained command throughout.  T2, 36-7 (Moniz).

60.    Moniz admitted that Allen did not verbally relinquish command, but Moniz "assumed" that he himself took command when Allen had his hawser removed, and directed M/Y LADY MAZIE to talk directly to Moniz.  T2, 38 (Moniz).

61.    After M/Y LADY MAZIE released Allen's line, Allen became occupied in bringing the line back aboard his boat. T2, 40 (Moniz).

62.    The wind conditions at the time that Moniz "assumed" that he took command were somewhere around 15-20 knots, possibly less. T2, 38-9 (Moniz).

63.    Moniz then undertook to talk directly to M/Y LADY MAZIE.  He undertook to do so over VHF radio from the partly open cockpit of his boat, with his 130 HP engine running, and the wind blowing.  T2, 39-40 (Moniz).

64.    The situation at this time was that Allen, who had arrived on scene with the larger boat, having two 130 HP engines was now disconnected from M/Y LADY MAZIE and taking his line in, while Moniz, who had arrived on scene later, with a smaller boat with one 130 HP engine, was left with a line aboard M/Y LADY MAZIE, after Allen had asked M/Y LADY MAZIE to test its engines by putting them into gear.  T2, 40 (Moniz); T1, 148 (Allen).

65.    After the first line had been released from M/Y LADY MAZIE, Jerry Prescott had a conversation over VHF radio with the second assist boat.  The second assist boat wanted him to test his running gear.  Prescott objected to having one line aboard while the propellers were being turned over.  The second boat operator said that he wanted to keep a line on until they were sure that M/Y LADY MAZIE's propellers were going to work.  T1, 104 (Prescott).

66.    Jerry Prescott was reluctant to conduct the operation in that fashion.  He informed the assist boat operator that he considered it to be risky.  He specifically remembered talking to the operator of the second boat, and telling him carefully and explicitly what to do.  He instructed the operator first to slack off the line and keep it clear from the propeller.  He then stated that he was going to put the starboard engine only into gear and make a slow turn to port, but that the operator was to take the tension off the line before he did that, and secure the line by

hand so that it was not in the water.  Finally, Prescott testified that he asked the operator of the second boat to acknowledge his instructions, and the operator did so. T1, 104-5 (Prescott).

67.    Jerry Prescott then put the starboard engine into idle speed.  He testified that there was nothing slower than idle speed, and he testified that he only used one engine, and there was no way to put the engine into gear at any speed lower than idle speed.  He acknowledged that he was doing so at the express instruction of the second assist boat operator.  T1, 105 (Prescott).

68.    Jerry Prescott also testified that he made the decision to turn to port because that would turn M/Y LADY MAZIE away from the shore.  Had he turned to starboard he would have been turning back toward land. T1, 106 (Prescott).

69.    Moniz acknowledged that he remembered hearing Jerry Prescott relate to him some information about his intentions.  At trial, his testimony was that Jerry Prescott  "said something about putting the boat in gear.  I don't remember what was said, but I said okay…" T2, 23 (Moniz).

70.    At the time, Moniz had the stern of his boat turned toward M/Y LADY MAZIE and was attempting to turn the boat around so that he was "parallel" to M/Y LADY MAZIE.  T2, 23 (Moniz).

71.    The next thing Moniz knew, his boat was being dragged backwards and the port side was going under the water.  T2, 23 (Moniz).

72.    As his boat was being dragged backwards and under the water, Moniz dove off the port side into the water.  T2, 24 (Moniz).

73.    Allen then appeared alongside in the first assist boat and pulled Moniz out of the water.  T2, 25 (Moniz).

74.     Allen then told Moniz that he was going to drop Moniz off on M/Y LADY MAZIE to dry off and have the owners sign the paperwork. Allen then maneuvered his boat back to tend to the overturned assist boat. T2, 26 (Moniz).

75.     When Moniz came aboard M/Y LADY MAZIE, Jerry Prescott's wife, Mary Lou Prescott, was on deck. She gave him a towel, a dry shirt and a cup of coffee. T2, 27 (Moniz).

76.     Mary Lou Prescott was on the stern when Moniz, who had just been brought out of the water, came aboard. She observed him apologize for the incident. He said that it was his fault and that he went the wrong direction with the boat. T1, 122 (M.L. Prescott).

