to remove the vessel from the strand. Undeniably, a certain amount of danger is inherent in any salvage operation. Since braided nylon lines are used to pull and tow grounded vessels, the strain placed upon these lines creates a significant risk of injury to salvage crews should the line part or a hull fitting on the salvaged vessel give way. The larger the vessel being pulled, the greater the strain. When a nylon line under strain parts, the resulting whiplash effect is capable of taking off limbs and has been known to kill salvage crew members. Should cleats or hull fittings on the salvaged vessel give way, they become missiles which have killed and maimed crew members on the towing vessel. Because of the extremely shallow water around the vessel, the salvage vessels involved are in constant danger of going aground and causing damage to their own hulls, propellers and rudders. Additionally, when operating in shallow water, the possibility of ingesting bottom material causing damage to engines and pumps is also a constant threat to salvage vessels.

From the foregoing, it should be obvious to even the most lubberly that the concept of a "simple grounding" of which the uninformed speak with such ease is far from "simple." Varying degrees of peril to both the vessel and the salvor are almost always present. There are, however, some circumstances when a vessel aground is not in peril and the services involved in removing her from the grounding are, in fact, towage rather than salvage.

Vessels can and do intentionally safely ground themselves on soft bottoms for a variety of reasons. This is particularly true of smaller recreational vessels whose hulls and running gear are not unduly stressed by the forces of such a situation. Similarly, when the vessel is undamaged, aground on a soft bottom and capable of freeing herself without assistance at the next tide, the service of towing her off before the tide, to save strain on the vessel's engines or to avoid the necessity of the persons on board getting out and pushing may be more of a convenience than a necessity.[33]

Each such case must be decided on its own facts. The issue is whether the services were necessitated by the peril or provided as a matter of convenience. Generally, the better practice, and one followed by many pleasure boat salvors in such situations, is the "one boat, one hour" concept which is treated as a convenience tow and billed on a fixed rate, hourly basis. In other words, if they can get the vessel off using one boat within an hour, it is a "convenience" to the owner and not treated as salvage. It

---

33. *See, e.g.,* La Rue v. United Fruit Co., 181 F.2d 895 (4th Cir. 1950).

must be remembered, however, that when the vessel is hard aground, pounding on a reef, disabled, seriously damaged or otherwise in appreciable peril, the concept does not apply regardless of the number of vessels or the amount of time involved. In each case, the presence of peril and the degree of that peril must be determined based on the circumstances applicable to that case. There are few "rules of thumb" or inviolate principles that can be applied to every case.

## V. POPULAR SALVAGE "MYTHS AND MISCONCEPTIONS"

A number of other issues frequently arise in the context of salvage of pleasure boats which are misunderstood by both sides. These include questions of whether the vessel owner must affirmatively assent to salvage of his vessel, whether the salvor may retain the vessel until paid and whether the salvor becomes the owner of an "abandoned" vessel.

A frequent complaint heard by salvors from both vessel owners and their insurers is that the salvor did not obtain permission prior to beginning salvage operations and thus became a trespasser or officious inter-meddler. There is no question but that salvage services cannot be thrust upon an unwilling vessel master or owner who refuses them.[34] However, it is not necessary that the vessel master or owner affirmatively agree to the rendering of salvage services if, under the circumstances, a prudent man would have accepted.[35] Thus, it will be a question of fact as to whether the vessel master or owner took affirmative steps to decline salvage services or implicitly agreed to them. When a vessel is exposed to a marine peril and no one is aboard to refuse or accept the salvage services (whether it is derelict, abandoned or has simply been temporarily left), it is not necessary for the salvor to attempt to locate the owner or to obtain permission prior undertaking salvage operations. Under such circumstances, the salvor is not a trespasser but may proceed to assist the vessel and make a claim for a salvage award.[36]

With regard to the salvor's right to retain possession of the vessel, the answer is less clear. The salvor who has earned the right to a salvage

---

34. The BOLIVAR v. The CHALMETTE, 3 F. Cas. 818 (C.C.E.D. Tex. 1872) (No. 1611); The CHOTEAU, 9 F. 211 (C.C.D. La. 1881); The INDIAN, 159 F. 20 (5th Cir. 1908).

35. Merritt & Chapman Derrick & Wrecking Co. v. United States, 274 U.S. 611 (1927) (citing The ANNAPOLIS, 167 Eng. Rep. 150, 161 (P.C. 1861)).

36. Rickard v. Pringle, 293 F. Supp. 981 (E.D.N.Y. 1968); The ANN L. LOCKWOOD, 37 F. 233 (D. Del. 1888); NORRIS, *supra* note 2, § 136.

award through successful, voluntary salvage services to a vessel in peril has a high-priority possessory, preferred maritime lien on the vessel.[37]  A salvor in possession of a vessel is not bound to surrender it on demand to the owner until reasonable security has been provided for his claim. On the other hand, the salvor must move with all deliberate speed to either arrange for the posting of security or bring an action *in rem* against the vessel to foreclose his lien. However, it is improper for the salvor to deny the owner or his agents access to his vessel or property to inspect or preserve it.[38] Thus, the general rule is that the salvor may retain possession of a vessel until either the owner posts adequate security or it is established that he will not. The salvor must, in the former case, release the vessel to the owner or, in the latter case, turn the vessel over to the U.S. Marshal and proceed to foreclose his lien. When the salvor is not in possession of the vessel, such as when he tows a vessel with its crew still aboard off a strand and it then can proceed on its own, there is little that the salvor can do when the vessel throws off the towline and departs. The salvor must rely on his lien and seek enforcement by an action against the vessel or its owner.[39]

The question of ownership of "abandoned" vessels is a thorny one which is much given to both litigation and misunderstanding. Indeed, even the concept of what constitutes an "abandoned" vessel is confusing to many because the law uses the term "abandoned" variously for different purposes. One of the most popular myths associated with salvage is that a derelict vessel found adrift or abandoned becomes the property of the finder. Technically, an "abandoned" vessel, more properly called by the proper nautical term "derelict," is one which was left by its crew without intention to return and without hope of recovery.[40] Such a vessel may also be properly called a wreck. Previously, whether or not a vessel had been "abandoned" and become a derelict was extremely significant because the customary award in such cases was a moiety (half) of the vessel's value. However, that practice has long since been abandoned.[41] Today, such circumstances affect the salvage award only in the degree of peril from which the vessel was saved.

---

37. *See, e.g.,* 46 U.S.C. § 31301(5)(F) (1993); The FAIRFIELD, 30 F. 700 (D. Ga. 1887).

38. The ALCAZAR, 227 F. 633 (D.N.Y. 1915); *see also* NORRIS, *supra* note 2, §§ 150-54.

39. NORRIS, *supra* note 2, § 151; Albion Lumber Co. v. Inter-Ocean Transp. Co., 240 F. 1017 (D. Cal. 1914).

40. The BARQUE ISLAND CITY, 66 U.S. (1 Black) 121 (1862); *Rowe v. The BRIG,* 20 F. Cas. 1281; NORRIS, *supra* note 2, § 131.

41. Post v. Jones, 60 U.S. (19 How.) 150 (1857).

Even when a vessel is "abandoned" and left without intention to return or hope of recovery, the vessel remains the property of her owner absent some affirmative act by the owner which clearly and convincingly establishes a positive intent on the part of the owner to part with ownership.[42] The salvor who finds such a vessel obtains a possessory lien on the vessel but not ownership. The salvor must care for the vessel and make reasonable efforts to identify and locate the owner. The salvor may, of course, file an *in rem* action to foreclose his salvage lien and, if the owner fails to appear or make suitable arrangements to pay the salvage award, the salvor may bid his judgment at the marshal's sale and obtain clear title to the vessel.[43]

## VI. SALVAGE CONTRACTS

There are many sound reasons why a salvor would want the vessel master or owner to sign a salvage contract or agreement. Such a document would clearly establish that the vessel accepted the salvage services. Similarly, the contract may address issues such as security, arbitration, interest, attorney's fees or other terms. The contract may or may not specify the compensation to be paid in the event of success. If the contract pre-dates the services, rather than being executed contemporaneously with or after the services, the services are not salvage services because the services are not rendered voluntarily but as the result of a pre-existing legal duty.[44]

Not every salvage contract results in contract salvage. If the contract provides that the contractor will be paid regardless of success, the services become contract salvage services.[45] The contract salvor retains a lien on the vessel but not a high priority salvage lien.

