UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RALPH JOSEPH d/b/a NEW
BEDFORD MARINE RESCUE,
    Plaintiff,

    v.                                 CIVIL ACTION NO.
                                      04-11173-MBB

J.P. YACHTS, LLC,
    Defendant.

**MEMORANDUM AND ORDER**

**June 9, 2006**

**BOWLER, U.S.M.J.**

This action relates to the grounding of the M/Y Lady Mazie ("the Lady Mazie"), owned by defendant J.P. Yachts, LLC ("J.P. Yachts"), that occurred in Cuttyhunk's outer harbor in the early morning of September 2, 2003. Plaintiff Ralph Joseph d/b/a New Bedford Marine Rescue ("New Bedford Marine") rendered services to the ship and successfully freed the vessel from its grounding. Characterizing the services as pure salvage, New Bedford Marine seeks a substantial damages award of $350,000. J.P. Yachts, however, maintains that it entered into a contract salvage agreement with New Bedford Marine at the hourly rate of $125 per assist boat. Acknowledging its lack of payment, J.P. Yachts seeks a relatively small damages award either based upon this hourly rate or quantum meruit. Having conducted a two day trial and received the parties' post trial submissions, the issues are ripe for review.

BACKGROUND

Plaintiff Ralph Joseph ("Joseph"), a New Bedford resident, started New Bedford Marine with one boat in 1995. The company expanded such that by 2003 it had three communications centers consisting of towers, computer equipment and VHF marine radio antennae. The company also had five boats, two pick-up trucks and 12 to 13 Coast Guard licensed captains associated with the company.

The first of the New Bedford Marine boats involved in the September 2, 2003 rescue of the Lady Mazie was an aluminum bodied boat with an inflatable collar around it which served as a fender. Worth slightly more than $100,000, the boat had a towing drum and a tow line attached to the pilot house. This boat was the first to arrive on the scene and, notably, was "custom built for towing." (Tr. 1, p. 149).[1]

The second boat involved in the rescue was a KenCraft 21 foot commercial hull vessel with a 130 horse power engine. Of all the boats available to New Bedford Marine at the time, it was the one best designed for work in shallow water. The second boat, which sustained damages as a result of capsizing during the rescue, was worth an estimated $40,000 to $45,000 prior to the rescue.

New Bedford Marine provides emergency services primarily to

---

[1] Citations to the record are provided only for direct quotes.

2

pleasure crafts in the Buzzards Bay and Martha's Vineyard area that experience difficulty at sea.  In 2003, the company responded to an estimated 300 rescues.  The company's "busy season" runs from the end of June to Columbus Day.  Of those 300 rescues, only nine to 12 of them amounted to salvage operations.

Beginning in 1995, New Bedford Marine became affiliated with Tow Boat U.S. ("Boat U.S.") as an assistance provider for Boat U.S. members.[2]  In 2003, New Bedford Marine remained affiliated with Boat U.S.  Like other approved assistance providers, New Bedford Marine was a party to an annual license service agreement with Boat U.S.  Towing companies, such as New Bedford Marine, enter into annual licenses with Boat U.S. and thereby receive the benefit of being recommended to Boat U.S. members in need of towing and ungrounding services for soft, as opposed to hard, groundings using one, as opposed to two, assist boats.

New Bedford Marine receives a significant amount of business as an approved Boat U.S. assistance provider.  In fact, almost two thirds of New Bedford Marine's assist operations come about through referrals from Boat U.S. to service Boat U.S. members.[3]  Over the years, New Bedford Marine has "never had a complaint

---

[2]  Boat U.S. members pay a membership fee of approximately $50 annually for a basic membership.

[3]  In addition to referrals from Boat U.S., New Bedford Marine monitors VHF radio channels for marine assistance requests issued by the Coast Guard.  The company maintains a good relationship with the Coast Guard, local marinas and local police and fire departments.

from a Boat U.S. member."  (Tr. 2, p. 61).

Boat U.S. members, in turn, who need assistance in towing or soft groundings involving one assist boat can telephone a toll free number and obtain a list of towing companies in a particular geographic area.[4]  Every Boat U.S. member receives a Boat U.S. On The Water Towing Service Agreement ("Boat U.S. Towing Agreement") with a membership card.

Jerry Prescott ("Prescott") together with his wife Mary Lou Prescott own J.P Yachts, the company that owns the Lady Mazie. The Lady Mazie is an 85 foot long motor yacht that the Prescotts purchased in 2000, the year the vessel was built, for $2,960,000. They did not make any major additions to the vessel after they purchased it.  Prescott testified that there was no damage to the Lady Mazie after the grounding.

Notably, Prescott is a Boat U.S. member and therefore received the Boat U.S. Towing Agreement.  He knew the details of the brevis agreement at the time he telephoned the Boat U.S. toll free number on September 2, 2003, to obtain the name of a service provider.  He was provided with New Bedford Marine's telephone number.[5]

---

[4]  Membership benefits additionally include non-towing services such as boat financing and insurance.

[5]  Michael Bain ("Bain"), an employee of Prescott's since 2000 or 2001 with experience sailing and delivering pleasure boats, actually dialed the toll free number and then handed the telephone to Prescott.

Prescott telephoned New Bedford Marine at around 5:00 a.m. and spoke with Joseph.  Prescott waited until that time to make the telephone call in order to obtain the less expensive daytime Boat U.S. member towing rate of $125 an hour as opposed to the more expensive nighttime rate.

During the conversation with Joseph, Prescott identified himself as a Boat U.S. member and described his situation as having dragged the Lady Mazie's anchor but further represented that the anchor was still holding.  Prescott knowingly did not advise Joseph that the ship was aground[6] or that he needed more than one boat.  An experienced businessman and proprietor of a number of companies as well as a 30 year boating veteran who once held Coast Guard licenses for a master of motor vessels of not more than 50 and then not more than 100 tons, Prescott knew the significance of and the danger posed by a rescue of a vessel under the circumstances faced by the Lady Mazie on September 2, 2003.  Rather than advising Joseph of the important facts of the grounding precipitously close to the rocky beach with the strengthened wind and two to three foot waves pushing the vessel toward the beach, Prescott misled Joseph about the extent of the problem.  Describing the situation as a simple dragged anchor, Prescott requested assistance to keep the boat's stern from going

---

[6]  Joseph's testimony differs dramatically from Prescott's testimony in this regard.  (Cf. Tr. 1, p. 42 with Tr. 1, p. 65). In comparison to Prescott's demeanor, Joseph's demeanor was strikingly more relaxed, straight forward and credible.

onto the beach and emphasized that he needed only one boat.  It
is common in the area of Cuttyhunk for anchors to run afoul of
sea grass.  (Tr. 2, p. 65).  Prescott also asked how much such
services would cost.  Joseph then asked Prescott "if his anchor
was still holding."  (Tr. 2, p. 65).  Prescott answered that the
anchor was still holding even though the original anchor was not
holding.[7]

Having been led to believe that the situation required the
towing services of only one boat and that the vessel was not in
immediate danger, including that she was not aground and would
not require the services of more than one vessel,[8] Joseph quoted
Prescott the discounted Boat U.S. member daytime rate of $125 an
hour for one boat and one captain for the captain to de-anchor
the boat, pull it into deeper water and reset the anchor.
Prescott agreed and consistent with the agreement Joseph sent out

---

[7]     Bain testified that he dropped the spare anchor,
attached to an estimated 12 feet of chain, off the starboard
quarter.  (Tr. 1, p. 118).  The only visible line in the pictures
taken by Clinton E. Allen ("Allen"), who manned the first New
Bedford Marine boat to arrive at the scene, of the occurrence is
the hawser from Allen's boat to the Lady Mazie.  (Ex. 18 & 19).