77.     Moniz handed a metal folder to Jerry Prescott and stated "I was asked if you could sign this." T2, 27 (Moniz).

78.     Inside the folder, Jerry Prescott found a salvage agreement. Prescott refused to sign the salvage agreement, telling Moniz that this was not his agreement with Joseph, and that he would not sign it. T2, 28-9 (Moniz).

79.     Moniz replied by telling Prescott to have that discussion with the main office. "I just work here." T2, 28 (Moniz).

80.     Jerry Prescott testified that when Moniz handed him the salvage agreement he refused to sign it because it was not the agreement he had earlier made with New Bedford Marine. In his mind, the agreement he had made with New Bedford Marine was to hire two boats at the rate of $125/hour per boat. T1, 93-4 (Prescott).

81.     Joseph admitted that after the ungrounding, Jerry Prescott called to tell him that he was not going to sign the salvage agreement that Moniz had presented to him. Prescott asked for a bill based on the earlier agreement of $125/hour per boat. T2, 79 (Joseph).

13

82.    During the conversation on M/Y LADY MAZIE's stern, Jerry Prescott asked Moniz for his bill based on the $125/hour per boat rate, but Moniz did not give it to him.  T2, 79 (Joseph).

83.    When the matter of the billing and the contractual arrangements could not be resolved, Michael Bain took Moniz back to Allen's boat.

84.    Jerry Prescott testified that if at the time he had initially called New Bedford Marine to request the second boat, he had been told that it would require him to sign a salvage contract, he would not have agreed.  T1, 98 (Prescott); T2, 30 (Moniz).

G.    MISCELLANEOUS AND CONCLUSION

85.    VHF communications between the M/Y LADY MAZIE  and the assist boats were carried out with handheld microphones.  To transmit, the operator pressed the microphone button and spoke.  While speaking, the operator could not hear any of the other communications. Similarly, when the other parties pressed the button to transmit, that party could not hear the other communications.  Unlike a telephone, if two people happened to be talking at the same time, they could not hear each other. T1, 86 (Prescott)

86.    Jerry Prescott testified that the vertical distance from M/Y LADY MAZIE's main deck to the water line was about 6 feet. Plf. Exhibit 18 shows this approximate 6 foot distance between the main deck and the water line. T1, 90-1 (Prescott); Plf. Exhibit 18.

87.    Jerry Prescott had 30 years experience at sea.  He testified that he was able to tell from the condition of the sea what the wind speed was. Examining Plaintiff's Exhibit 18, he stated that it was "impossible" that the winds could have been 28 knots sustained speed with gusting up to 35 as claimed by the plaintiff, based on the condition of the sea as portrayed in that photograph. T1, 91 (Prescott); Plf. Exhibit 18.

88.     Jerry Prescott testified that at no time on September 2, 2003 did the wind or sea conditions vary from what was generally portrayed in Plaintiff's Exhibit 18.  T1, 92 (Prescott); Plf. Exhibit 18.

89.     Jerry Prescott testified that there were other marine assistance services available on September 2, 2003.  Prescott had talked to them, and if he had decided to say no to New Bedford Marine, he could have called on other services to assist him. T1, 96 (Prescott).

90.     No one from New Bedford Marine ever discussed a "salvage plan" with Jerry Prescott.  T1,97 (Prescott).

91.     No one from New Bedford Marine ever told Jerry Prescott who was in command of the salvage operation. T1, 97 (Prescott).

92.     Jerry Prescott testified that if at the time he had initially called New Bedford Marine to request the second boat, he had been told that it would require him to sign a salvage contract, he would not have agreed.  T1, 98 (Prescott).

93.     Examining Defendant's Exhibit A, the NOAA Weather Data Sheet for September 1-2, 2003, Jerry Prescott testified that he had secured this report from NOAA, and that he understood it to show actual recorded weather observations for wind speed, in for the following times:

| TIME | WIND SPEED | | TIME | WIND SPEED |
|---|---|---|---|---|
| 5:53 a.m | 14 | | 8:03 a.m. | 15 |
| 6:26 a.m | 14 | | 8:53 a.m. | 17 |
| 6:41 a.m. | 16 | | 8:55 a.m. | 13 |
| 6:53 a.m. | 16 | | 9:37 a.m. | 14 |
| 7:22 a.m. | 13 | | 9::44 a.m. | 14 |

| 7:43 a.m. | 13 | | 9:53 a.m. | 12 |
|---|---|---|---|---|
| | | | 10:13-11:00 | |

T1, 99-101 (Prescott)

94.     At the time M/Y LADY MAZIE was aground, the winds and the seas were not pushing it towards the jetty.  T1, 102 (Prescott).