Importantly, if the contract provides that the salvor will be paid only in the event of success, whether or not the contract fixes the amount of compensation, the salvor retains his status as a "pure" salvor and retains also his salvage lien. Such contracts are called "no cure-no pay" salvage contracts.[46]

---

42. Columbus-America Discovery Group v. Atlantic Mut. Ins. Co., 974 F.2d 450, 1992 AMC 2705 (4th Cir. 1992), *cert. denied*, 113 S. Ct. 1625 (1993).

43. NORRIS, *supra* note 2, § 150.

44. BENEDICT, *supra* note 2, (Supp. 1993) § 172.

45. The PARISIAN, 264 F. 511 (5th Cir. 1920); BENEDICT, *supra* note 2, § 159.

46. NORRIS, *supra* note 2, § 159.

If the contract fixes the compensation to be paid to the salvor but only in the event of success, it is a fixed price, "no cure-no pay" salvage contract. Under such a contract, the salvor loses his right to a discretionary salvage award and can only be awarded the agreed amount.[47]

If the contract does not contain an agreement to pay a given sum or to pay without regard to success but only provides that the salvor will be entitled to an award in the event of success on a "no cure-no pay" basis, the services do not become contract salvage but retain their status as "pure salvage services."[48]

While some use is made of contract salvage for recreational vessels, primarily in the context of wreck removal, most salvage contracts presented to recreational vessel operators and owners are "no cure-no pay." The use of fixed price contracts is uncommon except in cases of raising vessels sunk at their berths in shallow water or in the salvage of vessels of relatively low value.

A number of questions arise even with regard to "no cure-no pay" contracts calling for a discretionary salvage award. One of the first inquiries raised, assuming that the owner did not execute the agreement, is whether the person executing the contract on behalf of the owner had, or needed, the authority of the owner to sign the agreement. It is well settled that when a vessel requires salvage services, the vessel's master has the authority to sign a salvage agreement without special authority from the owner who is bound by the actions of the master.[49] However, the signing of a salvage agreement by the master after the vessel has been assisted requires authorization by the vessel owner.[50]

Next, the insurer presented with a salvage agreement signed by the insured or his agent will often argue that the agreement is void because it was signed as the result of duress or coercion. Of course, if the agreement was signed after the services were rendered, any duress or coercion created by the exigent circumstances is no longer a factor. Just because the contract was signed under exigent circumstances, however, does not automatically mean that it is unenforceable as a result of duress. A certain amount of duress is inevitably present when the master or owner is under the pressure of the peril threatening his vessel. Duress of that nature does

---

47. *Id.*

48. The CAMANCHE, 75 U.S. (8 Wall.) 448 (1869).

49. Andrews v. Wall, 44 U.S. (3 How.) 568 (1845); The G.W. JONES, 48 F. 925 (D.N.Y. 1892).

50. NORRIS, *supra* note 2, § 178.

not, however, automatically void the salvage agreement. An admiralty
court will closely scrutinize the agreement for any sign of overreaching,
improper coercion or over charging by the salvor, and will set aside the
contract if it finds that the salvor took advantage of the situation to impose
unconscionable or inequitable contract terms on the vessel. Extortionate
demands forced by a salvor upon the master of a vessel *in extremis* will not
only void the contract but often results in a salvage award that is less than
it would otherwise be. If, however, the terms of the contract are reasonable
and not oppressive, the contract will be upheld without regard to pressures
created by the emergency faced by the vessel.[51]

        Many of the same factors that will void a contract under common
law such as fraud, collusion, mutual mistake, misrepresentation or
suppression of material facts or compulsion will also void a salvage
contract.[52] There are few reported cases involving recreational vessels
where a salvage agreement has been found to be void because of duress,
fraud or coercion. In one case, however, the arbitrator found an agreement
to salvage a recreational vessel to be unenforceable, not because the
provisions with regard to compensation were unconscionable, but because
they were incomprehensible.[53]    The arbitrator found, however, no
misconduct on the part of the salvor and went on to award $8,500 for the
salvage of a motorboat worth $41,500.[54]

## VII. SALVAGE ARBITRATION

        Many salvage contracts include a provision under which disputes
regarding to the salvor's compensation will be submitted to binding
arbitration. The most widespread of these is Lloyd's Open Form Salvage
Agreement ("LOF") which is used worldwide. The LOF provides for the
provision of salvage services on a "no cure-no pay" basis. Most of the
agreement is taken up with detailed provisions for arbitration of the salvage
award at Lloyd's of London under English law. The concept of a standard
form of salvage agreement calling for London arbitration has been in use
since the 1890's when England not only had the world's largest navy and
merchant marine but controlled much of the world's trade. Originally, the

---

51. The ELFRIDA, 172 U.S. 186 (1898); The EMULOUS, 8 F. Cas. 704 (C.C.D. Mass. 1832).

52. *See generally* NORRIS, *supra* note 2, §§ 166-71.

53. *In re* SHOPPING SPREE, 1993 AMC 1296.

54. *Id.*

motivation was to protect vessel owners and their insurers, both usually English, from exorbitant salvage awards in what was viewed as the backwaters of the world. However, the system of knowledgeable arbitrators deciding salvage cases on written submissions and affidavits worked so well that it not only survived the decline and fall of the British Empire but it became the standard forum for resolving salvage disputes involving professional salvors and vessels of every nation. Indeed, the use of arbitration as the preferred method of resolving salvage disputes became so widespread that reported salvage cases became few and far between.[55]

With the large increase in numbers of professional salvors serving recreational vessels, it is not surprising that they would adopt and use the LOF given its status as the world standard. However, the expansion of the recreational vessel population has brought new insurance carriers into the maritime market: carriers who were uncomfortable with the unfamiliar concepts of salvage and arbitration; carriers who were even more uncomfortable with having their interests decided in London at what they viewed as great expense by English barristers and solicitors. The situation was exacerbated by some salvors who used the threat of compelling London arbitration as a club in settlement negotiations. Threatened with increasing numbers of London arbitrations, some carriers have challenged the enforceability of the London arbitration clause which is the heart of the LOF.

To the great surprise of many admiralty counsel, the challenge to the enforceability of London arbitration under the LOF has met with some success. The attack came from an unsuspected quarter. In the recreational boating context, the LOF at issue was almost always an agreement between two U.S. citizens involving services to be provided to a U.S. vessel in U.S. waters. Thus, the argument was successfully made that under the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards,[56] the court could neither compel arbitration in London under the LOF nor enforce an arbitration award should one be entered. Without the provision for enforcing binding London arbitration, the LOF is useless to a salvor.