[8]  At trial, Joseph did not "know how many questions [he]
asked [Prescott]."  (Tr. 2, p. 103).  He truthfully acknowledged
that at his deposition he described the conversation as
"detailed."  (Tr. 1, p. 101).  He also acknowledged that he did
not ask Prescott if the Lady Mazie was aground.  Prescott,
however, did not accurately represent the circumstances facing
the Lady Mazie during this conversation.

Allen with a boat that was custom built for towing.[9]

Two documents form the background for the parties' oral agreement.[10]  The first is the aforementioned Boat U.S. Towing Agreement which Boat U.S. members, including Prescott, receive and which defines the members' towing service.  The second is the aforementioned license service agreement between Boat U.S. and its licensee, New Bedford Marine.  Each document distinguishes between soft and hard groundings and between services requiring the assistance of more than one vessel.  The Boat U.S. rate and towing services apply only to soft groundings and only to services that do not require the assistance of more than one vessel.  The discounted rate and towing or ungrounding services also do not apply to salvage situations.

Thus, the Boat U.S. Towing Agreement, a one page document, states that, "This Service does not apply to . . . salvage, including but not limited to, hard groundings, or any assistance requiring more than one vessel, pumps, divers, airbags or other

---

[9]  Allen purchased New Bedford Marine from Joseph prior to the time of trial and at the time of his testimony was the company's owner.

[10]  Of course, these documents do not comprise the contract itself which was oral, not written, and was formed during the first conversation between Joseph and Prescott.  To the contrary, the annual license service agreement was a contract between New Bedford Marine and Boat U.S. and the Boat U.S. Towing Agreement evidenced the arrangement between Prescott and Boat U.S.

special equipment . . ..."[11]   (Ex. 9).   Likewise, the license
service agreement states "that 'Towing/Ungrounding' is covered"
and that "'Salvage' is not covered."  (Tr. 2, p. 77).   The
document defines "'Towing/Ungrounding'" as "any operation not
involving immediate danger to the boat . . . and requiring only
one towing vessel with lines attached to the grounded boat . .
.."  (Tr. 2, p. 78).   In contrast, "Salvage" is defined as
"operations involving immediate peril to the grounded boat,
multiple towing vessels or special salvage equipment (pumps,
airbags, dredging equipment, cranes etc.)."  (Tr. 2, p. 78).   The
situation faced by the Lady Mazie required more than one boat and
involved an immediate danger to the vessel which was listing and
aground.

    Given the foregoing, the parties entered into a contract for
*towing* at the Boat U.S. daytime rate of $125 per hour for *one*
boat and one captain for a vessel that was not in marine peril.[12]
Given the surrounding circumstances and the context in which the
agreement was formed, the agreement was strictly limited to

--------------------------------------

    [11]  The document additionally states that the "Service
provides for the commercial towing of [the member's] disabled
boat from the point of breakdown at sea to your port of choice; .
. . ; ungrounding assistance for a soft grounding; and towing of
your disabled boat from a restricted use dock to your port of
choice for the purpose of making repairs."  (Ex. 9).

    [12]  In making this finding, this court has fully considered,
albeit not recited, Prescott's testimony regarding his first
conversation with Joseph.

towing, not ungrounding.  The scope of the agreement did not extend to hard or soft groundings or for services that required more than one assist boat.

The events leading to the foregoing telephone call and the formation of the towing contract are as follows.  The Prescotts, together with Bain on board, arrived at Cuttyhunk in the early afternoon of September 1, 2003, having motored the Lady Mazie from a marina in New Bedford.  Once they reached Cuttyhunk's outer harbor, Prescott piloted the Lady Mazie while Bain, serving in the capacity of "mate/captain" (Tr. 1, p. 112), went forward to prepare the anchor.  Prescott and Bain jointly decided where to drop anchor.  The ship anchored in Cuttyhunk's outer harbor outside the north jetty.  (Ex. 22).

After dropping anchor in the afternoon, the Prescotts traveled on a tender into the inner harbor and went ashore. Prescott had never been to Cuttyhunk before.

Prescott's limited experience with the harbor and its characteristics contrasts sharply with Joseph's and Allen's experience.  Allen, who has extensive experience with the Coast Guard and holds a captain's license, had been to Cuttyhunk hundreds of times.  The "beach" in the outer harbor area where the Lady Mazie was anchored consists of "boulder ridden and cobblestone-sized rocks."  (Tr. 1, p. 136; Ex. 24 & 25).  There is no sand on that beach, according to Allen.

9

The Prescotts returned to the Lady Mazie in the evening. The weather was gray and overcast at the time. That evening, the Prescotts and Bain went to their respective cabins and went to sleep. No one occupied an anchor watch. Additionally, Prescott did not set the depth sounding alarm or the electronic anchor watch which beeps if the ship moves. The weather in the Cuttyhunk area in the early morning hours consisted of a light rain with the wind traveling in a south to southeast direction at varying speeds of three to nine knots.

At around 3:00 a.m., Prescott and Bain were awakened by a loud bump. The wind had changed to a northerly direction causing the anchor to drag and the vessel to run aground. Parallel to the rocky shore line with the port side to the shore, the vessel was "north exposed" (Tr. 1, p. 37) in a drizzling rain. She lay just off shore between Cuttyhunk's north jetty and Pease Ledge.[13] At that time, the waves were one to two feet with the wind blowing at a speed of 15 to 20 knots. As day broke, the wind speed increased such that by 6:26 a.m. the recorded wind speed reached 25 knots having gusted to 29 miles an hour at 6:23 a.m.[14]

_____

[13]   Joseph Moniz ("Moniz"), who captained the second New Bedford Marine boat, estimated that by the time he arrived on the scene at 9:00 a.m., the port side of the Lady Mazie was "20, 25 feet from the beach." (Tr. 2, p. 13).

[14]   Corroborating this fact are notations made on New Bedford Marine's standard intake form. Information is added to this form at the start and "[a]s we go along." (Tr. 2, p. 73). The sheet reflects that the owner stated that the wind speed indicator on board the Lady Mazie registered steady winds of 28 knots. (Ex.

Recorded wind gusts at Martha's Vineyard airport ranged from 20 to 25 knots between 5:23 a.m. and 9:44 a.m.

Before telephoning the Boat U.S. toll free number, Bain and Prescott managed to remove the extra anchor on board the Lady Mazie and, according to Bain, set the anchor off the starboard side of the vessel close to the stern. Bain pulled the line attached to the 35 pound Danforth spare anchor and testified that "he knew right away it was a grassy bottom" because the line was not "bumping." (Tr. 2, pp. 123-124).

As previously noted, Prescott and Joseph first spoke by telephone around 5:00 a.m.[15] As a result of the telephone call, Joseph contacted Allen and directed him to take a boat out to Cuttyhunk because a vessel had dragged her anchor. Allen took the 23 foot inflatable boat which, as previously noted, was custom built for towing. In particular, she was equipped with a hawser[16] wrapped on a spool built into the pilothouse.

By the time Allen left New Bedford at around 5:20 a.m. to travel the ten to 14 mile distance to Cuttyhunk the weather was "pretty nasty" with two to three feet waves. (Tr. 1, p. 131). Conditions worsened as Allen got closer to Cuttyhunk. Because of

_____

10).

[15] Prescott also testified that he spoke with a number of other marine assistance services that were available on September 2.

[16] A hawser is "a rope . . . use[d] for towing." (Tr. 1, p. 149).

11

the sea state and fog, the trip took Allen longer than the usual
40 to 45 minute travel time to arrive at Cuttyhunk.