95.     At the time M/Y LADY MAZIE was aground, the winds and seas were not pushing it toward Pease Ledge. T1, 102 (Prescott).

96.     At the time M/Y LADY MAZIE was aground, the wind and seas were not pushing it towards the location marked "RKY" on the chart marked as Plaintiff's Exhibit 21. T1,103 (Prescott); Plf. Exhibit 21.

97.     At no time while M/Y LADY MAZIE was agound, was the vessel being destroyed by the elements, or in any immediate peril of being destroyed by the elements. T1, 103 (Prescott).

98.     After M/Y LADY MAZIE was towed into deep water, Michael Bain went below decks to look for leaks and found no water. T1, 70 (Prescott).

99.     At the time of M/Y LADY MAZIE's grounding, Jerry Prescott did not think there was risk that the running gear – propellers and rudders – were damaged. T1, 74-5 (Prescott).

100.    When M/Y LADY MAZIE was aground, and Jerry Prescott called Joseph in the initial phone conversation, Jerry Prescott did not believe that M/Y LADY MAZIE was in danger.

101.    Based on his observations of how the two assist boat operators handled their boats throughout the course of their operation, Jerry Prescott did not believe that New Bedford Marine's actions had been carried out in a professional way. T1, 79 (Prescott).

102.    Based on his observations of the manner in which the assist boat operators conducted themselves during the course of the operations, Jerry Prescott believed that the danger to the rescuers was primarily through their own poor handling of the boats. T1, 80 (Prescott).

103.    Jerry Prescott did not believe that M/Y LADY MAZIE was resting on hard, or rocky, bottom.  He believed that M/Y LADY MAZIE rested on soft bottom throughout because when a fiberglass hull rests on rocks, gravel or ledge, you can hear a grinding sound inside the boat, and he heard none. T1, 88-9 (Prescott).

104.    Jerry Prescott did not believe that M/Y LADY MAZIE was resting on hard or rocky bottom also because the boat was hauled and inspected in October 2003, a month after the grounding, and there were no abrasions on the hull or even scrapes in the paint. Had M/Y LADY MAZIE been resting on hard bottom, Prescott would have expected to see abrasions on the hull and/or scrapes in the paint. T1, 88-9 (Prescott).

105.    Captain/Mate Michael Bain also did not believe that M/Y LADY MAZIE was aground on hard bottom.  He took an extra anchor out in M/Y LADY MAZIE's tender and dropped it about 300 feet off M/Y LADY MAZIE's starboard quarter.  He then returned to M/Y LADY MAZIE's deck and pulled the anchor line in by hand approximately 75 feet, until the anchor flukes "set" along the bottom.  In so doing, he was able to tell that the anchor was sliding along a slick or slippy bottom, probably sea grass.  Had the anchor been resting on a rocky or hard bottom, he would have felt it bumping over the rocks. T2, 122-4 (Bain).

106.    Jerry Prescott recalled seas in the 1-2 foot range. On examining the photographs, Plaintiff's Exhibit 18, Prescott estimated the seas to have been 1 foot or less in height.  The sea conditions and weather conditions in the photographs (Plaintiff's Exhibit 18) were generally consistent with Prescott's recollection of the weather on September 2, 2003, and he testified that

in his recollection, conditions were never worse than those portrayed in the photograph. T1, 89-90 (Prescott); Plf. Exhibit 18.

107.    At no time during any of their discussions or their course of dealings did the plaintiff and defendant discuss "no cure, no pay" as a basis for any service offered or accepted.

## III.    REQUESTED RULINGS OF LAW

1.    An enforceable salvage contract was entered into between the plaintiffs and the defendants to provide an assist boat at the rate of $125/hour per boat and operator.  Offer and acceptance of that contract are not disputed and therefore a valid oral contract for marine salvage was created. Flagship Marine Services Inc. d/b/a Sea Tow Services v. Belcher Towing Company et al., 1992 AMC 2901 (11th Cir., 1992) (finding enforceable salvage contract based on oral offer and acceptance).

2.    When a party to a salvage operation begins under one form of salvage agreement, that party may not convert the agreement or arrangement to another form if it later appears more advantageous to do so.  The original agreement reached between the plaintiff and the defendant was one for contract salvage.  The plaintiff is not allowed to attempt at a later occasion to convert that original agreement into a pure salvage arrangement. BENEDICT ON ADMIRALTY, v.8, Sec. 13.06 (2003 Supp.); The ELFRIDA 172 U.S. 186 (1898); 2002 AMC 2982; Flagship Marine, supra, 1992 AMC 2901 (11th Cir., 1992).