The core of the argument is that the statute, implementing the Convention, provides that when an arbitration agreement or award arises from a relationship that is entirely between citizens of the United States, the

---

55. GILMORE AND BLACK, *supra* note 2, §§ 8-15, at 582-83.

56. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2518, T.I.A.S No. 6997 (1958).

agreement or award is deemed not to fall within the Convention (and thus foreign arbitration can be neither enforced nor compelled) unless the relationship involves property located abroad, envisages performance abroad, envisages enforcement abroad or has some other reasonable relationship with a foreign state.[57] Despite arguments that an agreement between U.S. citizens to arbitrate at Lloyd's clearly assumes both performance and enforcement abroad, some courts have found that arbitration in London under the LOF can be neither compelled nor enforced. This has been the case even when the vessel insurer signed a separate letter of undertaking incorporating the LOF and promising to pay the arbitration award.[58]

These decisions have potentially sounded the death knell for use of the LOF by salvors of recreational vessels in the United States. However, the identical issue has recently been litigated in the District Court of New York, where both the decisions in *Brier* and *Reinholtz* were criticized.[59] The court notes that both decisions were determined by magistrate judges, who "gave too little recognition to the content of the LOF's and the precise language of Section 202" of the Convention.[60] In the *Jones* suit both parties were U.S. citizens, the vessel was located in the United States, and the only connection with a foreign forum was the LOF. The court held that in selecting the LOF the intent of the contract was the use of English law and the enforcement of the salvage Award in Great Britain. Therefore, the court determined that the salvage contract did not violate the convention, because it clearly "envisaged enforcement abroad."[61]

Whether the insurance companies will enjoy any long term benefit remains to be seen. Certainly, there will be more litigation with regard to salvage awards. Both the Society of Marine Arbitrators of New York and the Maritime Arbitration Board of Miami are scrambling to put panels of salvage experienced arbitrators into place to fill the potential void left by the demise of the LOF. Boat Owners Association of the U.S. has established an arbitration system to deal with such cases and incorporated a term calling for binding local arbitration in their salvage agreements.

---

57. 9 U.S.C. § 202 (1987).

58. Brier v. Northstar Marine, Inc., 1993 AMC 1194 (D.N.J. 1992); Reinholtz v. Retriever Marine Towing & Salvage, 1993 WL 414719 (S.D. Fla. 1993).

59. Jones v. Sea Tow Servs. Freeport NY, Inc., 828 F. Supp. 1002 (E.D.N.Y. 1993).

60. *Id.* at 1015.

61. *Id.* at 1015-16.

## VIII. SALVAGE AND INSURANCE COMPANIES

Yet another area of frequent misunderstanding is the liability exposure of the hull underwriters in salvage situations. In cases of disabled vessels and groundings where the salvors performed so well that the vessel suffered no damage whatsoever, it is frequently argued that there can be no loss without damage and, thus, no liability on the part of the insurance company. Indeed, one company has argued that its hull policy provided no coverage for salvage claims whatsoever and it had no duty to provide a defense for its insured against an action brought by a salvor.[62]

Such attitudes reflect a basic misunderstanding of the nature of salvage. Aetna was quickly disabused of its ill-conceived position by the Connecticut Superior Court which invited Aetna's attention to the well settled admiralty law that salvage claims are a covered loss.[63] Indeed, the court correctly pointed out that the true beneficiary of the salvor's services was Aetna not the vessel owner. Thus, Aetna was not only required to provide a defense but to pay an award to the salvor.[64]

Indeed, hull insurers are not only required to pay salvage claims and provide a defense to the insured but may be sued directly themselves for the amount of the salvage award. It has long been established that any party receiving a direct pecuniary benefit as a result of the salvor's services is liable to pay a salvage award. This includes the hull insurers and such actions are not barred by statutory prohibitions of direct actions against insurers under insurance policies.[65]

The *Cresci* decision has proven very useful to salvors. With an insurance company as a co-defendant, it is usually not necessary to take the vessel into the custody of the U.S. Marshal. This expedites the case and avoids the posting of bonds as well as significantly reducing the costs of litigation and paperwork involved. It also obviates the necessity of conducting a sale of the vessel to collect the judgment and eliminates the risk that the proceeds of the sale will not cover the judgment. Indeed, the concept of a direct salvage claim against the hull underwriters provides a sort of self-executing letter of undertaking to the salvor. The better practice, however, is still to obtain a waiver of seizure from the vessel

---

62. Aetna Casualty & Sur. Co. v. Eberheim, 556 A.2d 1067, 1990 AMC 226 (1988); *see also* Peters v. Warren Ins. Co., 39 U.S. (14 Pet.) 99 (1840).

63. *Id.*

64. *Id.*

65. Cresci v. Yacht BILLFISHER, 874 F.2d 1550 (11th Cir. 1989).

owner to preserve the lien in the event that the insurer becomes insolvent.

The concept also can significantly increase the amount of the salvage award. A salvage award against a vessel owner is usually based on the post-salvage, pre-repair market value of the vessel as the measure of the benefit bestowed by the salvage services on the owner. This is logical since market value is what the vessel is worth to the owner. Such a measure can be difficult, however. There will be arguments over depreciation, whether the market is high or low, etc. Market value can be an illusive concept.

With regard to the hull insurer, however, the benefit is much more easily calculated. If the vessel was at risk of becoming an actual or constructive total loss, the benefit bestowed on the insurer is the insured value of the vessel under the policy (since that is what the insurer would have had to pay) less the actual cost of repairs. If the vessel was not at risk of loss, the measure of benefit is what the cost of repairs would have been but for the actions of the salvors less the actual cost of repairs. Many times, the insured value far exceeds the market value. The cost of yacht repairs is also usually a high figure.

## IX. SALVAGE AWARDS

We turn next to the determination of the amount of the salvage award. Computation of the salvage award has traditionally followed the long standing guidance provided by the Supreme Court more than a century ago.

In *The BLACKWALL*, Justice Clifford set out the six factors to be considered in determining the amount of the salvage award.[66] The Second Circuit has arranged them in descending order of importance as follows:

    (a)    The degree of danger from which the vessel was rescued;

    (b)    The post-casualty value of the property saved;

    (c)    The risk incurred in saving the property from impending peril;

    (d)    The promptitude, skill, and energy displayed in rendering the service and salving the property;

    (e)    The value of the property employed by the salvors and the danger to which it was exposed;

---

66. The BLACKWALL, 77 U.S. (10 Wall.) 1 (1869).

(f)     The costs in terms of labor and materials expended by the
        salvors in rendering the salvage service.[67]

In considering its award, the court must not only consider the peril
immediately faced by the vessel but the dangers presented by the situation
that might have forseeably developed but for the actions of the salvors.[68]

    The value of a vessel to her owner is what he can obtain for her in
an arm's length, negotiated sale in the open market. Thus, the value of the
benefit bestowed by salvors on the vessel owner is a vessel's market value
after the salvage service but before repair compared to what her market
value would have been had the salvors not intervened to relieve her from
her peril. However, the amount of a salvage award is not based on a
precise or exact valuation of the salved property particularly when that
value is high.[69]

    Counsel for vessel owners and their insurers sometimes argue that
had the vessel sunk, she would have lost as much as one-third of her
market value as "damaged damage" not because of the physical damage to
the vessel but as the result of the damage to the vessel's reputation. Thus,
they argue, a lesser salvage award should be made for preventing the vessel
from sinking because the vessel would have been worth less had she sunk.
However, care must be taken with such arguments. A savvy salvor's
counsel will argue in return that, as a result of the salvor's efforts, the
vessel owner was able to substantially avoid any significant loss of market
value from the stigma of becoming known as "damaged goods."
Accordingly, the successful efforts of the salvor saved the vessel's owner
a loss of market valued above and beyond the cost of additional repairs and
damage prevented by its actions and the award should be even greater.

    The salved value is the post-casualty value of the property, in her
damaged state, at the time of the salvage or after the vessel is brought into
safe harbor.[70] Deducting the actual cost of repairs from the value of the
vessel after repairs is an acceptable measure of the vessel's value after
salvage or salved value.[71]

---

67.  *Ocean Servs. Towing*, 810 F. Supp. at 1263, (citing *E.V. Bureau Wijsmuller*, 702 F.2d
333, 339); Brown v. Johansen, 881 F.2d 107 (4th Cir. 1989) (noting hierarchy of factors); Platoro
Ltd. v. Unidentified Remains of Vessel, 695 F.2d 893, 904, *cert. denied*, 464 U.S. 818 (1983)
(listing factors in this order).