When Allen arrived at the scene at 6:50 a.m., he encountered
a vessel in substantially different circumstances than a vessel
that had dragged her anchor. The Lady Mazie was aground in shoal
waters just off the rocky shore with 18 inches of her bottom
paint visible. The two to four foot waves were rolling directly
into the vessel pushing her to the shore.[17] She was listing to
the port, albeit not dramatically. Each time a wave swell hit
her, she would rise up, lurch toward the shore and fall back
down. Facing the elements, it was unreasonable to expect that
the spare anchor, which may not have been holding or proficiently
employed, would prevent the ship from going further up onto the
beach.

The testimony differed as to whether she lay hard or soft
aground. Allen testified that the boat was hard aground.
Marilou Prescott testified that although she could not recall if
she had previously said the vessel was hard aground, she
testified at trial that the vessel "was aground, yes," in answer

---

[17]  Photographs taken from Allen's boat (Ex. 18 & 19) show a
slightly calmer scene because the pictures were taken from
Allen's boat with the propulsion smoothing the surface and the
waves faced the Lady Mazie as opposed to Allen's boat. Moniz's
testimony is consistent and corroborative of Allen's testimony.
When Moniz arrived in the second boat at approximately 9:00 a.m.,
he observed two to four foot waves.
    Prescott, in contrast, testified that the weather conditions
did not get worse than the conditions portrayed in exhibit 18.

to the question of whether "The Lady Mazie was hard aground?" (Tr. 1, p. 123). At one point during his testimony, Prescott agreed that when he first telephoned Joseph, the ship was "hard aground." (Tr. 1, p. 79). Elsewhere during his testimony, Prescott characterized the ground as "a soft bottom." (Tr. 1, p. 48). He posited that the ship lay on a soft bottom because he did not hear any "grinding sound" transmitted through the fiberglass bottom. (Tr. 1, p. 88). Bain agreed and testified to the presence of a grassy bottom because of the lack of bumping he felt when attempting to set the spare anchor. There was also an absence of structural and visible damage to the hull after the ungrounding. Particularly given the lack of damage, this court concludes that the Lady Mazie experienced a soft grounding.

The vessel's two rudders may have been touching the sea bottom. Prescott testified that he did not believe that the propellers were out of the water or aground yet at another point during his testimony he agreed that "the propellers had been grounded or close to the ground." (Tr. 1, p. 74). Nonetheless, he did not think there was even "some risk" of damage to the rudders and propellers. (Tr. 1, p. 74).

The wind was in a north to northeast direction at varying speeds of 13 to 17 knots with gusts of 25 knots and 29 miles an hour. It was rainy and, according to Allen, "very windy." (Tr. 1, p. 133).

When Allen arrived, Bain came out in the tender to meet him. With the two boats side by side, Allen immediately informed Bain that, "[T]his was not what I was sent out to do" and that "he was in a salvage situation." (Tr. 1, p. 135). Bain was silent but did not voice any disagreement. Allen then told Bain to attach the hawser to the starboard quarter of the Lady Mazie so that Allen could keep a strain on the vessel and minimize the vessel's hitting on the rocks.

While Bain went back to the Lady Mazie to attach the hawser to the starboard quarter, Allen made a telephone call to Joseph. He told Joseph that the vessel was hard aground, "18 inches out of draft" and that "[t]his [was] not going to be a simple drag anchor." (Tr. 1, p. 139). When Allen told Joseph that he needed another assist boat, Joseph told Allen "to advise them that the boat was now in a salvage situation" which was "completely different from what they hired us to do." (Tr. 2, pp. 69 & 75). Allen replied that he already had, thereby leaving Joseph with the impression that Allen had spoken with Prescott as opposed to Bain.

Shortly after Joseph and Allen spoke about the need for another boat, Prescott telephoned and spoke with Joseph a second time.[18] During this conversation, Prescott requested a second

---

[18] Prescott did not produce the telephone records for his cellular telephone to his counsel.

boat.[19]  Although Prescott insists that he discussed the price of the second boat as $125 per hour, Joseph simply described this second conversation as Prescott requesting a second boat and complaining about Allen's inexperience.[20]  Under the facts, there was no meeting of the minds during this second conversation to form a salvage contract or to extend the scope of the initial one boat towing contract into a salvage contract to rescue the Lady Mazie from the marine peril with two boats as she lay aground.[21]  Prescott did, however, consent to Joseph sending a second boat and assisting with the rescue.

Immediately after this conversation, Joseph contacted Moniz, a part time employee of New Bedford Marine at the time who holds a Coast Guard license for a master, and instructed him to take the KenCraft out to the scene to assist Allen.  Arriving at the scene at approximately 9:00 a.m., it took Moniz an hour to travel the distance between the Fairhaven Auxiliary and Cuttyhunk. Consistent with Allen's depiction, Moniz described the Lady Mazie

---

[19]  According to Prescott, he would not have asked for a second boat if he had been told that it would require him to sign a salvage contract.  (Tr. 1, p. 97-98).

[20]  Allen has extensive training in marine rescue and salvage and has been a member of the Coast Guard Auxiliary for the past eight years.  He has been "on the water" for almost his entire adult life.  (Tr. 1, p. 127).  As previously noted, he holds a Coast Guard captain's license.

[21]  Unconvincingly, Prescott testified that he did not assent to the imposition of salvage conditions or "a pure salvage contract."  (Tr. 1, p. 92).

15

as "broadside to the beach aground, very definitely aground" with the "entire waterline . . . out of water." (Tr. 2, p. 11). Moniz additionally described a northeast wind blowing at a rate of 15 to 20 knots. A small craft advisory issued at 9:00 a.m., a warning that occurs when winds are expected to be 25 knots.

While awaiting Moniz's arrival, Allen continued to do his best to maintain a firm and steady strain line on the Lady Mazie. Because of the sea conditions and wind, it was an understandably difficult task. Altering his course and revolutions per minute, Allen eventually improved his ability to stay in position. Prior to and after the second conversation between Prescott and Joseph, Allen was in communication with Prescott through VHF radio contact.

With low tide between 6:00 and 7:00 a.m., both Prescott and Allen recognized that the tide was coming in and that the Lady Mazie could gradually be refloated. Allen as well as Prescott therefore planned to keep a strain on the Lady Mazie until the tide could assist in freeing the vessel.

When Moniz arrived, Allen instructed Moniz to advise Prescott and/or Bain to come out and place a hawser from the Kencraft on the same stern cleat on the Lady Mazie that secured Allen's hawser. Allen planned to maintain a firm tension on the Lady Mazie's stern until the tide came in, at which time Allen and Moniz could gradually ease the Lady Mazie off the strand.

16

A short time later, Bain came out in the tender, brought
back the hawser from the KenCraft and attached it to the same
cleat on the Lady Mazie that held the first hawser.  The two
rescue boats then made a "V" shape with the vortex representing
the cleat on the starboard quarter of the Lady Mazie.  Working
together and periodically speaking over VHF radio, Allen and
Moniz kept a firm tension on the Lady Mazie's stern thereby
preventing the boat from going closer to the boulder laden shore.

As time went by, Allen and Moniz observed the Lady Mazie's
bottom paint decrease in visibility as the vessel gradually began
to lift off the ground with the incoming tide.  If the two had
not kept firm hold on the Lady Mazie, "[t]he wind would have
pushed her further up on the beach."  (Tr. 2, p. 18).  Moniz then
suggested to Allen to have the Lady Mazie engage her bow
thruster, if she had one, in order to further assist in easing
the Lady Mazie off the strand.  Allen therefore contacted
Prescott and, with the bow thruster engaged and the two rescue
boats keeping a constant strain, the Lady Mazie eased off the
grounding at approximately 10:20 a.m.