3.    The terms of the BoatUS on-the-water Towing Service Agreement (Plf. Exhibit 9) do not govern the parties in this case, and its obligations are not binding upon the defendant J.P. Yachts LLC, or Jerry Prescott. Although Mr. Prescott testified that he was a BoatUS member, no contract bearing his signature was proven to the court.  The court is therefore left with no

evidence of the express contractual obligations under which Mr. Prescott agreed to be bound, if any.  When expressly asked on the witness stand whether Exhibit 9 was the effective agreement covering his call to New Bedford Marine, Mr. Prescott denied it, saying that he was not calling to get the pre-paid tow, but rather because he wanted to find a reputable towing service whom he could engage by the hour to accomplish what he needed.  The burden of proving the existence of a contract and its terms is upon the one claiming rights under that contract.  The COMMANCHE, 75 U.S. 448 (1869); Kimes v. United States, 207 F. 2d 60 (2d Cir., 1953), 1953 AMC 1335; The SUSAN, 23 F. Cas. 40 (D. Mass. 1859) (No. 13, 630); Connolly v. S.S. KARINA II, 302 F. Supp. 675, 1969 AMC 1105 (E.D. N.Y. 1969).  Because the plaintiff failed to produce a copy of the towing services agreement executed by and therefore binding upon Jerry Prescott, he failed to prove the terms of any such agreement, and therefore is not entitled to claim any benefits therefrom.

Moreover, the Towing Service Agreement (Plf. Exhibit 9), by its own terms states that it does not apply to (…among others) "salvage, including, but not limited to hard groundings, or any assistance requiring more than one vessel, pumps, divers, airbags or other special equipment;…" T2, 67 (Joseph); Plf. Exhibit 9.  This provision would seem to remove a salvage event, or an event requiring two boats, such as the event giving rise to this suit, from beneath the umbrella of the Towing Service Agreement.  That, then, would seem to permit the parties to make their own separate salvage arrangements, which, in effect, is what was done in this case.

4.	Because there was never in existence between the parties to this suit a "no cure, no pay" agreement, and because examination of the entire trial transcript produces no reference to any such arrangement between the parties, there was no "no cure, no pay" arrangement

existing between the parties respecting any salvage arrangement made between the two.  The absence of a "no cure, no pay" arrangement, means that any enforceable salvage arrangement between the parties may not be under principles of pure salvage.  Flagship Marine Services Inc. d/b/a Sea Tow Services v. Belcher Towing Company et al., 1992 AMC 2901, 2905-7 (11th Cir., 1992).

     5.     The plaintiff is not entitled to void the original contract salvage agreement he entered into with the defendant to provide assist boats at the rate of $125/hour per boat on the basis of mistake, because the undisputed evidence from the trial proves that the mistake was unilateral on the part of the plaintiff, and that the plaintiff assumed the risk for his mistake. Flores v. American Seafoods Co. 335 F. 3d. 904, 914 (9th Cir. 2003) (admiralty courts decline to void contract where mistake was unilateral, or where mistake rendered results unconscionable, citing Restatement (2d.) of Contract, sec. 153 (1981)); The KENNEBEC, 231 F. 423 (5th Cir. 1916).

     The unilateral mistake made by the plaintiff in this case was his mistaken belief that M/Y LADY MAZIE was not aground.  The plaintiff, a professional salvor and proprietor of his own salvage company, was conducting the initial interview with the defendant, and had the opportunity to ask all the questions, and gather all the information he needed.  It is undisputed that in conducting this interview, the plaintiff never asked the defendant whether his vessel was aground.  Instead, he assumed that it was not.  Where a professional or an expert has specialized knowledge about the details of his profession or area of expertise, and secures only limited knowledge from the other party, he will be held to have accepted the risk of his shortcomings if he treats such limited knowledge as sufficient. Covich v. Chambers, 37 N.E. 2d. 115, 8 Mass. App. Ct. 740, 749 (1979).

6.      Enforcing the original salvage contract would not be unconscionable.  The quoted rate of $125/hour, for boat and operator, was a price determined and set entirely by Ralph Joseph.  It is a price which is therefore presumptively based on the cost to Joseph of providing the service, plus some profit to himself, and is therefore presumptively fair and sufficient.  If the price is fair and sufficient for one boat, it is presumptively fair and sufficient for two boats, and therefore not unconscionable.  Flores v. American Seafoods Co. 335 F. 3d. 904, 914 (9th Cir. 2003).