68.  BENEDICT, *supra* note 2, §§ 249-250.

69.  NORRIS, *supra* note 2, §§ 258-259; *see also* Rand v. Lockwood, 16 F.2d 757 (4th Cir.
1927).

70.  *See Beach Salvage Corp.*, 201 F. Supp. 479, 483; BENEDICT, *supra* note 2, at § 259.

71.  The OXFORD, 66 F. 590 (5th Cir. 1895).

Another area of frequent dispute is the interplay between promptness and labor in determining the salvage award. It will often be argued that since the salvors had the fire out or the flooding under control in a relatively short time, that the salvage award should be reduced accordingly because no significant labor was involved.[72] This is, of course, ridiculous. Salvors should not be encouraged to prolong their labors to enhance their award anymore than they should be penalized because the damage to the vessel was minimal. Any diminution of the salvage award based on such factors would be contrary to public policy inasmuch as they would encourage salvors to take their time and to allow further damage to the vessel.

Indeed, in cases of fire or flooding, rapid action is far more important than the amount of labor expended since the expenditure of too much time in such situations will only serve to worsen the damage. When time is of the essence, the shortness of time spent in rescuing the vessel does not lessen the merit of the service.[73] For example, in the seminal salvage case of *The BLACKWALL*, the fire-fighting services rendered took less than one hour.[74]

In considering the size of the salvage award to which the salvor is entitled, it is important to remember that the amount of the salvage award is not based on work and labor performed on an hourly or fixed rate basis, but is given as a reward to ensure safety of property and life at sea. There is a strong public policy in favor of encouraging salvors to save and restore property to its owners and to encourage others to venture out and save distressed property. Public policy is that salvage awards should be liberal in the form of a "reward," not quantum meruit.[75]

Public policy dictates that a salvor's award should be such as to encourage others to aid vessels in distress.[76] "Public policy requires that such a promise of reward should be held out, in case of success, that all those in a situation and competent to render relief, shall be eager to do so from the mere hope of gain."[77] The salvage award should be neither too much nor too little. It must be sufficiently liberal to encourage salvors but

---

72.  NORRIS, *supra* note 2, §§ 274-276.

73.  NORRIS, *supra* note 2, § 275.

74.  *See* The BLACKWALL, 77 U.S. (10. Wall) 1 (1869).

75.  Seaman v. TANK BARGE OC601, 325 F. Supp. 1206, 1209 (S.D. Ala. 1971); Lancaster v. Smith & S/Y CHANDRA, 330 F. Supp. 65 (S.D. Ala. 1971); *B.V. Bureau Wijsmuller*, 702 F.2d at 308; *see also* BENEDICT, *supra* note 2, § 232.

76.  Tonder v. M/V The BURKHOLDER, 630 F. Supp. 691 (D.C.V.I. 1986).

77.  Tidewater Salvage, Inc. v. Weyerhaeuser Co., 633 F.2d 1304, 1307 (9th Cir. 1980).

not so high as to discourage vessel owners from seeking assistance.[78]

## X. PROFESSIONAL SALVORS

Exactly what constitutes a professional salvor has not been precisely defined. However, *The LAMINGTON* set out some factors as to what constitutes a professional salvor, including machinery, skills, and appliances being ready for instant service even if only called for occasionally.[79] Another case, *Bindon v. Jones*, indicates that a part-time professional salvor can exist.[80] Furthermore, the Second Circuit has indicated that "exclusive devotion of a company's resources to salvage is not a condition precedent to recognition of a professional salvor's favored status."[81] Most recently it was noted that part-time professional salvors, although called upon to perform salvage operations, deserve an increment due to their availability to persons in distress.[82] In most cases, the salvors involved have devoted a significant amount of capital, time and energy in furtherance of the services they provide. Although they may not engage in salvage operations seven days a week, they are available to do so should the need arise. For this reason and the reasons cited above, the Court should find that the salvors involved are appropriately considered as professional salvors and are entitled to an equitable uplift in the salvage award because of their professional status.

Public policy also provides that, in order to encourage professional salvors to relieve the taxpayers from the necessity of buying, equipping and maintaining salvage vessels as well as training and maintaining their crews, professional salvors are entitled not only to compensation for services rendered, but to a so-called equitable uplift or incentive bonus to induce both small and large salvors to remain in business, prepared to respond to the next mayday.[83] A professional salvor is entitled to claim a special bonus award for a successful salvage.[84] The concept that professional salvors are entitled to premium pay for successful completion of their

---

78. The VEENDAM, 46 F. 489 (D.N.Y. 1891).

79. The LAMINGTON, 86 F. 675 (2d Cir. 1898).

80. 1986 AMC 1403 (W.D. Wash. 1984).

81. BENEDICT, *supra* note 2, § 81.

82. H.R.M., Inc. v. S/V MARTINA MIA II, 1992 AMC 1347, 1351 (D.R.I. 1991).

83. *SHOPPING SPREE*, 1993 AMC 1296; *S/V MARTINA MIA II*, 1992 AMC 1347.

84. B. V. Bureau Wijsmuller v. United States, 487 F. Supp. 156, 1979 AMC 2331 (S.D.N.Y. 1979), *aff'd*, 633 F.2d 202, 1980 AMC 2993 (2d Cir. 1980).

services has been long standing and is widespread.[85]  There is strong
public policy that a professional salvor is entitled to a more liberal award
than an amateur in order to encourage professional salvors to maintain
salvage equipment and expertise.[86]

## XI. THE ENVIRONMENTAL FACTOR

One of the most interesting developments in salvage law has been
the growing attention paid to the environment. Ironically, the 1990 revision
to the Lloyd's Open Form has helped significantly in this regard.

With increasing government intervention into salvage situations
which posed a threat to the environment, salvors found themselves faced
with problems ranging from denial of access to ports to decisions to bomb
the vessel into splinters. Salvors became increasingly reluctant to expend
time and money on salving a vessel with little hope of receiving a
reward.[87]

In 1981, discussions were first held in Montreal to resolve the
problem. A draft convention on salvage was adopted to address this
issue.[88] The 1980 revision to the LOF provided the unsuccessful salvor
who attempted to salve a "tanker laden or partly laden with a cargo of oil"
with his expenses plus fifteen per cent as a reward if he attempted to
prevent or mitigate damage to the environment.

Subsequently, the International Convention on Salvage was adopted
and ratified by the United States.[89]  The 1990 revision to the LOF
incorporates articles 1, 8, 13 and 14 of 1989 Salvage Convention, and
provides that the unsuccessful salvor can receive, as a reward for his efforts
to prevent or mitigate damage to the environment, his expenses plus up to
200% of his expenses.[90]  Additionally, the successful salvor can have his
award enhanced as a result of efforts to protect the environment. This

---

85.  *See* Devine v. United Transport. Co., 1957 AMC 175 (W.D. Wash. 1956); W. E. Rippon
& Sons v. United States, 348 F.2d 627, 1964 AMC 2695 (2d Cir. 1965).

86.    7A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE 293 (Supp. 1992-1993).
*See also* Rainbow Line, Inc. v. M/V TEQUILA, 341 F. Supp. 459 (S.D.N.Y. 1972), *aff'd,* 480
F.2d 1024 (2d Cir. 1973).

87.  Donald R. O'May, *Lloyd's Form and the Montreal Convention,* 57 TUL. L. REV. 1412,
1434 (1983).

88.  *See generally* E. VINCENZINI, INTERNATIONAL SALVAGE LAW § 31 (1992).

89.  BENEDICT, *supra* note 2, App. B at 20 (citing International Convention on Salvage, Apr.
18, 1989, I.M.O. Doc. LEG/CONF 7/26).