Having freed the Lady Mazie, the rescue boats then towed the
vessel into deeper water with her bow facing the entrance to the
inner harbor and jetty.[22]  Maintaining communication by radio,

---

[22]  The inner harbor is denoted as Cuttyhunk Pond on the
various nautical charts.  The wind was still heading in a
northeast direction towards the jetty and the inner harbor.
Allen and Moniz were towing the Lady Mazie into the wind.

Allen asked Prescott to re-check the bilges for flooding. Bain went below and again verified the lack of flooding and the absence of water and leaks in the engine room. At some point in time, Bain took a dinghy and went around the Lady Mazie to make certain she was not taking on water in light of the grounding. Because of the shallowness of the water, Moniz was unable to pilot his boat, which draws "two feet maximum," around the port side of the Lady Mazie. (Tr. 2, p. 14).

It also became necessary to test the Lady Mazie's running gear with her engines to avoid releasing the vessel from the hawsers prematurely only to discover that she could not move and would, as a result, "pull back into the rocks again."[23] (Tr. 1, p. 149). Allen planned to keep one hawser attached while Prescott tested the engines. Recognizing the danger involved with keeping one hawser attached, Allen carefully explained twice to Prescott over the radio how to momentarily put the engines in gear and test the running gear. Allen then instructed Prescott to release the hawser attached to Allen's boat and then speak with Moniz over the VHF radio. Accordingly, Bain released the hawser attached to Allen's rescue boat from the Lady Mazie's starboard cleat.

_____

[23] Allen decided to keep a line attached to the Lady Mazie as opposed to towing her out farther and releasing both hawsers before checking the engines with the running gear.

Prescott was also concerned with the risk.[24]  He nonetheless voiced his understanding of the procedure and started one of the engines.  By radio, Moniz told Prescott to "make sure you just bump it in gear . . .." (Tr. 2, p. 23).  Prescott stated he understood.  Moniz then asked Prescott to "give me a second." (Tr. 2, p. 23).  Instead, Prescott immediately put the engine in forward gear and powered the boat for one minute contrary to the instructions to only keep the vessel in gear momentarily.[25]  As a result, the KenCraft capsized and Moniz dove into the water to get clear of the boat.  Having seen what occurred, Allen immediately took his boat over to Moniz and pulled him out of the water.  Moniz appeared startled, scared and in shock.  With the water temperature ranging in the sixties and air temperature "in the 50s" (Tr. 1, p. 161), Moniz was cold.  Allen brought Moniz over to the Lady Mazie whereupon he boarded the vessel to get dry while Allen went back to retrieve the capsized KenCraft before it drifted onto the rocks.[26]

Allen also handed Moniz a metal clipboard with a salvage

---

[24]  According to Prescott, he told Moniz to "slack off your line" and to "get the tension off your line" before he made a slow turn to port.  (Tr. 1, p. 104).

[25] Prescott disagreed and testified that he only put the engine in "idle speed."  (Tr. 1, p. 105).

[26]  "A lot of [the equipment] was lost" as a result of the Kencraft's capsize.  (Tr. 1, p. 160).

invoice for Prescott to sign.[27]  After Moniz came on board, he gave Prescott the paper work while Marilou Prescott procured a towel, teeshirt and cup of coffee for Moniz.[28]  Prescott read the material and refused to sign the papers.  He then telephoned Joseph and told him he was not going to sign anything, demanded a bill based on the $125 hourly rate and immediately disconnected the telephone.  Prescott's bias against any kind of salvage situation or request is evidenced by comments he made to Moniz after terminating the telephone call to Joseph.  Prescott told Moniz that "these salvage forms are notorious . . . [and] a complete ripoff.  I'm not getting involved with any of that stuff."[29]  (Tr. 2, p. 29).

Shortly thereafter, Bain took Moniz over to the first rescue boat.  By that time, Allen had the KenCraft in tow.  Because of the rough sea state he could not right the KenCraft and, instead, proceeded back to New Bedford at a speed of three to four knots.

---

[27]  Once on board the Lady Mazie, Moniz did not apologize because he believed there was "nothing for [him] to apologize for."  (Tr. 2, p. 28).

[28]  Neither she nor Prescott invited Moniz into the cabin to get warm.

[29]  Related by Moniz, the statement is not hearsay because it addresses Prescott's bias.  This court does not accept the statement for the truth of the matter asserted, i.e., that the salvage forms or the Florida company Prescott referenced in the conversation is "a complete ripoff."  (Tr. 2, p. 29).

Bain was also not a credible witness.  Not only was he impeached by deposition testimony a number of times, he remains in the employ of Prescott.

With Allen having telephoned Joseph, a third New Bedford Marine rescue boat arrived skippered by Captain James Almeida ("Almeida") in order to provide Moniz with a Mustang suit to protect him from the cold and prevent hypothermia.  Moniz had become extremely cold.

The first rescue boat with Allen and Moniz and the KenCraft in tow did not arrive back in New Bedford until 5:00 or 6:00 p.m.  With the effort of Joseph, Almeida, Allen and to some degree Moniz, the group managed to right the KenCraft.[30]  The boat was then pumped, placed on a trailer and taken back to Joseph's home.  Various New Bedford Marine personnel worked on the KenCraft until about 11:00 p.m.  Allen left the group before they completed the task and arrived back at his home in the adjacent town of Dartmouth at approximately 9:00 p.m.

In the meantime, after Bain dropped Moniz off with Allen and returned to the Lady Mazie, the vessel proceeded to Newport in time for the Prescotts to have lunch.  On the way to Newport, Bain tested the engines by cruising the vessel at a speed of 18 knots.  She did not vibrate.  The steering performed properly and she had no leaks.

Bain testified that the first time the Lady Mazie was hauled out of the water was in November or early December, after traveling to Florida, the Bahamas and back to Florida.  According

---

[30]  Moniz left and went home before the group successfully righted the vessel.

21

to Bain, the Lady Mazie was brought into a boat yard in Fort
Lauderdale, Florida and taken completely out of the water.  Bain
inspected the entire bottom of the vessel and did not observe any
evidence of damage.  According to Bain, there was "[n]othing
whatsoever" in damage, including no scrapes, indentations or
scratches in the paint.  (Tr. 2, pp. 144-145).

    According to Prescott, the Lady Mazie was first hauled out
of the water in October as opposed to November or early December.
Like Bain, Prescott did not see any scrapes in the paint or
abrasions in the fiberglass hull.

    By letter dated September 11, 2003, Joseph, denoting himself
"Salvor," wrote to the Atlantic Mutual Insurance Company
("Atlantic Mutual"), the insurer for J.P. Yachts and/or the Lady
Mazie.  Therein, Joseph made the mistake of stating that, "The
reporting party said that the vessel had dragged her anchor and
become aground on the rocky beach north of the Cuttyhunk Island
jetty." (Ex. D).[31]  As previously noted, however, Prescott did
not inform Joseph that the Lady Mazie was aground when they first
spoke.

    At trial, Joseph convincingly described the letter as a form
letter with jumbled facts not necessarily transcribed in the

------

    [31]  Irrespective of whether exhibit D amounts to an offer to
compromise, the letter serves as impeachment evidence relative to
Joseph's testimony.  See Fed. R. Evid. 408 ("[t]his rule does not
require exclusion when the evidence is offered for another
purpose, such as proving bias or prejudice of a witness . . ..").

order they occurred.  He convincingly testified that Prescott
stated during their first conversation that "his anchor had
dragged and he needed a boat to keep [the Lady Mazie's] stern
from going on the beach."  (Tr. 2, pp. 65 & 78-79).  The letter
does not persuade this court otherwise.