7.      Pure salvage, although sometimes called non-contractual, is in fact established by contract principles in the vast majority of circumstances.  The general rule is that there is no "forced salvage" except in certain limited circumstances.  Maritime law recognizes the right of the owner, or of the owner through his servant, the ship's master, to refuse salvage services except under the following limited circumstances: (1) when to do so would imperil participants in the common venture including both cargo interests (The ODENWALD, 71 F. Supp. 314, 1947 AMC 666 (D. P. R. 1947), Aff'd 168 F. 2d. 47, 1948 888 AMC (1st Cir. 1948)), and also passengers (The VEENDAM, 46 F. 489 (S.D.N.Y. 1891)); (2) when the vessel is abandoned by its owner and crew (The GERBEVILLER, 34 F. 2d 825 (D. Mass. 1929)); or, (3) until the moment that the peril begins to destroy the vessel and threaten human lives. See, generally, Healy and Sweeney, THE LAW OF MARINE COLLISION (Cornell, 1998), 403-4.  None of these circumstances apply to M/Y LADY MAZIE.  It is undisputed that LADY MAZIE was not being destroyed by the elements, and in fact the undisputed evidence from the trial is that LADY MAZIE was not even the slightest bit damaged following her grounding.  It is also undisputed that there was no mutual assent to a pure salvage arrangement because none of the legally recognized circumstances justifying the forced salvage can be found in this case.  Therefore the

21

plaintiff cannot force a pure salvage arrangement upon this unwilling defendant.  See, generally, Healy and Sweeney, supra at 404.

8.      A pure salvage claim requires proof of a marine peril.  This means that the threat to the vessel need not be imminent, but it must be probable that the vessel will be damaged or destroyed without intervention.  New Bedford Marine Rescue Inc. supra. at 497.  The plaintiff in this case has failed to meet his burden of establishing a marine peril.

Even if a marine peril was sufficiently established, the quantum of the plaintiff's award must be analyzed in terms of the six Blackwall factors which are: (1)  the degree of danger from which the ship was rescued; (2) the post-casualty value of the property saved; (3) the risk incurred in saving the property from impending peril; (4) the promptitude, skill, and energy displayed in rendering the salvage services; (5) the value of the property employed by the salvors and the dangers to which it was exposed; and (6) the cost in terms of labor and materials expended by the salvors in rendering the services.

The evidence suggests that the degree of danger from which the vessel was rescued was very slight, that the risk incurred in saving the property was primarily due to the ineptitude of the salvors; that the skill and energy of the salvors was highly questionable; and the cost in terms of labor and materials was minimal.  The plaintiff entered no evidence upon the record of the post-casualty value of the property saved, or the value of all the property employed.  Accordingly, this was a low-order salvage and it merits only the most minimal of awards.  New Bedfore Marine Rescue Inc. supra at 502.

9.      If it is considered that there is dispute as to the extent of mutual assent to the conditions under which the second assist boat was sent, the compensation to the plaintiff for services of that second boat should be calculated in the same manner as were the agreed upon

formula for compensation for providing the services of the first boat. This is, in effect, a

*quantum meruit* award. The only evidence before the court of the fair rate of compensation for

use of the second assist boat is the $125/hour rate agreed upon for the use of the first assist boat.

That rate should therefore be applied for the use of the second boat as well. It was the

undisputed testimony at trial that the services of both boats totaled approximately 23 hours. At

the rate of $125/hour, the total award due the plaintiff is $1625. That is a fair rate for

compensation for the services based upon a rate established by the plaintiff himself, and

therefore presumptively fair and adequate. The use of two boats, their operators and their

hawsers, or ropes, were the only services requested by the defendant, and were essentially the

only services provided by the plaintiff.  Sea Tow Services of Carteret County Inc. v. S/V

NAUTILUS et al., 2000 AMC 799, 802, 3 (N.Y. Arb. 1999) (upon failure to prove entitlement to

pure salvage award, compensation on *quantum meruit* bases is appropriate.)

Respectfully submitted,

Defendant,

J.P. YACHTS, LLC

By its attorney,

/s/ William Hewig, III
William Hewig, III (BBO# 541910)
Kopelman and Paige, P.C.
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

Date:   September 23, 2005

262062/60314/0008

23