90.  BENEDICT, *supra* note 2, App. A at 10.

concept shifts burden of costs of prevention and mitigation efforts from public to vessel owners and insurers. Availability of a reward for environmental efforts should encourage salvors to outfit vessels for environmental efforts and spare taxpayers costs of vessels, personnel, training and standby. Special compensation encourages salvors to "roll the dice" and undertake both salvage and environmental protection when the probability of success of salvage is slim.

The overall concept encourages environmental protection as a whole. Several courts have found this argument persuasive and enhanced a salvor's award for efforts to protect the environment.[91] To obtain such an award, the salvor must prove by a preponderance of evidence that damage to the environment would have occurred but for salvage efforts.[92] Potential problems exist with regard to the definition of "substantial physical damage" to the environment, especially in cases where no damage occurs, as well as with the definition of "major" incidents.    Other definitions within the treaty will also require judicial interpretation. Valuation of marine resources is also a problem. Another problem will be the fact that the hull underwriters usually pay salvage awards while Protection and Indemnity ("P & I") underwriters pay for clean-up costs and environmental damage. Under the *Cresci* doctrine, this may result in P & I underwriters becoming directly liable for the environmental portion of the salvage award.[93]  While the concept will probably require much litigation and interpretation, it should prove useful for both salvors and the environment.

## XII. THE AMOUNT OF THE AWARD

Salvage awards are not based on any fixed percentage of the vessel's value. Historically, the practice in ancient times was to award a fixed percentage of the vessel's salved value in all salvage cases of similar circumstances. From this ancient usage, the practice of awarding a fixed percentage of the salved value based on the order of salvage became customary and widespread.[94] To this day, many salvors assume that such

---

91.  Trico Marine Operators, Inc. v. Dow Chem. Co., 809 F. Supp. 440, 1993 AMC 1042 (E.D. La. 1992); *see also* Westar Marine Serv. v. Heerema Marine Contractors, 621 F. Supp. 1135, 1988 AMC 1122 (N.D. Cal. 1985).

92.  *Ocean Servs. Towing*, 810 F. Supp. at 1264.

93.  *Cresci*, 874 F.2d at 1551.

94.  The EGYPT, 17 F. 359 (D. Va. 1883).

is still the practice. However, this is not correct. While some awards are still expressed in terms of a percentage, this practice is becomingly increasingly rare. Each award, whether expressed in terms of a percentage of salved value or a quantum, must be based on the peculiar circumstances of each case taking into consideration all the *BLACKWALL* factors.[95]  The use of a fixed percentage award to be applied to all salvage cases of similar circumstances is no longer valid.[96]

Similarly, awards in other salvage cases cannot serve as an absolute precedent because each case must be judged based on its own circumstances. However, awards in similar cases may be used, if not as precedent, as guidance.[97]  This is especially true, where the vessel salved is a yacht rather than a "blue water" vessel. While a salvor of a $60 million tanker may be more than adequately compensated by a very small percentage of the vessel's value (1%-2%), the salvor of a yacht may not be reasonably compensated on the same percentage basis.

Frequently, the value of the vessel and equipment put at risk by the salvor equals or exceeds the value of the vessel assisted. It is almost certainly a more significant percentage then when large ocean going vessels are assisted. The public policy component of providing incentive to salvors by having those who use their services contribute so that they remain available for other boaters who might need them is also more significant in the recreational vessel context. Thus, salvage awards reported in cases involving large commercial vessels in a blue water context provide little guidance with regard to the size of an appropriate reward.[98]  An examination of recent salvage cases involving yachts may prove instructive, however, as to the typical range of awards in such cases.

For example, in one of a series of recreational salvage cases referred to binding arbitration by Judge Pettine of the U.S. District Court for the District of Rhode Island, awards of $3,000 and $13,000 were made for saving yachts with a value of $12,000 and $48,000 respectively. The total time expended by the salvor was just under one hour. However, the vessels were saved, at some risk to the salvor, from being driven aground and suffering serious damage or total destruction. The salvor, running a business virtually identical to those of the salvors in this case, was also found to be entitled to an enhancement of 5% of the salved value to the

95. *The BLACKWALL*, 77 U.S. at 14.

96. Murphy v. The SULIOTE, 5 F. 99 (C.C.D. La. 1880); NORRIS, *supra* note 2, § 240.

97. *See generally* NORRIS, *supra* note 2, §§ 236-41.

98. *SHOPPING SPREE*, 1993 AMC at 1310.

award as a professional salvor.[99]   Similarly, in a recreational salvage arbitration in Boston, an award of $8,500 was made for the salvage of a grounded motorboat with a value of $41,500 involving moderate peril not involving serious risk of loss.[100]

Judge Marcus of the Southern District of Florida recently awarded $8,000 to the salvor of a recreational boat with a salved value of $16,100 where the vessel was saved from sinking in deep water.   The salvor plugged a leak and de-watered the vessel using his own pumps and a Coast Guard pump.[101]

Merely because the value of the vessel is high, it does not follow that the award must also be high.[102]   However, large valuation of the vessel or benefit does frequently result in more liberal awards because it enables the court to confer a reward large enough to encourage salvors without casting too heavy a burden on property large enough to bear it.[103] Thus, the combination of high values and highly meritorious services should result in a high award.[104]

## CONCLUSION

The ongoing struggle between insurers and salvors is unfortunate. While there have been some instances of abuse by salvors, as a whole, the salvage industry provides a valuable service which inures to the benefit of insurers. Insurers should be more willing to pay generous salvage rewards and thus avoid not only wreck removal expenses but the loss as well. One of the best alternatives is to have pre-negotiated fixed price salvage contracts in place for defined geographic areas even before the losses occur. Salvors also need to open better lines of communication with insurers, provide more information and purge their ranks of "pirates and freebooters."

---

99.   *S/V MARTINA MIA II*, 1992 AMC 1347.

100.   *SHOPPING SPREE*, 1993 AMC 1296.

101.   *Ocean Servs. Towing*, 810 F. Supp. 1258.

102.   The DEVONIAN, 150 F. 831 (D. Mass. 1907).

103.   Hennessey v. The VERSAILLES, 11 F. Cas. 1128 (C.C.D. Mass. 1853).

104.   The ST. PAUL, 86 F. 340 (2d Cir. 1898); NORRIS, *supra* note 2, § 258.

## BOAT/US SALVAGE ARBITRATION

OFFSHORE MARINE TOWING, INC.          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )          Case No.: 04-0527
                                      )
D.B. MARINE LTD., DANNY BOTTON        )
and M/V CASA GRANDE,                  )
                                      )
          Defendants.                 )

## ARBITRATION DECISION AND AWARD

PANEL: James L. Chapman, IV, Chairman (Crenshaw, Ware & Martin, P.L.C., Norfolk, Virginia); Edward V. Cattell, Jr. (Holstein, Keating, Cattell, Johnson & Goldstein, P.C., Philadelphia, Pennsylvania); Reginald M. Hayden, Jr. (Hayden & Milliken, P.A., Miami, Florida).

COUNSEL: John K. Fulweiler, Counsel for Plaintiff (DeOrchis, Hillenbrand & Weiner, L.L.P., Miami Florida); Albert L. Frevola, Jr., Counsel for Defendants (Gordon, Hargrove & James, P.A., Fort Lauderdale, Florida).

James L. Chapman, IV, Panel Chairman:

Following review of the Memoranda and Exhibits submitted by the parties, the Arbitration Panel met telephonically on December 7, 2004 and considered the merits of the claim of plaintiff Offshore Marine Towing, Inc. ("OMT") against defendants D.B. Marine Ltd., Danny Botton and M/V CASA GRANDE (collectively "DBM"). The Panel majority issues the following decision and award:

D.B. Marine Ltd. is the owner of M/V CASA GRANDE, an 85 foot twin screw motor yacht built in 1984. At approximately 2300 hours on Christmas Eve 2003, under the command of Capt. Leroy Roxbury, the vessel ran hard aground on North Rock, just north of North Bimini, Bahamas. At the time of the grounding, the tide was falling. Capt. Roxbury soon made contact with the U.S. Coast Guard on VHF marine radio channel 16, requesting assistance.