First, Joseph proved to be a credible witness who was not
materially impeached and who has since changed professions.
Having changed careers and sold the business to Allen by the time
of trial, Joseph had far less of a bias than either Prescott or
Bain.  His demeanor was also much more convincing than Prescott's
demeanor.  The letter also refers to Prescott describing the
beach as "rocky" (Ex. D), an unlikely occurrence because Prescott
wanted to downplay the peril faced by the Lady Mazie at all times
in order to procure the less expensive Boat U.S. daytime rate for
towing services.  The letter contains additional inaccuracies
including the circumstances regarding the initial contact from
Boat U.S. and that New Bedford Marine "immediately launched a
full found salvage vessel" based upon the initial report
concerning the Lady Mazie's predicament.  In fact, Joseph
responded by sending a boat custom fit for towing, as opposed to
salvage, and one captain to assist a vessel who had, as
represented by Prescott, merely slipped her anchor and needed a
tow to deeper waters.  It is therefore likely that the letter
contains other inaccuracies including the statement that the

reporting party stated that the vessel had "become aground on the rocky beach."  (Ex. D).[32]

In response to Joseph's letter, Atlantic Mutual agreed to adhere to certain conditions to avoid an arrest of the vessel. Joseph d/b/a New Bedford Marine filed the present suit in June 2004 seeking the liberal salvage award.  J.P. Yachts answered the complaint contending that the parties agreed to a salvage contract thereby estopping Joseph from securing a pure salvage award.


DISCUSSION

It is well settled that in order to receive a pure salvage award the plaintiff must prove the following three elements:  "1. A marine peril.  2.  Service voluntarily rendered when not required as an existing duty or from a special contract.  3. Success in whole or in part, or that the service rendered contributed to such success."  The Sabine, 101 U.S. 384, 384 (1880); accord Flagship Marine Services, Inc. v. Belcher Towing Co., 966 F.2d 602, 605 (11th Cir. 1992) (quoting The Sabine).


A.  Marine Peril

New Bedford Marine, as the party seeking a salvage award,

---

[32]  The intake sheet contains a question mark by the word "aground?" because, as explained by Joseph, there might have been a possibility that by the time the first assist boat reached the scene the vessel would be aground.

bears the burden of establishing a marine peril.  A marine peril exists "'when a vessel is exposed to any actual or apprehended danger which might result in her destruction.'"  <u>Faneuil Advisors, Inc. v. O/S Sea Hawk</u>, 50 F.3d 88, 92 (1st Cir. 1995). It is also not necessary "'"that the distress should be immediate and absolute; it will be sufficient if, at the time the assistance is rendered, the vessel has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered."'"  <u>Faneuil Advisors, Inc. v. O/S Sea Hawk</u>, 50 F.3d at 92; <u>accord</u> 3A <u>Benedict on Admiralty</u> § 63 (2005) (quoting with approval the same language).

Viewed under this standard, it is apparent that at the time Allen arrived and rendered assistance, the Lady Mazie faced a marine peril.  First, she was perilously close to the rock laden shore with the wind and waves blowing and pushing her toward the rock laden beach.  Second, the wind was gusting above 20 knots and a small craft advisory issued two hours after Allen's arrival.  The Lady Mazie was not held fast on an anchor and the seas were relatively rough.  <u>Cf.</u> <u>Faneuil Advisors, Inc. v. O/S Sea Hawk</u>, 50 F.3d at 92-93 (noting that "'courts have found no marine peril where a vessel'" was "'holed but was secured in calm weather and was not sinking'" or "'had drifted out to sea during a hurricane but subsequently came to rest and held fast on a mooring in calm waters'").  In fact, the wind and waves were

lifting the Lady Mazie up and then back down onto the shallow ocean bottom.  <u>See</u>, <u>e.g.</u>, <u>Taylor v. 42 Foot Egg Harbor Hull</u>, 1994 WL 779759 at * 10 (D.N.J. June 2, 1994) (motor yacht stranded on shoal considered in marine peril).  Listing and driven aground on shoals with a relatively strong wind pushing her toward the nearby rock laden shore and the spare anchor not holding the vessel steady, if at all, the Lady Mazie was in marine peril. <u>See</u> <u>Taylor v. 42 Foot Egg Harbor Hull</u>, 1994 WL 779759 at * 9 (D.N.J. June 22, 1994) ("vessel aground on Brigantine shoals, in the Atlantic Ocean, is always in peril, but not necessarily in immediate peril"); <u>accord</u> 3A <u>Benedict on Admiralty</u> § 64 (2005) ("vessel driven aground, on rocks, shoals or reefs must be considered as in a state of peril"); <u>see</u>, <u>e.g.</u>, <u>The Devonian</u>, 150 F. 831, 833-835 (D.Mass. 1907) (the tug, which pulled vessel aground with water surrounding her "free from ledges, rocks, or obstructions" off the stranding at high tide with a hawser, rendered salvage services, albeit noting lack of compensation if rescue had been unsuccessful).  Finally, the availability of other marine assistance services, as noted by Prescott, "may affect the degree of the peril but" in the case at bar "it does not eliminate that peril."  3A <u>Benedict on Admiralty</u> § 67 (2005).

B.  <u>Voluntary Service not Pursuant to Contract</u>[33]

---

[33]  In addition to addressing the second element of a salvage award, this section addresses a number of J.P. Yachts' related

The existence of a contract for salvage or to provide
services to a distressed vessel precludes the necessary
voluntariness required for a pure salvage award.  Smit Americas,
Inc. v. M/T Mantinia, 259 F.Supp.2d 118, 121-122 (D.P.R. 2003).
Thus, as previously stated, "'service voluntarily rendered when
not required as an existing duty or from a special contract'"
constitutes the second required element of a pure salvage award.
Faneuil Advisors, Inc. v. O/S Sea Hawk, 50 F.3d at 92.  J.P.
Yachts agrees.  (Docket Entry # 18, p. 21) ("[t]he plaintiff has
the burden of proving the three elements in order to establish a
valid pure salvage claim: . . . (2) services voluntarily rendered
when not required as an existing duty").  J.P. Yachts admits that
it "does not contest issues (2) and (3)."  (Docket Entry # 18, p.
21).  J.P. Yachts further admits that:

> The service of New Bedford Marine was voluntary(sic)
> rendered and not required as an existing duty.  The
> plaintiff did not contact New Bedford Marine pursuant to the
> terms of any special contractual arrangement, but only to
> "find a reputable towing service that (he) could engage by
> the hour to accomplish what (he) wanted."[34]

(Docket Entry # 18, p. 21).  This court agrees that the service
was voluntarily rendered and not required as an existing duty.

Instead of contesting the second and third elements to

---

arguments as well as, briefly, the third necessary element of
success.

[34] Prescott testified that he telephoned Joseph because he
"was trying to find a reputable local towing service that I could
engage by the hour to accomplish what I wanted."  (Tr. 1, p. 61).

establish a pure salvage award, J.P. Yachts argues that the
parties initially agreed to a salvage contract during or as a
result of the first conversation between Joseph and Prescott.
Asserting that the parties agreed to a salvage contract, J.P.
Yachts correctly points out "[t]he essential rule" set forth in
The Elfrida, to wit, that salvage contracts will be upheld
"unless corruptly entered into or made under fraudulent
representations, a clear mistake or suppression of important
facts . . . or when their enforcement would be contrary to equity
and good conscience." The Elfrida, 172 U.S. 186, 192 (1898); 8
Benedict on Admiralty § 13.06 (2004) (characterizing "[t]he
essential rule" in The Elfrida as "that a salvage contract will
be upheld *unless* it was entered into collusively, by compulsion,
fraudulent misrepresentations, mutual mistake of important facts,
or is plainly inequitable").