OMT is a professional salvage and towing company operating in southeast Florida which caters to the needs of the recreational boating industry by responding to marine casualties and requests for assistance. In order to monitor distress calls and communicate with its own vessels, OMT has invested in VHF high site radio antennae, including a 700 foot antenna installed in 2002 to reach the Bahamas. OMT constantly monitors the VHF marine radio for distress calls. The call from M/V CASA GRANDE was monitored by OMT, which, after verifying the grounding and that no one was hurt, offered to send a vessel from Port Everglades to pull the M/V CASA GRANDE off the rocks. Capt. Roxbury accepted OMT's offer (VHF Transcript, p. 6).

OMT then dispatched TOWBOAT #5 with a crew of two, Capt. Knecht and Capt. Halvorson. Throughout the transit, OMT remained in regular radio contact from its south Florida office with Capt. Roxbury to monitor the conditions of the M/V CASA GRANDE at North Rock. During these communications, Capt. Roxbury advised that the vessel was hard aground on the rock, and there was water in the bilges but pumping appeared to be keeping it from flooding the vessel. He advised that he had checked the running gear and that it did not appear to be damaged. (VHF Transcript, pp. 14, 16, 20-21)

TOWBOAT #5 was underway by 0100 hours and made the transit of approximately 40 miles across the Gulf Stream in less than three (3) hours, arriving at North Rock at 0345 hours on Christmas Day.[1] Capt. Knecht then boarded M/V CASA GRANDE with permission of Capt. Roxbury and/or Danny Botton. Capt. Knecht, believing that Botton was the owner, gave him OMT's standard form salvage contract (OMT Ex. 11D) and requested Botton to sign it. Botton refused, denying that pulling the vessel off the rocks would constitute salvage and, at the same time, expressing concern that, even though he had insurance, if he signed the contract, he would lose the vessel. Knecht Aff.

Botton then requested that Capt. Knecht check the condition of the vessel and offered that he would afterwards discuss the salvage contract. Internal inspection by Capt. Knecht revealed water in the several bilge spaces; there was so much water in the center space bilge of the engine room that the high water alarm was sounding. Water was observed to be entering at the shaft tubes. Because it appeared that the bilge pumps were not working, Capt. Knecht obtained pumps from TOWBOAT #5 and commenced dewatering M/V CASA GRANDE. Capt. Knecht also went over the side of the vessel to the rocky shore and checked the condition of the hull, finding that it appeared to have damage at the bow from the grounding but without obvious holing or structural damage. The forward 1/3 of the vessel was completely out of the water.[2] Knecht Aff.

The seas continued to build to average heights of three to four feet (3 - 4') and, as they struck the stern, the waves caused the vessel to pound on the rock, damaging the propellers, shafts and rudders. Because the tide would not begin to rise sufficiently until after 0600 hours, nothing could be done by TOWBOAT #5 until then to pull M/V CASA GRANDE off the rocks. Botton continued to argue with Capt. Knecht about the salvage contract, claiming that he did not

---

[1]  TOWBOAT #5 was the first salvage vessel on scene. Although another salvor arrived on scene shortly thereafter, it was unable to provide assistance due to an engine failure and departed the scene for Bimini to obtain repair. Tellam Aff.

[2]  There is a substantial dispute between the parties regarding the presence of water in the bilges and the extent to which the vessel was grounded. DBM has submitted a transcript of an unsworn interview of Capt. Roxbury by counsel for DBM and a Bahamian police report made by Botton and Roxbury. OMT has submitted the transcript of the VHF radio communications during the relevant period, the accuracy of which DBM does not challenge. The Panel majority finds that the statements of Roxbury and Botton are not credible. They are replete with contradictions. For example, Roxbury and Botton claim that M/V CASA GRANDE merely drifted onto the rocks, whereas the VHF transcript documents Roxbury stating that they were underway making 8 to 9 knots at the time of the grounding. According to John Tellam, who spoke to Botton on December 26, Botton said that the vessel had been making 12 knots at the time of the grounding. Tellam Aff. Likewise, the VHF transcript documents Roxbury telling OMT that they were taking on water and the post-casualty repair invoice (DBM Ex. E4) documents that 500 gallons of oily bilge water was pumped at the repair yard, yet Roxbury and Botton both deny that the vessel took on any water in their statements. There are numerous other inconsistencies which cast substantial doubt on the veracity of Roxbury's and Botton's statements in their entirety.

have insurance. Capt. Knecht explained that he would not render assistance unless Botton specifically agreed to accept OMT's services. Knecht Aff.

Because of the worsening conditions, Botton requested that Capt. Knecht put a hawser on M/V CASA GRANDE. In order to do so, Capt. Knecht had Capt. Halvorson anchor TOWBOAT #5 and a hawser was then attached to the stern of M/V CASA GRANDE. Knecht Aff.

As the tide began to rise, the vessel started to pound even more on the rocks. At about 0620 hours, Botton came out of his cabin and demanded to know why TOWBOAT #5 was not pulling M/V CASA GRANDE off the rocks. When Capt. Knecht explained that it was because Botton had not accepted OMT's salvage services, Botton then requested Capt. Knecht to commence salvage. TOWBOAT #5, under command of Capt. Halvorson, then successfully pulled M/V CASA GRANDE off the rocks.[3] Knecht Aff.; Halvorson Aff.

After she was refloated, Capt. Knecht made sure she was not holed. Although M/V CASA GRANDE continued to take on water through the propeller shaft tubes, OMT's pumps kept the flooding at bay. However, the vessel was unable to sail under her own power due to the damage to the running gear and Capt. Knecht towed M/V CASA GRANDE to Big Game Club in Bimini, Bahamas.[4] While still refusing to sign the salvage agreement, Botton gave a $500 tip to Capt. Halvorson, apologizing that he did not have more cash with him. TOWBOAT #5 thereafter departed for Florida, arriving at Lauderdale Marina at 1515 hours Christmas day. Halvorson Aff.

---

[3] DBM claims that OMT did not salvage M/V CASA GRANDE because Capt. Roxbury and the mate actually refloated her with a kedge anchor as the tide rose. As pointed out earlier, the statement of Capt. Roxbury is of doubtful veracity. No statement of the mate was submitted, which might corroborate this claim. Neither Botton's nor Roxbury's statements to the Bahamian police mention that the vessel was kedged off the rocks without any assistance from OMT. While Roxbury asserts that a winch was used with the kedge anchor, the winch is not described or depicted in any of DBM's submissions. Mr. Maclaren, the retired British naval officer put forth as an expert surveyor by DBM, offers no opinion that the winch was capable of hauling M/V CASA GRANDE off the rocks by means of the kedge anchor. In contrast, Capt. Knecht and John Tellam testified that M/V CASA GRANDE was too securely grounded to pull herself off the rocks by means of a kedge anchor. Knecht Aff.; Tellam Aff.

The Dissent makes the additional point that during the extended radio communication leading up the arrival of Towboat #5, the word "salvage" was not used. Rather, the term "commercial assistance" was used by OMT. "Commercial assistance" is a phrase which entered the lexicon when the U.S. Coast Guard determined that it would no longer provide property salvage services to the general public. (The U.S. Coast Guard still responds to situations in which life is in danger, but will not normally respond if only property is at risk.) Today, the Coast Guard will refer the distressed vessel to "commercial assistance." This phrase really refers to whatever assistance may be rendered by a commercial company, not the Coast Guard. The precise nature of such "commercial assistance," i.e., towage or salvage, can only be determined by the circumstances surrounding the casualty. The distressed vessel would understandably prefer to have such services characterized as a "tow." However, in this case, although Mr. Botton initially stated that he wanted only a tow, once his vessel began to pound on the rocks with the rising tide, he changed his mind and authorized the salvage.