Unfortunately for J.P. Yachts, under the facts the parties
did not have a salvage contract for salvage services. Rather,
the parties initially agreed to a simple towing contract at $125
per hour for one boat to assist a ship that had dragged her
anchor, an anchor that was holding, and needed to be pulled to
deeper waters but was not aground or otherwise in peril. J.P.
Yachts, as the shipowner, bears the burden of establishing a
salvage contract. The Camanche, 75 U.S. 448 (1869); Kimes v.
United States, 207 F.2d 60 (2nd Cir. 1953); 8 Benedict on

Admiralty § 13.06 (2004) ("shipowner bears the burden of proof of demonstrating the existence of a binding contract"). It fails to meet that burden.[35]

It is true that, "When there is a contract to undertake a salvage service or to provide some type of service to a distressed vessel, there is no 'pure salvage.' This is because to be voluntary there must be an absence of a legal duty or obligation." Smit Americas, Inc. v. M/T Mantinia, 259 F.Supp.2d at 121-122 (internal quotation marks omitted). As clarified and succinctly explained by one leading commentator, however, in

---

[35] Prescott's attempt to fit or sculpt the contractual undertaking during that first conversation with Joseph into the factual circumstances at issue in Flagship Marine Services, Inc. v. Belcher Towing Company, 966 F.2d 602, 606 (11th Cir. 1992) (upholding salvage contract where Sea Tow offered its services for "reasonable charge" and "Belcher then authorized Sea Tow to perform whatever services were necessary to save the tug"), is unconvincing. First, his testimony appeared calculated and his demeanor was not forthright. See generally In Re Morad, 323 B.R. 818, 826 (1st Cir. 2005) (noting that trier of fact "'has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements'"). Second, the parties in Flagship had "a prior business relationship involving salvage services" wherein "Sea Tow had previously charged Belcher for salvage work on a flat running rate basis." Flagship Marine Services, Inc. v. Belcher Towing Company, 966 F.2d at 603 & 605 n. 4. The Eleventh Circuit in Flagship twice emphasized that prior business relationship as significant in holding the parties to their salvage contract. See Flagship Marine Services, Inc. v. Belcher Towing Company, 966 F.2d at 605 n. 4 & 606 ("[m]ore importantly, because of the pre-existing business dealings between Sea Tow and Belcher, Belcher's authorization bound Belcher to pay for services that Sea Two rendered"). To state the obvious, Prescott and New Bedford Marine had no such prior relationship.

order to establish a salvage contract and thereby preclude a
finding of voluntariness, the "salvage contract must be clear,
definite and explicit as to the amount of compensation and there
must be a mutual understanding that the services involved are in
the nature of salvage." 8 <u>Benedict on Admiralty</u> § 13.06 (2004).
The services agreed upon were not in the nature of a salvage or
to assist a distressed vessel. To the contrary, New Bedford
Marine adequately established and proved that the parties agreed
during that first conversation to a simple towing contract for
one boat and one captain at the rate of $125 per hour to assist a
vessel that had slipped, but was still holding, her anchor and
was not aground or otherwise in distress.[36]

The circumstances presented in <u>Fort Myers Shell and Dredging
Co. v. The Barge NBC 512</u>, 404 F.2d 137 (5th Cir. 1968), are
instructive. Like Prescott and Joseph, acting on behalf of New
Bedford Marine, the parties in <u>Fort Myers</u> initially agreed to a

---

[36] The distinction between towing and salvage generally
turns upon the "'totality of the circumstances'" with towing
typically undertaken from a position of safety for the purpose of
expediting a voyage and salvage undertaken from a position of
danger for the purpose of removing a vessel from some distress.
8 <u>Benedict on Admiralty</u> § 14.02 (2004). Thus, a salvage service
"'is voluntarily rendered to a vessel requiring assistance, and
is designed to relieve her from some distress or danger either
present or to be reasonably apprehended.'" <u>Star Towing Co. v.
The Barge ORG-6504</u>, 301 F.Supp. 819, 822 (E.D.La. 1969) (quoting
Norris <u>The Law of Salvage</u> § 188 (1958)). In contrast, "'A towage
service is one which is rendered for the mere purpose of
expediting her voyage, without reference to any circumstances of
danger.'" <u>Id.</u> at 822.

simple towing contract for a set fee, albeit for two barges as
opposed to a single motor yacht.  Before the tug arrived,
however, the two barges were washed ashore "positioned in tandem
above the normal high water mark, parallel to the shoreline, near
the remaining pilings of an old dock."  Id. at 138.  The salvor's
rescue vessel proceeded to successfully refloat the stranded
barges after being joined by a second and third rescue vessel and
after expending considerable effort.  Id. at 138.  Significantly,
the Fifth Circuit in Fort Meyers reversed the district court's
holding that the "services in unbeaching the barges constituted a
continuation of its towage contract" rather than an act of
voluntary salvage.  Id. at 138-139.

Likewise, when Allen arrived on the scene, he immediately
discovered that the services required were starkly different than
what he had been sent to perform.  Instead of encountering a
vessel that had simply slipped her anchor, as mistakenly
represented by Prescott to Joseph during their first
conversation, Allen encountered a vessel that was listing,
perilously close to the rocky shore and aground with the waves
and wind pushing against her stern broadside directly toward the
shore.  The scope of the initial agreement did not extend to such
services and the parties did not otherwise agree to modify the
initial towing contract to encompass the situation encountered by
Allen.  As aptly explained by the court in Fort Myers:

31

> The District Court's determination that Fort Myers was
> contractually obligated to unbeach the barges lacks adequate
> support in the record.  By agreeing to a modification and
> continuation of the prior towing contract whereby it would
> be obligated to refloat the barges on the beach rather than
> pick them up at the sea buoy, Fort Myers would have
> undertaken a time-consuming and extensive unbeaching
> operation for the same fee that had been set for a
> relatively simple towing job.  We are unable to find
> sufficient evidence to indicate that such an agreement was
> made.

Fort Myers Shell and Dredging Co. v. The Barge NBC 512, 404 F.2d
at 139.

Similarly, the court in Smit Americas, Inc. v. M/V Mantinia,
259 F.Supp.2d 118, 126 (D.P.R. 2003), rejected the contention
that the parties' initial agreement extended to encompass the
circumstances as they existed when the salvor arrived at the
scene and rendered assistance.  Like the salvor in Smit, when
Allen arrived "he found the vessel in substantially different
circumstances than had been understood by [Joseph] when initially
contacted by [Prescott]."  Id. at 126.

Allen promptly informed Bain of the different circumstances.
Then, without objection and without forcing his services upon
J.P. Yachts, Allen proceeded, with the assistance of Moniz and
the second boat, to rescue the Lady Mazie from her position of
marine peril.  The services rendered were not pursuant to a
salvage contract but, instead, lay outside the scope of the
initial towing contract.  Prescott's request for a second rescue
boat shortly after Allen's conversation with Joseph provides

32

additional evidence that the services provided lay outside the parties' initial towing agreement.  Furthermore, "the fact that a shipowner requests a salvage service and that the salvors in response furnish it, standing alone, does not create an implied contract so as to defeat a salvage claim."  <u>Flagship Marine Services, Inc. v. Belcher Towing Company</u>, 966 F.2d at 605 (internal quotation marks, brackets and emphasis omitted).

Relying on the <u>Flagship</u> decision, J.P. Yachts nonetheless argues that the absence of a "no cure, no pay" arrangement between the parties precludes a recovery for pure salvage.  It is true that the parties agreed to a contract that guaranteed payment to New Bedford Marine irrespective of success.  It is also true that, "In ascertaining whether services rendered by a salvor are voluntary, 'the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage.'"  <u>Flagship Marine Services, Inc. v. Belcher Towing Company</u>, 966 F.2d at 605.