[4] From the evidence submitted, it appears that approximately $60,000 of $94,000 in post-casualty repairs was attributable to the grounding. This includes the damage to the propellers, shafts and rudders, as well as water in the bilges. It also appears from the invoice that there was concern about damage to the transmissions, although it is not clear whether they were actually damaged. DBM Ex. E4. While there is a dispute between the testimony of Mr. Maclaren, a surveyor hired by DBM's insurer who attended the vessel, and Mr. Neil, a naval architect retained by OMT (who never had the opportunity to inspect the vessel) on this issue, the Panel notes that Mr. Maclaren's full survey report was not provided to OMT as required by the BOAT/US Salvage Arbitration Plan. ("Any supporting information or opinions obtained from a marine surveyor of the yacht . . . shall also be disclosed as soon as practicable.") For this reason, the Panel majority declines to accept the estimate of Mr. Maclaren.

3

Despite Mr. Botton's refusal to sign the standard form salvage agreement, the Panel majority finds that DBM authorized OMT to salvage M/V CASA GRANDE and that OMT successfully did so.

Under the BOAT/US Salvage Arbitration Plan, the Panel is called upon to consider nine (9) "Guiding Principles" in deciding a reasonable salvage award:

*1. Salved vessel's post-casualty valuation.*

While the parties have been unable to agree on little else, they have stipulated that the post-casualty value of M/V CASA GRANDE was $1,221,500.00.

*2. Weather, seas and other marine conditions immediately prior to, during and following the salvage recovery operations which relate to the danger to the property.*

The weather was sufficiently poor to justify a conclusion that it was unsafe for an 85-foot fiberglass vessel to remain aground on North Rock. The seas were breaking three to four feet (3 - 4') and the tide was rising which would have continued to pound the vessel. In addition, she was taking on water through her shaft tubes and OMT's pumps were required to prevent flooding. It is apparent that the M/V CASA GRANDE was in substantial peril had she remained grounded on the rocks and was at risk of severe damage.

*3. Degree of risk to persons or property during the recovery effort.*

Except for the pounding occasioned during the rising tide, there was only a slight degree of risk to persons or property during the recovery effort.

*4. Skill, experience, promptness and expertise of salvor.*

The salvors proceeded with a high degree of skill, experience, promptness and expertise. In particular, OMT was willing to send its vessel on a forty (40) mile journey across the Gulf Stream on Christmas Day to assist a grounded vessel in a foreign country. It dispatched two experienced and competent employees and maintained contact with M/V CASA GRANDE throughout the transit and salvage. Capt. Knecht is to be commended for his grace in handling the situation in the face of a belligerent and generally uncooperative owner.

*5. Time, equipment and expenses expended by the salvor in rendering the salvage service; and losses, if any incurred by the salvor.*

OMT committed TOWBOAT #5, valued at $130,000, and its crew of two experienced captains for in excess of twelve (12) hours in making the transit to Bimini, conducting the salvage, towing the disabled vessel to Big Game Club and returning home. OMT has not itemized any specific expenses, although it unquestionably incurred crew, fuel, supplies and similar expenses in the salvage. It also lost an anchor and some length of anchor chain and line, because it was necessary to cut the line during salvage operations.

*6. Time, equipment and expenses expended by the salvor to mitigate or prevent environmental damage.*

4

The Panel concludes that this Principle is inapplicable.

7. *Measure of success, extent of damage mitigated as a result of or caused by the salvage effort.*

The salvage was successful. No other salvor was available to provide assistance in the Bahamas and the situation was exacerbated by the Christmas holiday. It is doubtful that any assistance other than OMT's would have been rendered on Christmas Day if OMT had not responded. The Bahamas Coast Guard never responded to the distress call by M/V CASA GRANDE. The other salvor who arrived on scene had mechanical problems which prohibited rendering assistance. Had M/V CASA GRANDE remained on the rocks through a full tidal cycle, substantial additional damage would have been incurred. This was completely mitigated by OMT's prompt and efficient salvage of the vessel. OMT's salvage efforts did not cause any damage to M/V CASA GRANDE.

8. *Value, readiness and efficiency of salvor's vessel and equipment.*

There is no dispute that TOWBOAT #5 had a value of $130,000 at the time of the salvage. It was ready to respond and did so efficiently. In addition, OMT has invested over $2,000,000 in vessels and other equipment which allow it to perform its services in a highly professional and efficient manner. In particular, the high site VHF radio antenna substantially enhanced OMT's readiness in responding to the grounding of the M/V CASA GRANDE in the Bahamas. Cardone Aff. and OMT Exhibit 12C. The Panel credits OMT for its investment in these resources.

9. *Prevailing prices and awards for comparable salvage recovery operations and hourly or per foot salvage rates in that region.*

OMT has never sought a salvage award on any basis other than a percentage of the value of the property salved. It is therefore inappropriate to consider hourly or per foot salvage rates.

The Panel has reviewed the salvage awards in cases to which our attention has been directed. The awards in cases submitted by DBM do not involve salvage of vessels that were taking on water or in remote locations. Likewise, some of the awards in cases submitted by OMT involved vessels that were sunk or in the process of sinking on the open seas. The Panel finds it difficult to evaluate the facts of the awards in other cases because every salvage operation is so fact specific.

Considering all of the evidence in light of the Guiding Principles, the Panel majority finds that an award of twenty percent (20%) of the value of M/V CASA GRANDE is a fair and reasonable award for the salvage service rendered by OMT.

OMT, as a professional salvor, has also made a separate request for an "equitable uplift" of ten percent (10%) of the value of the vessel, citing *B.V. Wijsmuller v. United States*, 702 F. 2d 333 (2d Cir. 1983) and *H.R.M., Inc. v. S/V MARTINA MIA II*, 1992 A.M.C. 1347 (Arb., 1991). Under the Boat/U.S. Arbitration Plan, the Panel must follow the Guiding Principles. While the Guiding Principles do not separately provide for an "equitable uplift" for a professional salvor, the elements of an uplift are contemplated by the factors of "experience" and "expertise" within Principle 4 and the factors of "value, readiness and efficiency of the salvor's equipment" under

5

Principle 8. The Panel believes the factors of professional salvor status are already included within the Guiding Principles and declines to make a separate "equitable uplift" award.

OMT has requested an award of attorneys' fees in the amount of $10,741.50. No basis is offered to support OMT's request to depart from the American rule that each side is to bear its own attorneys' fees. There is no evidence of an agreement between the parties that DBM would pay the legal fees of OMT. Nor does the Arbitration Plan provide for an award of attorneys' fees to the prevailing party. Indeed, one of the benefits of the Plan is "sharply reduced cost, in comparison to Court proceedings as well as other arbitration plans." Plan, at p.2. The Panel believes that requiring payment of the prevailing party's attorneys' fees would eviscerate this substantial benefit of the Plan and declines to award attorneys' fees to OMT.[5]

Finally, OMT seeks pre-judgment interest at the rate of six percent (6%). DBM does not object. Pre-judgment interest in the amount of $12,224.40 is calculated from February 7, 2004 (30 days after invoice)[6] through December 7, 2004 (305 days at $40.08/day).

In summary, the award is as follows:

| | |
|---|---|
| Salvage award | $244,300.00 |
| Credit for payment | 500.00 |
| Net salvage award | 243,800.00 |
| Prejudgment interest | 12,224.40 |
| Final Award | $256,024.40 |

This final award may be reduced to judgment in any court of competent jurisdiction in accordance with the United States Arbitration Act. 9 U.S.C. § 9 *et seq.*

SO SAY WE.