That said, however, the initial contract was not a salvage contract for salvage services.  It was a towing contract for towing services.  Rendering assistance to a grounded vessel listing in the wind whose bottom paint was showing in excess of a foot with the wind pushing her broadside directly toward the rock

laden shore is a service significantly and substantially different from that agreed to by the parties in the initial agreement.  The circumstances were not reasonably within the contemplation of the parties to the towing contract.  Rather, they lay outside the scope of the initial towing contract.

Once Allen arrived at the scene, he informed Bain that he was "in a salvage situation at this point."  (Tr. 1, p. 135).  Allen was not attempting to disavow the parties' salvage contract.  The parties never entered into such a contract.[37]  Allen and Joseph then proceeded to voluntarily provide salvage assistance at the scene albeit with the motivation of material gain.  See Ocean Services Towing and Salvage, Inc. v. Brown, 810 F.Supp. 1258, 1262 (S.D.Fla. 1993) ("fact that the salvor's efforts have pecuniary motivations is immaterial to his entitlement to a salvage award, as long as the prerequisites for a salvage claim have been proven"); Unnamed Master and Crew v. Certain Unnamed Vessel, 592 F.Supp. 1191, 1194 (S.D.Fla. 1984) ("fact that the [p]laintiffs may have been motivated by the opportunity for material gain does not prevent them from receiving an award in salvage, since they have proven the existence of the three salvage conditions:  peril, voluntary service, and success"); accord 3A Benedict on Admiralty § 97

---

[37]    Hence, J.P. Yachts' argument that when a party to one salvage operation begins under one form of salvage, he may not convert to another form if it appears more advantageous, citing The Elfrida, 172 U.S. 186 (1898), does not apply.

(2005) (discussing <u>Unnamed Master</u>).

The decision in <u>Flagship</u> is distinguishable on a number of grounds, most notably, because of the parties' prior business relationship.[38]  Here, the only "prior" connection between New Bedford Marine and J.P. Yachts existed by virtue of the *towing* referral service of Boat U.S.

J.P. Yachts' argument that New Bedford Marine was attempting to impose a forced salvage is equally unavailing.  Prescott voluntarily and willingly accepted the services of New Bedford Marine.  When Allen advised Bain that "you're in a salvage situation," Bain did not object.  Nor did Prescott.  <u>See generally</u> <u>Legnos v. M/V Olga Jacob</u>, 498 F.2d 666, 672 (5th Cir. 1974) ("So long as the services are voluntary and are not rejected by those in authority a bystander or interloper is eligible for salvage award in proportion to the value of his contributory efforts").  Instead, Prescott telephoned Joseph and asked for a second boat, a circumstance indicative of salvage given the parties' relationship.

In sum, J.P. Yachts failed in its burden to establish a salvage contract.  New Bedford Marine met its burden of establishing a towing contract.  It also met its burden of showing services voluntarily rendered when not required as an existing duty or under a special contract.  In any event, J.P.

---

[38]    See footnote number 35.

Yachts "does not contest" the foregoing second element.  (Docket Entry # 18, p. 21).

As a final matter, there was also the necessary success in whole or in part thereby establishing the third element.  New Bedford Marine succeeded in dislodging the Lady Mazie from her soft grounding and she proceeded on to Newport without incident. Indeed, she did not require repairs or experience any damage. The vessel was rescued from being driven onto the rock laden shore.  Accordingly, this court turns to a calculation of the amount of a salvage award.

C.  Amount of the Salvage Award

Once a valid salvage claim is established, the court must determine the amount the salvors should be awarded for their services.  In determining a fair salvage reward, it is difficult to rely on precedent because salvage cases are seldom alike. B.V. Bureau Wijsmuller v. United States, 702 F.2d 333, 339 (2nd Cir. 1983); 3A Benedict on Admiralty § 239 (2005).[39]

---

[39] This court therefore declines to adhere to the unpublished arbitration decision attached to New Bedford Marine's memorandum of law (Docket Entry # 22).  Unlike the case at bar, the circumstances in that case involved a vessel on the rocks and thus in greater distress than the soft grounding experienced by the Lady Mazie.  Pulling that vessel off the rocks likewise involved greater skill than was required to ease the Lady Mazie off the ocean bottom with the incoming tide.  In any event, the unrelated and unpublished arbitration decision issued by an arbitration panel as opposed to a federal or state court does not carry binding precedential authority.

A salvage award is "given not merely to compensate on a quantum meruit basis the persons by whose voluntary assistance property is saved from peril or loss in navigable waters, but also to reward such persons by giving them a sort of bonus or bounty for their perilous services."[40] <u>United States v. The James L. Richards</u>, 179 F.2d 530, 533 (1st Cir. 1950) (further noting that "salvage is not merely compensation, but it is also a reward, given to persons for their meritorious services in order to encourage others to do likewise").

The standard to calculate a salvage award was set down "long ago" by the Supreme Court in <u>The Blackwall</u>, 77 U.S. 1 (1869). <u>H.R.M., Inc. v. S/V Venture VII</u>, 972 F.Supp. 92, 96 (D.R.I. 1997). J.P. Yachts and New Bedford Marine agree that those factors are as follows:

> 1. The labor expended by the salvors in rendering the salvage service.
> 2. The promptitude, skill, and energy displayed in rendering the service and saving the property.
> 3. The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed.
> 4. The risk incurred by the salvors in securing the property from the impending peril.
> 5. The value of the property saved.
> 6. The degree of danger from which the property was rescued.

<u>Margate Shipping Co. v. M/V JA Orgeron</u>, 143 F.3d 976, 984 (5th Cir. 1998) (quoting <u>The Blackwall</u>, 77 U.S. at 14). They do not, however, agree on the application of these factors to the facts.

---

[40] The quantum meruit recovery posited by J.P. Yachts is therefore inappropriate.

Addressing these factors <u>seriatim</u>, the labor expended was not particularly great.  Taking the weather into account, the services consisted largely of towage services.  <u>See</u> <u>generally</u> <u>The New Camelia</u>, 105 F. 637, 640-641 (5th Cir. 1900) (noting that salvage award "should be mainly on the basis of the towage services actually rendered, and any large allowance would be judicial liberality at the expense of the suffering owners").  Allen and Moniz maintained their hawsers attached to the Lady Mazie and waited for the tide to gradually lift her off the grounding.  Together, they managed to refloat her in a matter of hours.  The return to New Bedford took considerably more time but the process was complete by the end of the day.

Allen and Moniz responded promptly to the scene and demonstrated a degree of zeal and skill.  The value of the property employed by New Bedford Marine at the time of the rescue consisted of the estimated value of $100,000 for the first boat and $40,000 to $45,000 for the second boat.  The second boat faced a risk and significant degree of danger as a result of the hawser remaining attached to the Lady Mazie during the test of her engines and running gear.  <u>See</u> <u>generally</u> 3A <u>Benedict on Admiralty</u> § 272 (2005) ("degree of danger to which the salvor's property was exposed is entitled to be considered"); 1 Robert Force and Martin J. Norris <u>The Law of Seamen</u> § 9:54 (2003) (proper to consider the risk to which salving vessel is exposed).

Although the value of the property employed in the salvage operation is "[a]mong the least important factors to be considered," Taylor v. 42 Foot Egg Harbor Hull, 1994 WL 779759 at * 13 (D.N.J. June 22, 1994), the award includes and accounts for the danger and the damage experienced by the Kencraft during the rescue.

The risk faced by Allen and Moniz was moderate.  The winds and waves were in the range of two to three feet and a small craft advisory issued two hours after Allen arrived.  That said, however, Moniz faced a significant risk and a danger of drowning when he dove into the water to get clear of the Kencraft.  See 3A Benedict on Admiralty § 267 (2005) (it is appropriate to consider "personal injury during the salvage operation . . . as indicative of the fact that there has been risk involved"); cf. Ocean Services Towing and Salvage, Inc. v. Brown, 810 F.Supp. at 1264 (noting that "no lives were ever in danger during the rescue effort" in discussing the fourth factor).