James L. Chapman, IV, Chairman

Edward V. Cattell, Jr.

---

[5] There is, of course, a point at which attorney's fees would be awarded under admiralty and maritime law, for example in cases in which one of the parties has acted in bad faith so as to substantially increase the overall costs of the matter.

[6] The demand for a salvage award of 30% was mailed to Botton's counsel on January 8, 2004, stating that payment was due "upon receipt." The Panel majority believes that it is commercially reasonable for interest to commence 30 days after the date of the demand.

Edward V. Cattell, Jr., concurring:

I join in the entirety of the majority opinion, but feel that footnote 5 does not go far enough in its explication of the circumstances under which an arbitration panel can and should award attorney's fees and costs to the prevailing party, notwithstanding the "American Rule." The entire concept of the salvage contract calls for the parties to attempt to agree on fair compensation after the fact. Most salvage contracts call for the recovery of attorney's fees and costs by the salvor. However, if the owner of the salved vessel refuses to sign, as here, the salvage is not pursuant to contract, but is "pure salvage." The parties are still to try and agree on the salvage award. If they can not do so, the options are litigation or arbitration. The salved vessel (or, more likely, its underwriter) is not required to "roll over" in the face of what it deems an excessive demand for compensation. However, it must respond to the demand and negotiate in good faith. If no agreement can be reached, it should agree to arbitration, or, if it does not want to arbitrate, post adequate security and then litigate. If it does neither. If it refuses to negotiate in good faith, refuses to respond to an arbitration demand, and then refuses to respond to a demand for security, thus forcing the salvor to incur the cost of arresting the vessel, it must bear the cost of its intransigence and pay the legal fees and costs of the salvor in arresting the vessel. The arrest of the vessel is necessary, in such case, even if only to get the process of resolution of the fee dispute started. It should never be necessary. When the salved vessel, or its underwriter forces this action to be taken, it must be made to pay for it. This is especially true in smaller cases where the award is likely to be in the lower ranges. Let me be clear. There is no suggestion in the record we reviewed that Mr. Botton or his underwriter failed or refused to negotiate in good faith, or to proceed with arbitration. Mr. Botton's initial refusal to sign the agreement did not rise to the level of concern addressed herein. For this reason I agree that an award of attorney's fees is not supported in this case. However, I feel that each arbitration panel owes the industry the duty to develop the law in this area so that all parties clearly understand that they will be held to account if they cause the costs of the process to be increased needlessly.

Edward V. Cattell, Jr.
(concurrence)

Reginald M. Hayden, Jr., dissenting:

I respectfully dissent, in part, from the decision of my learned colleagues.

First, I do not believe that under the facts of this case that this is a salvage situation. A review of the radio transmissions between the parties over a three hour time frame makes absolutely no mention of the word "salvage". Instead there are discussions concerning "commercial assistance".[7] The owner, when OMT arrived on the scene, told them he wanted a tow to Bimini and refused to sign a salvage agreement.

---

[7]  I listened to the entire, actual tape of the conversations. "Salvage" was never mentioned. OMT asked if "commercial assistance" was needed and the vessel said "yes". Commercial assistance can be equated to towage for a fee and not salvage. Even Claimants agree they offered "commercial assistance". (Para. 10, OMT submission).

7

Sea Tow Miami (John Tellam), a competitor of OMT, also responded and arrived on scene at or about the time Offshore Marine Towing (OMT) arrived. The seas crossing the Gulf Stream were two to three feet, which were minimal. Tellam, in his Affidavit, makes the Gulfstream conditions out be "moderate to poor" with 2-3 foot seas, which is an exaggeration. OMT overheard a call to the USCG at 2345 on December 24, got underway, with 2 people aboard around 0100, arrived on scene at 0345 on a 31' custom JC with two 225hp diesels. The vessel was valued at $130,000. Upon arrival at the Casa Grande seas were approximately 3 feet. The OMT captain had no problem using a jet ski to leave his vessel and board the Casa Grande. After he boarded and had discussions with the owner, who refused to sign a salvage contract, telling OMT he wanted a tow into nearby Bimini. According to the owner, OMT agreed to this and accepted $500 cash. I believe that OMT agreed because a competitor, Sea Tow was standing by to negotiate and OMT did not want to lose the work. By agreeing with OMT, Casa Grande did not enter into negotiations with Sea Tow. It took OMT about 15 minutes to rig a towing bridle and by pulling in a direction opposite to the vessel's heading, the Casa Grande came off the bottom easily. Based upon the photos (which in my estimation clearly show only slight bottom damage to the keel forward) and other Affidavits, only the forward part of the bow section of Casa Grande was aground. The Casa Grande was never aground over one-third of its bottom as the Claimants have alleged. The fiberglass was not fractured or punctured. The vessel was never "pounding" on the rocks. The seas were not "breaking". Had these situations been occurring the vessel would never have pulled off so easily and with little hull damage. I totally disagree with the findings that the vessel was "hard aground". In reviewing the documentation, exhibits and briefs it is clear the Claimants have totally exaggerated and overstated their position and should be held accountable for doing so. In fairness, there are contradictions on both sides of the submissions, but I do not feel my colleagues have taken the OMT exaggerations or contradictions into consideration as I have done.

There was no danger of pollution. No great expertise was needed to make a short pull of minimal duration to free the vessel. In short, it was a simple, easy job that took no longer than fifteen minutes.

As an illustration of the very moderate weather conditions, the yachts Captain, in a small boat had earlier, put an anchor out aft to keep the vessel from turning or the stern from swinging or drifting on to the bottom, which was good seamanship.

Any degree of risk to OMT was very slight, if that. Were I to have agreed that this is a salvage situation I would have found this is salvage of the LOWEST order.

The Casa Grande was at the dock in Bimini by 0700. I would estimate that the total time spent by OMT was between 8 and 12 hours which would include the trip from Ft. Lauderdale to Bimini and return.

OMT accepted $500 from Mr. Botton before towing them to Bimini. I could be argued this constitutes a waiver and estoppel by OMT. It clearly shows OMT was looking for a

---

These words, under the circumstances, can be grossly misleading. OMT needed to fully disclose their intent to claim "salvage."

8

payment of cash that negates salvage. OMT accepted the cash and never gave an explanation as to what they understood it was for.

I agree with my colleagues that there should be no equitable uplift, that there should be a credit for the $500.00 which the owner of the Casa Grande paid to OMT in Bimini and further agree that under Admiralty and Maritime Law attorneys fees are not applicable.

I also dissent in awarding pre-judgment interest. OMT never sent an invoice to the vessel owner. There was never a demand for a dollar amount. The demand for 30% of the value of the vessel was patently unfair and overreaching. Pre-judgment interest should not be awarded based on these facts.

I disagree with my colleagues that the entire value of the OMT fleet should be taken into consideration. OMT got underway with one vessel which, at the time may or may not have been adequate for the job. There was no indication that any other vessels were to be considered in this operation and none were used.

OMT is the Boat/US representative in the Ft. Lauderdale area. As such they have an extensive fleet which is needed in order to service the Boat US members.

I would render a quantum merit award of $50,000 for the services performed. Such an award would breakdown to over $4000.00 per hour for OMT which would be extremely fair and reasonable. I feel that an award of 20% of the value of the vessel is exorbitant, not in line with the factual scenario and is simply an encouragement for alleged salvors to demand exorbitant figures for their services.

The Casa Grande is 80' long. Based upon a quantum merit award of $50,000 the Claimant OMT would receive $588.24 per foot for their services. Normal towage services in the Bahamas are $150 per hour.[8] Under any circumstance the award given by my colleagues in my estimation is exorbitant, ill founded and not in line with the facts and circumstances of this case.

Reginald M. Hayden, Jr.

---

[8]    Tow Boat (OMT) publishes its towing rates at $150/hour.