The value of the Lady Mazie remained the same before and after the rescue inasmuch as she sustained no damage.  The Prescotts made no major additions to the vessel after they purchased it in 2000, the year she was built, for $2,960,000. J.P. Yachts correctly points out that New Bedford Marine has the burden of establishing the value of the salved property.  See Nolan v. A.H. Basse Rederiaktieselskab, 267 F.2d 584, 589 (3rd

Cir. 1959); 3A <u>Benedict on Admiralty</u> § 259 (2005).  Providing a

value of the vessel three years before the date of the accident

fails to take into account any depreciation to the vessel or

market factors that might influence its value.  Moreover, where,

as here, "the value of the property salved is large, the amount

of the award is, as a rule, in much smaller proportion to the

value of the property than in those instances where the property

salved is small."  1 Robert Force and Martin J. Norris <u>The Law of</u>

<u>Seamen</u> § 9:53 (2003).  Hence, this court affords this factor a

relatively low weight in the calculus of the award.

The degree of danger faced by the Lady Mazie could have been

substantial.  Given the absence of noise emanating from her hull

as well as the absence of bumping during Bain's attempt to set

the spare anchor, she lay soft aground.[41]  Notwithstanding that

she lay soft aground, she was listing and the winds were gusting

in excess of 20 knots with two to three foot waves pushing her

toward the rocky shore albeit not taking in any water or in

danger of an imminent sinking.  (Tr. 1, p. 56).

Once Allen and then Moniz had hold of her, however, the

danger lessened.  <u>See</u> <u>The City of Portland v. Richards</u>, 298 F.

---

[41]  In assessing this factor, this court does not consider
the subsequent discovery of the absence of any structural or
other damage to the Lady Mazie as a result of the stranding.  <u>See</u>
<u>generally</u> 3A <u>Benedict on Admiralty</u> § 249 (2005) (discussing
effect of subsequent perils on assessment of danger to salved
vessel).  In any event, even considering this discovery, it would
not alter the amount of the salvage award.

27, 31 (5th Cir. 1924) (vessel "was not in great danger" inasmuch as "[t]he tugs which had hold of her could easily have saved her, as they did").  The existence of the incoming tide also bode well for lifting her off the ocean bottom.  The crew was not in peril. See <u>Taylor v. 42 Foot Egg Harbor Hull</u>, 1994 WL 779759 at * 11 (D.N.J. June 22, 1994) (noting there was "no indication that lives of the crew were in peril").  The availability of other aid nearby also lessens the danger faced by the Lady Mazie and thus tends to decrease the amount of a salvage award.  See <u>The Judith Lee Rose, Inc. v. The Clipper</u>, 169 F.Supp. 885, 888 (D.Mass. 1959) (noting "there were other persons prepared to furnish assistance, and there was no immediate danger" and adding only $500 salvage bonus to one day's gross earnings for towing); <u>see generally</u> 3A <u>Benedict on Admiralty</u> § 252 (2005) (discussing availability of aid and "well recognized rule" of awarding lower salvage amount where rescue takes place in harbor).  Hence, this factor supports a low salvage award.

New Bedford Marine additionally urges this court to "consider the harm to the environment that was likely to occur had [the Lady Mazie] sunk" and the "'skill and effort in preventing or minimizing damage to the environment.'"  (Docket Entry # 22, p. 5).  The relatively low risk of danger faced by the Lady Mazie evidences there was little, if any, potential harm posed to the environment.  The skill exhibited by Allen and Moniz

41

was not exemplary and the effort expended only slightly above average. Thus, although a number of courts outside this circuit consider the salvor's skill and effort in preventing or minimizing environmental damage, see Margate Shipping Co. v. M/V JA Orgeron, 143 F.3d at 988; Trico Marine Operators, Inc. v. Dow Chemical Co., 809 F.Supp. 440, 443 (E.D.La. 1992), even considering this factor it would not alter the award.

On balance and considering the foregoing factors, this court concludes that a salvage award in the amount of $80,000 is appropriate.[42] Such an award is significantly above the cost of the time and labor involved and serves as an adequate reward for rescuing the Lady Mazie from her distress.

Finally, there is no reason to reduce the award based upon any claimed negligence on the part of Allen and/or Moniz regarding the testing of the engines. In rejecting a similar argument, the court in Ocean Services aptly explained that:

> Proof of negligence requires a showing of a duty, a breach of the duty, proximate cause, and actual loss or damage resulting to the interests of another. The damages component of such negligence would be a depressed sale price of the salved "Asylum," such that defendants would have received less from the sale of the boat than they would have absent the negligence. But there can be no economic damage presumed here without proof that the ship was actually damaged as a result of the groundings.

Ocean Services Towing and Salvage, Inc. v. Brown, 810 F.Supp. at 1264. Here, as well, the Lady Mazie suffered no damage as a

---

[42] This award also takes into account New Bedford Marine's characteristic as a professional salvage service.

result of the grounding.

The complaint seeks interest and costs. As the prevailing party, New Bedford Marine is entitled to costs in accordance with 28 U.S.C. § 1920 and Rule 54(d), Fed. R. Civ. P. Prejudgment interest is generally the rule rather than the exception in admiralty salvage cases and the court has considerable discretion. Clifford v. M/V Islander, 846 F.2d 111, 113 (1st Cir. 1988). "'The general rule is that, although an admiralty court has discretion to grant or deny prejudgment interest, such interest should be granted absent peculiar circumstances.'" Taylor v. 42 Foot Egg Harbor Full, 1994 WL 779759 at *14 (D.N.J. June 22, 1994). This court finds no reason to depart from this general rule. New Bedford Marine is therefore also entitled to prejudgment interest.

A number of courts choose to award prejudgment interest from the date the salvage services were rendered. Taylor v. 42 Foot Egg Harbor Full, 1994 WL 779759 at *14 (D.N.J. June 22, 1994); Ocean Services Towage and Salvage, Inc. v. Brown, 810 F.Supp. at 1265; see also City of Boston v. SS Texaco Texas, 599 F.Supp. 1132, 1141-42 (D.Mass. 1984). The purpose underlying prejudgment interest is better served when calculating the interest from the date the salvage services were rendered.

The rate of prejudgment interest is that allowed by statute in the state where the court is located. 3A Benedict on

43

Admiralty § 305 (2005) ("rate of interest is that allowed by statute in the state where the court is located"); see also Taylor v. 42 Foot Egg Harbor Full, 1994 WL 779759 at *15 (D.N.J. June 22, 1994). Under Massachusetts law, the applicable percentage rate is 12% per annum. Mass. Gen. Laws ch. 231, § 6H. New Bedford Marine is therefore entitled to prejudgment interest at 12% per annum of the award amount of $80,000 from September 2, 2003 to April 20, 2006. Twelve percent of $80,000 is $9,600. The first two years therefore results in a prejudgment interest award of $19,200. There are 280 days from September 2, 2005 to April 20, 2006. Prejudgment interest accrued in a daily amount of $26.30 resulting in a total amount of $7,364 for 280 days. Accordingly, plaintiff is entitled to recover prejudgment interest in the total amount of $26,564.

## CONCLUSION

In accordance with the foregoing discussion, New Bedford Marine is entitled to a salvage award in the amount of $80,000 together with prejudgment interest in the amount of $26,564, costs under 28 U.S.C. § 1920 and Rule 54(d), Fed. R. Civ. P., and postjudgment interest under 28 U.S.C. § 1961.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

44